**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ISHYNIQUE MCCOY** | : | **CIVIL ACTION – LAW** |
| | : | |
| **v.** | : | |
| | : | |
| **T-MOBILE STORE, T-MOBILE USA,** | : | |
| **INC., APPLE, INC. and ASURION and** | : | |
| **CWORK SOLUTIONS, LP** | : | **NO: 2:18-CV-04079-AB** |
| | : | |
| **v.** | : | |
| | : | |
| **ATC LOGISTICS & ELECTRONICS,** | : | |
| **INC. d/b/a GENCO TECHNOLOGY** | : | |
| **SOLUTIONS d/b/a FEDEX SUPPLY** | : | |
| **CHAIN** | : | |

**RESPONSE OF THIRD-PARTY DEFENDANT, ATC LOGISTICS & ELECTRONICS,
INC. D/B/A GENCO TECHNOLOGY SOLUTIONS D/B/A FEDEX SUPPLY CHAIN, TO
THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, C-WORK
SOLUTIONS, L.P.**

Third-Party Defendant, ATC Logistics & Electronics, Inc. d/b/a GENCO Technology

Solutions d/b/a FedEx Supply Chain ("ATC"), by and through the undersigned counsel, files the

instant Response to the Motion for Summary Judgment of Defendant, C-Work Solutions, L.P.

("C-Work").

**PRELIMINARY STATEMENT**

On August 20, 2018, Plaintiff sued C-Work alleging various theories of negligence

relating to its interaction with an iPhone 6 Plus that purportedly exploded and caused injury to

Plaintiff. C-Work acknowledged that it provided certain device protection plans and services to

T-Mobile customers, including Plaintiff, but denied Plaintiff's claims of negligence against it.

On January 20, 2020, C-Work filed a Third-Party complaint pursuant to Federal Rule of Civil

Procedure 14(a)(1) asserting derivative claims against ATC for common law and contractual

indemnification and contribution based upon a Repair and Services Agreement it had with ATC

to perform certain repairs and refurbishing of mobile devices. ATC acknowledged having performed certain work on the subject phone seven months prior to the incident but denied C-Work's claims against it for contribution and indemnity.

C-Work now moves for summary judgment as to Plaintiff's claims, arguing, among other things, that Plaintiff failed to adduce any evidence of negligence on the part of C-Work and thus her claims must be dismissed.  ATC does not oppose the relief sought by C-Work. Plaintiff has failed to establish any evidence whatsoever to support her claims of alleged negligence against C-Work. As C-Work correctly points out, Plaintiff did not depose any representative from C-Work nor does her expert offer any opinions regarding C-Work's interaction with the phone. In fact, Plaintiff's expert readily acknowledged in his deposition that he was not asked to review any documents or materials from C-Work and he was unaware of C-Work's "exact role." *See* ECF No. 76-7.

While ATC is in agreement with C-Work regarding Plaintiff's inability to establish that C-Work was negligent, ATC specifically denies C-Work's conclusory assertion in its motion that the evidence of record demonstrates that ATC was negligent. Similar to Plaintiff's failure to develop any evidence to support her claim against C-Work, C-Work likewise failed to establish any evidence to support its third-party indemnification and contribution claims against ATC. For this reason, ATC also moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 and incorporates its arguments herein by reference. *See* ECF No. 76.

## SPECIFIC RESPONSES

## I.   PROCEDURAL POSTURE

1.   Admitted only that Plaintiff filed a lawsuit alleging that she was burned by an Apple iPhone 6 Plus.

2.   Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted only that ATC made certain repairs to the subject iPhone.

## II.   FACTS

6.      Denied.  ATC received the subject iPhone on December 30, 2015.  Certain repairs were performed on January 18, 2016.  The iPhone was sent back to C-Work on January 22, 2016. C-Work received the iPhone back from ATC on February 3, 2016, and then shipped it to Plaintiff's household on February 25, 2016.  *See* ECF No. 36. No evidence has been adduced to establish the condition of the iPhone at that time, and the record is devoid of evidence to show that the iPhone was defective when ATC delivered it to C-Work on January 22, 2016 – *7 months before the incident*.

7.      This paragraph references Plaintiff's Complaint, which is a writing that speaks for itself and, therefore, ATC denies any characterization of it.

8.      This paragraph references Plaintiff's Complaint, which is a writing that speaks for itself and, therefore, ATC denies any characterization of it.

9.      Admitted upon information and belief.

10.     Admitted upon information and belief.

11.     It is admitted only that ATC performed the following repairs on the subject iPhone with serial number 354387062506228:

- IPH6P-BATTADHESIVE (adhesive tape to secure battery in place);

- IPH6P-BATTERY;

- IPH6P-BCVR-SIL-REV02 (back cover);

- IPH6P-FRONTCAM;

- IPH6P-LCD-WHT;

- IPH6P-PWRDOCKCABLE-GRY (charging port).

12.     Denied.  ATC received the subject iPhone on December 30, 2015.  Certain repairs were performed on January 18, 2016.  The iPhone was sent back to CWork on January 22, 2016. C-Work received the iPhone back from ATC on February 3, 2016, and then shipped it to Plaintiff's household on February 25, 2016.  *See* ECF No. 36.   No evidence has been adduced to establish the condition of the iPhone at that time, and the record is devoid of evidence to show that the iPhone was defective when ATC delivered it to C-Work on January 22, 2016 – *7 months before the incident*.

To be sure, Plaintiff's expert, Jeffrey M. Kobilka, testified that, based upon his own inspection, the iPhone had an Apple battery.  *See* Exhibit "A," Deposition Transcript of Jeffrey M. Kobilka, at 95.  But, the batteries supplied by ATC were not Apple manufactured batteries, which indicates that the iPhone was worked on by another unknown person or entity in the 7 months after ATC performed its repairs.  *See* Exhibit "B," ATC's Initial Disclosures.  No evidence has been adduced to explain why the iPhone had an Apple battery when ATC did not use Apple manufactured batteries.

13.     Admitted.

14.     This paragraph references the expert report of Mr. Kobilka, which is a writing that speaks for itself and, therefore, ATC denies any characterization of it.

15.     This paragraph references the expert report of Mr. Kobilka, which is a writing that speaks for itself and, therefore, ATC denies any characterization of it.

16.     This paragraph references the expert report and deposition transcript of Mr. Kobilka, which are writings that speaks for themselves and, therefore, ATC denies any characterization of them.

17.     Admitted.

18.    Admitted.

19.    Admitted.

**III.    <u>ARGUMENT</u>**

20.    This paragraph consists of legal conclusions requiring no response.

21.    This paragraph consists of legal conclusions requiring no response.

22.    This paragraph consists of legal conclusions requiring no response.

23.    Admitted.

24.    This paragraph references the expert report of Mr. Kobilka, which is a writing that speaks for itself and, therefore, ATC denies any characterization of it.

25.    Denied.  C-Work has adduced no evidence demonstrating that ATC was negligent.  Neither C-Work nor Plaintiff has deposed any representative of ATC.  Instead, at the close of discovery, Plaintiff produced an expert report from Mr. Kobilka that attributed the incident to a "defective refurbishment" performed by ATC.  *See* Ex. A, Kobilka Transcript, at 93.  But, the record is devoid of evidence to show that the subject iPhone was defective when ATC delivered it to C-Work on January 22, 2016 – *7 months before the incident*.  No evidence has been adduced to establish the condition of the iPhone on January 22, 2016.

Mr. Kobilka did not review any materials relative to the work actually performed on the iPhone or any materials relating to ATC's inspection or quality control processes.  *Id.* at 37-38.  Likewise, no evidence has been adduced to show how C-Work handled the iPhone before it was sent to Plaintiff.   *Id.* at 40-42.

Mr. Kobilka further testified that, based upon his own inspection, the iPhone had an Apple battery.  *Id.* at 95.  But, the batteries supplied by ATC were not Apple manufactured batteries, which indicates that the iPhone was worked on by another unknown person or entity in the 7 months after ATC performed its repairs.  *See* Ex. B, ATC Initial Disclosures.  No evidence

has been adduced to explain why the iPhone had an Apple battery when ATC did not use Apple manufactured batteries.

Thus, no evidence has been adduced to eliminate the possibility of the iPhone being modified or damaged between its delivery to C-Work on January 22, 2016, and the incident at issue that occurred seven months later.  *See Baylis v. Red Lion Grp., Inc*., 214 F. App'x 193, 196 (3d Cir. 2007) (affirming grant of summary judgment to defendant where plaintiff "did not eliminate the possibility of damage during the time between the extinguisher's delivery, and its alleged malfunction.").  This is fatal to any negligence claim against ATC.

26.    Admitted.

27.    ATC does not oppose the relief sought by C-Work. ATC incorporates its Motion for Summary Judgment, at ECF No. 76, herein by reference and asserts in the event C-Work is dismissed it is likewise entitled to summary judgment as a matter of law.

28.    ATC does not oppose the relief sought by C-Work. ATC incorporates its Motion for Summary Judgment, at ECF No. 76, herein by reference and asserts in the event C-Work is dismissed it is likewise entitled to summary judgment as a matter of law.

**MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**

By:    */s/ Robert W. Stanko, Esquire*
       Robert W. Stanko, Esquire
       Andrew C. Goldstein, Esquire
       Attorneys for Third-Party Defendant,
       ATC Logistics & Electronics, Inc.
       d/b/a GENCO Technology Solutions
       d/b/a FedEx Supply Chain

Dated: February 1, 2022

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a true and correct copy of the foregoing Response of Third-Party Defendant, ATC Logistics & Electronics, Inc. d/b/a GENCO Technology Solutions d/b/a FedEx Supply Chain, to the Motion for Summary Judgment of Defendant, C-Work Solutions, L.P., was served via the Court's CM/ECF system, which sends notification to all counsel of record upon filing:

Frank A. Rothermel Esquire
Patricia K. Denham, Esquire
Bernhardt, Rothermel & Siegel
1515 Market Street
Philadelphia, PA 19102

J. Mark Pecci II, Esquire
MARKS, O'NEILL, O'BRIEN,
DOHERTY & KELLY, P.C.
One Penn Center
1617 JFK Boulevard, Suite 1010
Philadelphia, PA 19103

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN

By:    */s/ Robert W. Stanko, Esquire*
Robert W. Stanko, Esquire
Andrew C. Goldstein, Esquire
Attorneys for Third-Party Defendant,
ATC Logistics & Electronics, Inc.
d/b/a GENCO Technology Solutions
d/b/a FedEx Supply Chain

Dated: <u>February 1, 2022</u>

# EXHIBIT "A"

Jeffrey Kobilka, PE, CFEI
December 16, 2021

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ISHYNIQUE MCCOY                    :CIVIL ACTION - LAW
                                   :NO: 2:18-CV-04079-AB
                                   :
                                   :
     -vs.-                         :
                                   :
T-MOBILE STORE, T-MOBILE USA, INC.,:
APPLE, INC. and ASURION and CWORK  :
SOLUTIONS, LP                      :
                                   :
     -vs.-                         :
                                   :
ATC LOGISTICS & ELECTRONICS, INC.  :
d/b/a GENCO TECHNOLOGY SOLUTIONS   :
d/b/a FEDEX SUPPLY CHAIN           :



                    DECEMBER 16, 2021




            TELECONFERENCE DEPOSITION OF JEFFREY M. KOBILKA,

PE, CFEI, held via remote teleconference hosted by U.S.

Legal Support, located at 1818 Market Street, Suite 1400,

Philadelphia, Pennsylvania, on Thursday, December 16,

2021, at 1:10 p.m., before Michelle Keys, a Stenographer

and Notary Public of the Commonwealth of Pennsylvania.

Jeffrey Kobilka, PE, CFEI
December 16, 2021

---

Page 2

```
1   REMOTE APPEARANCES:
2   ON BEHALF OF PLAINTIFF:
3   BERNHARDT, ROTHERMEL & SIEGEL
    BY:  FRANK A. ROTHERMEL, ESQUIRE
4   1515 Market Street, Suite 1540
    Philadelphia, Pennsylvania 19102
5   No email provided
    (215) 568-0100
6
7   ON BEHALF OF THIRD-PARTY DEFENDANT ATC LOGISTICS &
    ELECTRONICS, INC. d/b/a GENCO TECHNOLOGY SOLUTIONS d/b/a
8   FEDEX SUPPLY CHAIN:
9   MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, P.C.
    BY:  ROBERT W. STANKO, ESQUIRE
10  2000 Market Street, Suite 2300
    Philadelphia, Pennsylvania 19103
11  rwstanko@mdwcg.com
    (215) 575-2807
12
13  ON BEHALF OF DEFENDANT CWORK SOLUTIONS, LP:
14  MARKS O'NEILL O'BRIEN DOHERTY KELLY
    BY:  ERICA C. JOHNSON, ESQUIRE
15  One Penn Center
    1617 John F. Kennedy Boulevard, Suite 1010
16  Philadelphia, Pennsylvania 19103
    ejohnson@moodklaw.com
17  (215) 832-4246
18
19
20
21
22
23
24
25
```

---

Page 4

```
1                      EXHIBITS
2   EXHIBIT         DESCRIPTION                PAGE
3
    Kobilka 1       Curriculum Vitae of        32
4
                    Jeffrey M. Kobilka
5
    Kobilka 2       Report of Jeffrey          32
6   M.
                    Kobilka
7
8
9
10       QUESTIONS INSTRUCTED NOT TO ANSWER
11  Q.    Let's say you had the opportunity to inspect
12  the charger and you came to the conclusion that it
13  was not a properly calibrated charger to the battery
14  that was in the iPhone, could it cause an overcharge
15  in that situation?
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
1                      INDEX
2   WITNESS:                         PAGE
3   JEFFREY M. KOBILKA, PE, CFEI       6
4
5
6   EXAMINATION
7   BY MR. STANKO                      6
    BY MS. JOHNSON                    96
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 5

```
1             (It is hereby stipulated and agreed
2        by and between counsel for the respective
3        parties that sealing, certification, and
4        filing are waived; and that all
5        objections, except as to the form of the
6        question, are reserved until the time of
7        trial.)
8                      -  -  -
9             THE STENOGRAPHER:  The attorneys
10       participating in this deposition
11       acknowledge that I am not physically
12       present in the deposition room and that I
13       will be reporting this deposition
14       remotely.  They further acknowledge that,
15       in lieu of an oath administered in person,
16       the witness will verbally declare his/her
17       testimony in this matter is under penalty
18       of perjury.  The parties and their counsel
19       consent to this arrangement and waive any
20       objections to this manner of reporting.
21            Attorneys, please indicate your name
22       and your agreement on the record.
23            MR. ROTHERMEL:  Okay.
24       Frank Rothermel, and I represent the
25       plaintiff, Ishynique McCoy.
```

---

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 6

1          MR. STANKO:  Robert Stanko, I
2     represent FedEx Supply Chain.
3          MS. JOHNSON:  Erica Johnson
4     representing CWork Solutions LP, and I
5     agree.
6               - - -
7          JEFFREY M. KOBILKA, PE, CFEI,
8      after having been first duly sworn,
9      was examined and testified as follows:
10              - - -
11         THE STENOGRAPHER:  Thank you.
12     You may proceed.
13         MR. STANKO:  Thank you.
14              - - -
15       E X A M I N A T I O N
16              - - -
17  BY MR. STANKO:
18  Q.    Mr. Kobilka, first and foremost, am I
19  pronouncing that correctly?
20  A.    Yes, you are.
21  Q.    Great.  Thank you.
22          As you just heard, my name is
23  Robert Stanko.  And I represent a company by the
24  name of FedEx Supply Chain.  There's been different
25  iterations of FedEx -- of my client's name in this

Page 7

1   case.  As far as what it was called when it
2   interacted with the subject iPhone in this case, it
3   was known as ATC Logistics, it was doing business as
4   Genco.  Before we proceed any further, I just want
5   to make clear for the record that I'll be referring
6   to them as "FedEx Supply Chain," but that is who I
7   represent.
8           We're here today, obviously, as you
9   very well know, to take your deposition in
10  connection with some work you did in this case that
11  was filed by Ishynique McCoy.
12          Have you ever had your deposition
13  taken before?
14  A.    Yes.
15  Q.    Okay.  I assume that's within your line of
16  work as an expert witness?
17  A.    As a forensic engineer, yes, it's within my
18  line of work.
19  Q.    Okay.  Could you estimate for me how many
20  times you've sat for a deposition?
21  A.    I'd say about ten times.
22  Q.    Okay.  So you're well aware of the procedure
23  here.
24          Have you sat for a deposition over a
25  video platform like we're doing here?

Page 8

1   A.    I have.
2   Q.    Okay.  So just as we experienced about
3   five minutes ago prior to jumping on the record, we
4   can get into some technological difficulties here
5   with this format.  Although you and Mr. Rothermel
6   are sitting in the same room; both me and
7   codefendant counsel, Ms. Johnson, are in different
8   places; and, obviously, the court reporter is in a
9   different place as well.
10          I think we managed those technical
11  difficulties quite well here.  We've got you guys
12  calling in on a different line.  I can hear you just
13  fine, and I believe you can hear me just fine.  But
14  I'd ask for your patience as we proceed here.  You
15  know, just in case we encounter any other technical
16  difficulties please speak up if you have any trouble
17  hearing me; I will absolutely speak up if I have any
18  trouble hearing you.  But it's obviously very
19  important for today's proceedings, not only that
20  they go well, but that they -- that we create an
21  accurate record here that we both understand one
22  another.
23          Are we good so far?
24  A.    Yes.
25  Q.    Okay.  Again, I know you sat for

Page 9

1   approximately ten depositions, so you know that this
2   is nothing but a question-and-answer period.
3   Obviously with the very large qualifier that you're
4   under oath.  Okay?
5           By no means are my questions today
6   intended to confuse you or trick you in any way.
7   I'm here today to ask you questions to learn more
8   information about what you did with respect to this
9   case, the opinions that you reached, and maybe also
10  a little bit about your qualifications generally
11  because they may bear upon the opinions that you
12  have rendered here.
13          All that said, it's important that if
14  you don't understand my question, if I'm confusing,
15  if I ask an inarticulate question, which I can do
16  sometimes, I'm sure Mr. Rothermel, who is sitting
17  with you, will jump at the opportunity to object,
18  and that's fine.  That is a perfectly normal
19  occurrence in these situations.
20          But I would ask that if you do
21  understand it and Mr. Rothermel does not object or
22  ask for any kind of clarification, that you do that.
23  Okay?
24          Again, that's because I'm not trying
25  to trick you.  I'm not trying to slip one by you

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 10

1  here.  If you answer a question, I'm going to assume
2  you understood the question and you're answering it
3  to the best of your ability.
4           Okay?
5  A.     Understood.
6  Q.     Gotcha.
7           I don't expect to be terribly long
8  here, but if you need to take a break, by all means,
9  let me know and I'll absolutely accommodate that.
10          And obviously anybody else -- the
11  court reporter, Ms. Johnson -- please speak up if a
12  comfort break is needed or a break of any other
13  nature.
14          All right.  Mr. Kobilka, could you
15  please state your name for the record?
16  A.     Jeffrey Kobilka.
17  Q.     Okay.  Do you have a middle initial?
18  A.     M. Martin.
19  Q.     Okay.  And, Mr. Kobilka, who are you employed
20  by?
21  A.     I'm employed by Robson Forensic.
22  Q.     And were you retained as an expert witness in
23  the matter of Ishynique McCoy v. T-Mobile, et al.?
24  A.     Yes.
25  Q.     And were retained by Ms. McCoy?

Page 11

1  A.     I was retained by plaintiff's counsel.
2  Q.     Okay.  So you were retained by the attorney
3  representing Ms. McCoy?
4  A.     Correct.
5  Q.     Okay.
6  A.     Yeah.
7  Q.     I did not receive a -- a CV from
8  Mr. Rothermel, but I took it upon myself to go on
9  Robson Forensic's website where you are listed as
10  one of their employees.
11          Is your CV, that's downloadable on
12  your profile page, is that an accurate and
13  up-to-date CV?
14  A.     I believe it is.
15  Q.     Okay.
16          MR. ROTHERMEL:  My apologies too for
17          that.  I don't know.  It's routinely
18          included.  I'm not sure why it wasn't
19          here.
20          MR. STANKO:  That's no problem.
21  BY MR. STANKO:
22  Q.     The date on the CV that -- that I downloaded
23  from Robson's website is May 14, 2020.
24          Does that help?
25  A.     Yes, I have a copy of my CV in front of me

Page 12

1  with the same date.
2  Q.     Same date?
3  A.     Yes.
4  Q.     Great.
5           Okay.  Mr. Kobilka, why don't you
6  tell me where you went to school?
7  A.     I went to Pennsylvania State University.
8  Q.     And I see you majored -- you have a bachelor
9  of science in electrical engineering?
10  A.     That's correct.
11  Q.     And you graduated in 2005?
12  A.     Yes, I did.
13  Q.     Did you obtain any further degrees, like a
14  master's degree, PhD, anything of that nature?
15  A.     No.
16  Q.     Did you join the workforce immediately after
17  college?
18  A.     Yes, I did.
19  Q.     And what did you do?
20  A.     After college, I worked for Keystone
21  Engineering Group as project -- project engineer,
22  automation and electrical design.
23  Q.     Okay.  And how long did you hold that
24  position?
25  A.     I worked for Keystone Engineering Group until

Page 13

1  2013, so about seven years.
2  Q.     And did that -- well, what did that job
3  entail?
4  A.     Some of the responsibilities included in that
5  job included -- because I'm the supervisory control
6  and data acquisition systems -- water and wastewater
7  PLC and HMI programming, troubleshooting electrical
8  systems, power distribution design, lighting design,
9  creation of specifications, design drawings and
10  wiring schematics, control system programming,
11  project startup and implementation, commissioning of
12  programmable logic controllers and variable
13  frequency drives, communications equipment, sensors
14  and electrical devices.
15          Construction management, maintenance
16  and troubleshooting of failed electrical circuits,
17  including power, communications, control, and
18  feedback signals.  Further troubleshooting of PLC
19  code and analysis of systems where electrical
20  equipment had failed.
21  Q.     You seem to be reading from something.
22          Are you reading from your CV?
23  A.     As I stated, I -- I do have my CV in front of
24  me.  I paraphrased from the CV.
25  Q.     Okay.  Did any of what you just described

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 14

1  involve assessment or evaluation of failure of a
2  lithium-ion polymer battery?
3  A.     While I did analyze failed electrical
4  equipment, failed electronics, these systems did not
5  involve lithium-ion batteries.
6  Q.     Where did you go after leaving there in 2013?
7  A.     After Keystone Engineering Group, I worked at
8  the Naval Surface Warfare Center, Philadelphia
9  division.
10  Q.     And describe what you did there.
11  A.     At NSWC, I was the lead system engineer and
12  software lead.  The position had multiple
13  responsibilities, including on the acquisition side,
14  which is before a ship is owned by the Navy,
15  provided engineering oversight and support for the
16  machinery plant control and monitoring system for
17  the LCS Freedom variant.  That system had control of
18  all noncombat-shipboard machinery.
19         On the in-service side, in support of
20  in service, which is owned by the Navy, LCS Freedom
21  ships, I did software development, as well as system
22  troubleshooting, maintenance, repair, replacement of
23  equipment, developed safety hazard analysis to
24  analyze risk and -- and mitigate risks for changes
25  that were made.  And developed procedures for

Page 15

1  maintenance and safety.
2  Q.     And you held that job for approximately
3  three years?
4  A.     Yes.  Additionally, this -- this should be --
5  should be updated to demonstrate that I -- I
6  currently do work in a limited part-time capacity
7  for NSWCPD through a defense contractor.
8  Q.     The time in which you've done work for
9  NSWCPD, the three years listed on your -- your CV,
10  and also the continued work you're doing as a
11  defense contractor, did any of that work involve
12  analysis of failures within lithium-ion polymer
13  batteries?
14  A.     While there were certainly troubleshooting
15  failures of electrical circuits and electronics, the
16  equipment being analyzed was not lithium-ion polymer
17  batteries.
18  Q.     Okay.  Is that a "no"?
19  A.     The equipment being analyzed was not
20  lithium-ion polymer batteries.
21  Q.     Okay.
22  A.     Other electrical equipment.
23  Q.     Okay.  Now, I know you just described
24  continuing to do some work as a defense contractor
25  for Naval Surface Warfare Center.

Page 16

1  Q.     Is that in your capacity with Robson,
2  or is that separate and apart from your role --
3  current role with Robson?
4  A.     That's separate.
5  Q.     Okay.  Is -- do you have another employer
6  other than Robson?
7  A.     GreenXT Technologies was the contracting
8  company that I'm working with.
9  Q.     Say that one more time.  GreenXT
10  Technologies?
11  A.     Correct.
12  Q.     And I don't see that on your CV.  That's not
13  on your CV, correct?
14  A.     That's correct.  Which is why I brought it to
15  your attention verbally.
16  Q.     Okay.  When did you start doing work for
17  GreenXT Technologies?
18  A.     I don't recall the exact date, but it has
19  come in and out with certain -- certain types of
20  work on different programs.
21  Q.     Okay.  Does any of the work that you do for
22  GreenXT Technologies involve analysis of failures
23  within lithium-ion polymer batteries?
24  A.     The work I do with GreenXT is similar to the
25  work listed on my CV and is not related to

Page 17

1  lithium-ion polymer batteries.
2  Q.     Any of these roles or jobs that you've held
3  that you've described to me here, before we get to
4  Robson Forensic, did any of these prior employments
5  or current employments, as is the case with GreenXT
6  Technologies, did any of these prior roles involve
7  assessments of thermal runaways within a cell phone?
8  A.     They did not.
9  Q.     Okay.  So you joined Robson Forensics in
10  2016.
11         Do you remember what month you
12  joined?
13  A.     I believe it was October.
14  Q.     And describe for me what you do for
15  Robson Forensics.
16  A.     I provide technical investigations, analysis,
17  reports, and testimony for the resolution of
18  commercial and personal injury litigation involving
19  design, implementation, programming, operation,
20  maintenance, and failure analysis of electrical
21  systems and related equipment.
22  Q.     So I'm following along with your CV.
23  That's -- that's literally word for word what's
24  written on your CV.
25         Can you describe for me in your own

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 18

1  words, or without reading the -- the content of your
2  CV, what it is you do for Robson Forensics more
3  specifically?
4  A.    Well, I read that paragraph because I think
5  it accurately describes what it is that I do in my
6  employment with Robson Forensics.  I'm an electrical
7  engineer who investigates matters and provides
8  technical investigation of matters related to
9  electrical engineering.
10  Q.    So you've been with Robson just over
11  five years.
12        Could you estimate for me how many
13  matters that you've investigated or been involved
14  with in your time with Robson?
15  A.    I can't.  I don't know.
16  Q.    Do you know if it's more than 50?
17  A.    I would -- I would -- I don't like to guess.
18  I do believe it's more than 50.  But like I said, I
19  don't have -- I don't have a list in front of me or
20  any count that I can give an accurate estimate on.
21  Q.    The matters that you investigate, do they
22  all -- do they all result in you authoring a report,
23  as you did with respect to the work you did in this
24  case?
25  A.    I do not write a report for every matter that

Page 19

1  I'm involved in.
2  Q.    Okay.  So there's certain matters where
3  you'll do some work, but not reduce any of that work
4  to a written report?
5  A.    Reports are not always requested or required
6  by the client.
7  Q.    I understand you're approximating when you
8  say that the matters you've been involved with for
9  the five-year time you've been at Robson may be in
10  excess of 50.  I understand that's an approximation.
11        Do you know if there -- if you've
12  been involved in more than a 100 matters in your
13  time during Robson?  And, again, I understand this
14  is an approximation.  I'm not asking you for a
15  specific number.
16  A.    I -- I don't -- I don't have a number that I
17  can give you that would be accurate enough for me to
18  speak of here.
19  Q.    When you conduct an investigation or work on
20  a particular matter with -- with Robson, is there a
21  peer-review process in place?
22        Do you know what I mean by that,
23  "peer-review process"?
24  A.    I do.  And -- and, yes.  At Robson Forensic,
25  a peer reviewer will always review work product that

Page 20

1  leaves Robson Forensic.
2  Q.    I may be guilty of jumping around a little
3  bit here, but I don't see any indication who
4  conducted a peer review with regard to the report
5  you authored in this case.
6        Could you identify for me who it is
7  that conducted the peer review here?
8  A.    Daryl Ebersole, PE, CFEI.
9  Q.    When you first joined Robson, did you -- were
10  you immediately working on matters by yourself, or
11  was there any kind of period where you were trained
12  or brought along with another representative of
13  Robson?
14  A.    I certainly worked investigations and -- and
15  took cases after I began working at Robson Forensic,
16  but I -- I -- I do recall that I had accompanied
17  other engineers on their investigations.
18  Q.    We keep -- we keep using the term
19  "investigations."
20        Would you describe or elaborate what
21  that term means to you?
22  A.    An investigation is -- you know, you have
23  a -- a stated purpose, a scope, which may be, such
24  as in this case, to make a determination as to the
25  cause of the explosion thermal runaway event.  From

Page 21

1  that point, you gather information, essentially
2  follow a scientific method to reach a conclusion.
3  And that -- that will involve reading depositions,
4  witness statements, and documents produced by the
5  various parties within the litigation.  And in
6  addition to, it may also involve site inspections or
7  evidence examinations.
8  Q.    You mentioned working on cases.  And that's
9  also included in your CV that you provided testimony
10  "toward the resolution of commercial and personal
11  injury litigation."
12        Do you keep any records of the -- you
13  or Robson keep any records of the percentage of work
14  you do on behalf of defendants in litigation versus
15  plaintiffs?
16  A.    I don't have any such record.  I'm not aware
17  that any record such as that exists either.
18  Q.    I apologize.  I cut you off and then I
19  couldn't hear you.
20  A.    I said -- well, you asked if Robson does, and
21  my answer is I'm not aware if such a record exists.
22  Q.    Do you personally keep those records?
23  A.    No.
24  Q.    Okay.  So you can't tell me one way or the
25  other how many times you testified on behalf of a

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 22

1   plaintiff versus a defendant?
2   A.      Specifically, no.
3   Q.      Okay.  Could you approximate that percentage
4   for me?
5   A.      Is your question how many times I've
6   testified?
7   Q.      That's a very good question by you.  Poorly
8   articulated question by me.  That was my question,
9   but I would like to broaden that actually, and ask
10  you, the work you performed, the investigations that
11  you've conducted on behalf of individuals who have
12  retained you.
13          Could you estimate for me the
14  percentage of which of those individuals were on the
15  plaintiff's side of litigation versus defense side
16  of litigation?
17  A.      I would say it's slightly on the side of
18  plaintiffs.  Maybe 60/40, 65/35, somewhere in that
19  range.  Again, that is a -- is an estimate and I'm
20  not deriving that from any specific information.
21  Q.      Thank you.  I understand that.
22          You mentioned earlier that you
23  testified -- you sat for a deposition.
24          Have you testified in a courtroom
25  setting in a trial?

Page 23

1   A.      I have.  I testified, yes, two times in front
2   of a judge.
3   Q.      Okay.  And do you recall whether those two
4   times you testified in front of a judge, was there a
5   jury there?
6   A.      No, neither time was there a jury.
7   Q.      Okay.  Do you recall whether your testimony
8   was offered on behalf of the plaintiff or a
9   defendant on those two occasions?
10  A.      In one case, it was on behalf of a defendant.
11  In the other, it was a plaintiff in a lithium-ion
12  battery explosion.
13  Q.      Okay.  And did that case involve a phone?
14  A.      It was a cylindrical cell.  No.  Short
15  answer, no.
16  Q.      Okay.  So it was a lithium-ion battery in
17  some other device?
18  A.      Correct.
19  Q.      Okay.  What about the ten times that you sat
20  for a deposition, do you recall testifying on behalf
21  of the plaintiff or a defendant in those ten
22  instances?
23  A.      I don't recall the exact, but -- but, yeah, I
24  think it's similar to the split of the estimate I
25  gave before.

Page 24

1   Q.      Okay.  So you just referenced one -- one
2   instance where you offered testimony regarding a
3   lithium-ion battery.
4           In your -- in your five years with
5   Robson, other than that -- that matter that you just
6   described, was -- were any of the other matters that
7   you've worked on in the five years, did they involve
8   alleged failures or thermal runaways in lithium-ion
9   batteries?
10  A.      Yes.  Other investigations I conducted have
11  involved lithium-ion battery cells.
12  Q.      Okay.  Could you estimate for me how many
13  investigations you've conducted with Robson Forensic
14  regarding lithium-ion batteries?
15  A.      While I couldn't name them offhand, and,
16  again, this is an estimate, I would say at least 15,
17  probably more than that.
18  Q.      Did any of those 15 or probably more than
19  that investigations conducted by yourself regarding
20  lithium-ion batteries involve a cell phone?
21  A.      Yes.
22  Q.      How many of those 15 involved a cell phone?
23  A.      At least half a dozen, six or so.
24  Q.      Did any of those half a dozen involve an
25  iPhone 6 Plus?

Page 25

1   A.      There was a case that involved an iPhone 6
2   Plus.  I don't recall if that was the 6s or the
3   6s -- if it's a 6 Plus or a 6s Plus, but it was
4   around that generation.
5   Q.      I'm sorry.  I missed that last part.
6   A.      It was a 6.  I don't recall the additional
7   modifiers, exactly.
8   Q.      Okay.  Did any of those other half a dozen
9   cases that you testified regarding a lithium-ion
10  battery in a cell phone involve another model
11  iPhone?
12  A.      There have been other model iPhones.  I don't
13  recall each model of iPhone that I've examined and
14  investigated.
15  Q.      Okay.  Could you estimate of the six that
16  you've testified -- or that you've investigated
17  regarding lithium-ion batteries in the cell phone,
18  how many of those involved an iPhone, whether it be
19  a 6 or another model?
20  A.      An estimate, four or five.
21  Q.      Okay.  And in those -- so four or five cases
22  that you've conducted an investigation that have
23  involved an iPhone, would you name those cases for
24  me?
25  A.      No, I could not.

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 26

1  Q.    Okay.  Is that information available at
2  Robson Forensic?
3  A.    I think you could ask.
4  Q.    Do you know if that information is available?
5  A.    I do not believe that's publicly available
6  information through Robson Forensic.
7  Q.    No, I understand it may not be publicly
8  available.
9              But my question is, do you know
10 whether they have that information regarding the
11 cases that you've conducted an investigation
12 regarding a lithium-ion battery in an iPhone?
13 A.    I believe so.
14 Q.    Okay.  The -- the investigation that you
15 conducted regarding the iPhone 6, and I understand
16 you're not sure whether it was Plus or not, did that
17 involve a lithium-ion battery thermal runaway event?
18 A.    Yes, it did.
19 Q.    Okay.  Who were you retained by in that
20 matter?
21 A.    Plaintiff's counsel.
22 Q.    And did you reach a conclusion regarding the
23 cause of the thermal runaway event in that matter?
24 A.    I did.
25 Q.    And what was your conclusion?

Page 27

1  A.    The -- the specifics of other investigations
2  are not pertinent to this one and our work is
3  confidential between Robson Forensic and -- and the
4  client.  So I'm not going to go into details of
5  those investigations, other than to state that I --
6  that I have investigated such matters.
7  Q.    Well, I have to say I disagree that the
8  conclusions that you've reached after examining an
9  iPhone and reaching a conclusion as to a thermal
10 runaway event regarding the battery that is within
11 that iPhone, I disagree that that's not pertinent to
12 your opinions here, but I can take that up with
13 Mr. Rothermel.
14             The four or five other cases that
15 you've described conducting investigation regarding
16 a thermal event within an iPhone, who were you
17 retained by in each of those cases?
18 A.    Plaintiff's counsel.
19 Q.    So in 100 percent of the cases that you have
20 been retained to examine a thermal runaway event in
21 a cell phone, you've been retained by the
22 plaintiff's counsel?
23 A.    To the best of my recollection, yeah.
24 Q.    Did you author a report in those four or five
25 other cases regarding your analysis of the iPhone or

Page 28

1  the battery therein?
2  A.    I believe in some of them I did and some of
3  them I did not.
4  Q.    Could you tell me how many of the five you
5  authored a report?
6  A.    I don't recall.
7  Q.    In any of these five, did you offer
8  deposition testimony or trial testimony?
9  A.    I don't believe so.
10 Q.    Okay.  You mentioned previously that you
11 testified in front of a judge.  I believe you
12 mentioned that you had testified in front of a judge
13 regarding a -- an iPhone battery case.
14             Is that -- am I misremembering that
15 or am I -- or --
16 A.    You are misremembering that.
17 Q.    Okay.  So you've never offered testimony
18 regarding a battery thermal event in an iPhone,
19 whether it be deposition or trial testimony?
20 A.    I -- I don't recall without the list in front
21 of me, if those cases went to deposition or -- or
22 trial.  Not -- they didn't go to trial.  I don't
23 recall if they went to deposition.
24 Q.    Okay.  I'm just going to note for the record
25 the rules require that I be provided with a list of

Page 29

1  all cases that you've provided testimony and I've
2  not received that list prior to today.
3              So I'm going to make a request on the
4  record that that list be provided to me.  And I'll
5  reserve the right to call you back to take another
6  deposition once that -- once that list is provided.
7              MR. ROTHERMEL:  Did you provide me a
8  list of your experts, just clarification?
9  Was that ever included?
10             MR. STANKO:  I mean, that's -- that's
11 neither here nor there, but, yes.
12             MR. ROTHERMEL:  Okay.  You did
13 provide it?
14             MR. STANKO:  Yes, sir.
15             MR. ROTHERMEL:  I don't remember
16 receiving it, so was it in -- when did you
17 provide that?
18             MR. STANKO:  I provided it with my
19 expert report in accordance with the
20 court's deadlines on October 29th.
21             MR. ROTHERMEL:  Okay.  Thank you.
22 Thank you.
23             MR. STANKO:  You're welcome.
24 BY MR. STANKO:
25 Q.    Mr. Kobilka, of the five matters that we've

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 30

1  discussed here that you conducted investigation into
2  an issue with a battery in an iPhone, did all five
3  of those predate your -- the subject incident that
4  we've -- that we're here today to discuss, which I
5  believe is July 17, 2016?
6  A.    This investigation is the most recent iPhone
7  investigation that I have conducted.
8  Q.    The most recent investigation, I understand
9  that.  Thank you.
10         How about the actual incident?
11  A.    I don't recall incident -- the incident
12  dates --
13  Q.    Okay.
14  A.    -- of the other incidents.
15  Q.    And -- and just so we're clear, the reason
16  I'm asking this is, you know, this is an incident
17  that dates back to July of 2016.  I don't know when
18  you were retained here to -- to do the work that you
19  were asked to do in this case and obviously that can
20  differ based on when events occur.
21         Do we agree on that?
22  A.    We agree --
23  Q.    Do you get what I'm saying?
24  A.    I'm unclear as to the question.
25  Q.    You're telling me that this investigation

Page 31

1  that you conducted is the most recent.
2         What I'm asking you is that doesn't
3  mean that the incident involved in this
4  investigation was also the most recent?
5  A.    It does not mean that and that was not the
6  intent of my statement.  And I'm not making a
7  statement to that effect.
8  Q.    Nor was it mine, and that's why I want to
9  just get -- get a clear and accurate record.  Okay.
10         So on that note, getting a clear and
11  accurate record, is it my understanding that you are
12  unwilling to provide any information regarding the
13  opinions and conclusions you reached relative to the
14  other five investigations you conducted regarding
15  lithium-ion battery in iPhones?
16  A.    Yes.  And I -- again, the repetition of -- of
17  five, I just want to reiterate, that that was an
18  estimate.
19  Q.    Okay.  But you're unwilling to provide any
20  further testimony regarding opinions you reached
21  relative to those matters, whether it's five or a
22  number around five?
23  A.    Correct.
24  Q.    Okay.  Mr. Kobilka, do you have your report
25  in front of you?

Page 32

1  A.    I do.
2         MR. STANKO:  Actually, you know what?
3      Before we go any further, Ms. Keys, I
4      would just like to -- to mark
5      Mr. Kobilka's CV, which I can send you a
6      copy of as -- as Kobilka 1.
7              - - -
8         (Whereupon, Exhibit Kobilka 1 was
9      marked for identification.)
10             - - -
11  BY MR. STANKO:
12  Q.    All right.  Mr. Kobilka, do you have your
13  report in front of you here?
14  A.    I do.
15         MR. STANKO:  Okay.  And we're going
16      to attach this as Kobilka 2.
17             - - -
18         (Whereupon, Exhibit Kobilka 2 was
19      marked for identification.)
20             - - -
21  BY MR. STANKO:
22  Q.    All right.  Mr. Kobilka, the first page of
23  your report, it states "Prepared by Jeffrey M.
24  Kobilka, November 4, 2021."
25         Do you see that?

Page 33

1  A.    I do.
2  Q.    Okay.  And is that the date that you prepared
3  this report?
4  A.    Yes.  Yes.
5  Q.    Okay.  I'm going to ask you to turn the page.
6         Now, we've already talked about the
7  fact that you were retained by the attorney for
8  Ms. McCoy.  Would it be accurate to say that you
9  were retained to review materials and offer opinions
10  on behalf of Ms. McCoy?
11  A.    I was retained to conduct an investigation.
12  Q.    Okay.  And were you not retained to offer an
13  opinion on behalf of Ms. McCoy?
14  A.    I was retained to conduct an investigation to
15  make a determination as to the cause of the
16  explosion which injured Ms. McCoy.
17  Q.    Okay.  To make a determination as to the
18  cause, would that be asking you to reach an opinion?
19  A.    As a part of my investigation, I may reach an
20  opinion.  But that's not the same thing as being
21  retained to make an opinion.
22  Q.    Okay.  The top of page 1 of your report,
23  could you read for me what it says at the top there?
24  A.    It says "Fieldman Incident."
25  Q.    What is the "Fieldman Incident"?

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 34

1  A.    That is the name of a report that the
2  template that I -- that I use.  It is of no bearing
3  on this incident.
4  Q.    Okay.  So you used -- you use a template to
5  author your reports?
6  A.    I take previous reports that I've written to
7  keep the formatting, font size, et cetera.
8  Q.    Okay.  To the right next to "Fieldman
9  Incident," there is a date.  It's -- can you read
10 for me what it says there?
11 A.    It says "November 4, 2019."
12 Q.    Okay.  And we've already established you
13 prepared this report on November 4, 2021.
14        So is that -- that's just a typo?
15 A.    That is -- yes, that is an incorrect date.
16 November 4, 2021 --
17 Q.    Okay.
18 A.    -- is the correct date.
19 Q.    Okay.  So your report indicates that "The
20 purpose of my investigation was to determine the
21 cause of the explosion which injured Ms. McCoy."
22        That's consistent with what you just
23 told me.  Were you offered any materials to review
24 in connection with your investigation?
25 A.    The materials available for review included:

Page 35

1  The City of Philadelphia Fire Department report;
2  photographs from inspections that I attended;
3  Apple's document production, Bates-stamped 001 to
4  116; FedEx Supply Chain discovery responses,
5  document production, and disclosure.  I reviewed the
6  deposition of Ishynique McCoy.  I -- I saw the
7  complaint.  And I -- I even looked at the fire
8  department report again.
9  Q.    So the report listed in number 7, is that the
10 same fire department report listed in number 1?
11 A.    Yes.
12 Q.    Okay.  And the Apple document production, it
13 notes 001 - 116.
14        Can you explain to me what the
15 contents of that production were?
16 A.    They were radiographic images and photographs
17 of the incident phone.
18 Q.    Okay.  Was there anything included in that
19 document production -- and, again, I'm referring to
20 Apple document production, that would be Apple as
21 the manufacturer of the iPhone?
22 A.    Yes.
23 Q.    Okay.  Was there anything in that document
24 production regarding the schematics of the phone or
25 the internal operating system or anything of that

Page 36

1  nature?
2  A.    Not to my knowledge.
3  Q.    Okay.  Were there any written materials in
4  that Apple document production whatsoever?
5  A.    In the numbered documents that I'm
6  referencing here, no.  It was radiographic images
7  and photographs.
8  Q.    Did you review any other documents from Apple
9  that are not listed within these -- within this list
10 right here on your report?
11 A.    I was not provided nor did I review any other
12 Apple document production in this matter.
13 Q.    So in connection with your investigation
14 here, you didn't review anything regarding the
15 battery operation system of an iPhone 6 Plus?
16 A.    No.
17 Q.    Would you agree with me that that would be
18 helpful to your investigation here regarding whether
19 this lithium-ion battery failed?
20 A.    No.  The evidence that the lithium-ion
21 battery was available to me during my inspections --
22 excuse me, the evidence that the lithium-ion battery
23 cell failed is -- is made clear by the investigation
24 I performed and the documents available to me.
25 Q.    So -- so you didn't need to review anything

Page 37

1  else other than what is listed here in your report
2  to reach your conclusions?
3  A.    I had sufficient information through the
4  investigation, through the inspection, through the
5  documents provided to reach my conclusions.
6  Q.    Okay.  Did you review any documents or
7  deposition transcripts from an entity known as
8  CWork?
9  A.    The deposition of Ishynique McCoy is the only
10 deposition that was included in my file.
11 Q.    What about any documents from CWork regarding
12 procedures relative to storing iPhones, shipping
13 iPhones, repairing iPhones, refurbishing iPhones?
14 Did you review any materials relating to those
15 subject areas?
16 A.    No such materials were included in my file.
17 Q.    What about any materials from my client,
18 FedEx Supply Chain, relating to procedures it
19 follows in repairing and refurbishing iPhones?  Did
20 you review any materials like that?
21 A.    The -- I reviewed documents which indicated
22 that work on the subject phone was conducted by
23 FedEx Supply Chain.  As far as procedures, I do not
24 believe that those are part of my file.
25 Q.    Okay.  Did you review any instructions,

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 38

1 manuals, anything of that nature relative to the
2 work that was performed by FedEx Supply Chain on the
3 subject iPhone?
4 A.     Again, I -- I do not believe that FedEx
5 Supply Chain's work manuals or instructions or
6 procedures were included in my file.
7 Q.     Did you review any procedures relating to
8 FedEx Supply Chain's quality control?
9 A.     To the extent that FedEx Supply Chain has
10 quality control, I'm not aware.
11 Q.     Okay.  What about any inspections that FedEx
12 Supply Chain would conduct of phones that it repairs
13 or refurbishes?  Did you review any materials
14 indicating those procedures?
15 A.     I'm not aware of any quality control or
16 inspection procedures or evidence that such an
17 inspection occurred.
18 Q.     Your report indicates that certain work was
19 performed by my client, FedEx Supply Chain, on
20 January 18, 2016, on the subject iPhone.
21            Could you tell me what work was
22 performed?
23 A.     That work included replacing the screen, back
24 cover, battery, front camera, and charging port.
25 Q.     Did you review any documents regarding or

Page 39

1 relating to the actual schematics of an
2 iPhone 6 Plus?
3 A.     Schematics were not a part of my file in this
4 matter.
5 Q.     So "no"?
6 A.     No.
7 Q.     Your report indicates that the phone was
8 then (audio distortion) --
9            (Stenographer clarification.)
10 BY MR. STANKO:
11 Q.     Your report indicates that the phone was then
12 sent back to CWork on January 22, 2016.  And I'm
13 still on page 1 here, for your reference.
14            Do you know what CWork does, by the
15 way?
16 A.     My understanding is that CWork/FedEx Supply
17 Chain were responsible for refurbishing and
18 repairing iPhones for resale.
19 Q.     Okay.  And where are you deriving that
20 information regarding CWork?
21 A.     I believe there's a description of what they
22 do, although they may be more pertinent to the FedEx
23 Supply Chain.  I'm deriving this information from
24 the -- the FedEx Supply Chain interrogatory
25 responses, at least with regard to what it is that

Page 40

1 FedEx Supply Chain did to the incident phone.
2 Q.     Okay.  And I -- I understand that.
3            What I'm asking is whether you have
4 any knowledge of what CWork -- what business CWork
5 is involved in.
6 A.     I -- I don't recall what I -- it is my
7 understanding from -- from the document production
8 that I believe FedEx Supply Chain was contracted to
9 CWork to perform this work, but CWork's exact role
10 in this, I'm unclear on.
11 Q.     Okay.  So CWork gets the phone back on
12 January 22, 2016.
13            Did you review anything that
14 demonstrated the condition of the phone at that
15 point in time when it was sent from FedEx Supply
16 Chain to CWork on January 22, 2016?
17 A.     My understanding from -- from Ms. McCoy is
18 that when she received the phone, she thought it
19 was, you know, in essentially new condition.
20 Q.     Okay.  And I understand that's your
21 understanding from Ms. McCoy.
22            My question is, did -- did you review
23 any materials or anything that related to
24 demonstrating the condition of the phone on
25 January 22, 2016?

Page 41

1 A.     Again, my understanding is that the condition
2 of the phone had not changed since it left the
3 control of FedEx Supply Chain.  Nothing in the
4 record that I possess indicates that it -- it was
5 altered or changed up and to the time of the
6 incident.
7 Q.     Do you know how the phone was sent back to
8 CWork?
9 A.     When you say "how" --
10 Q.     I'm sorry.  Go ahead.
11 A.     "How the phone was sent back," could you
12 clarify, please?
13 Q.     Sure.
14            Do you know if it was sent in a box?
15 A.     I don't know the shipping method and
16 packaging materials that FedEx Supply Chain used to
17 transfer the phone to CWork.
18 Q.     Do you know whether CWork does anything with
19 the phone when it receives it on January 22, 2016?
20 A.     I'm not aware of any internal work, repair,
21 disassembly of the phone that CWork would have done.
22 No indication in the documents that I possess that
23 indicated that happened.
24 Q.     Are you aware of any action taken on the part
25 of CWork when they received the phone on January 22,

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 42

1 2016?

2 A.    My understanding is that FedEx Supply Chain

3 performed refurbishment and repair on the phone and

4 that that was the last time that the phone was

5 repaired or -- or modified in any way up until the

6 time of the incident.

7 Q.    So I understand that, repair and

8 modification.

9         What I'm asking you is, are you aware

10 of any action whatsoever that CWork does with the

11 phone when they receive it on January 22, 2016?

12 A.    I'm not aware of what CWork did with the

13 phone other than it eventually made its way into

14 Ms. McCoy's hands.

15 Q.    Okay.  So you're not aware of whether CWork

16 conducted any inspections of the phone?

17 A.    I'm not.

18 Q.    You're not aware of where CWork stored the

19 phone?

20 A.    I don't have any documentation of -- of

21 CWork's actions regarding this phone.

22 Q.    You have no information whatsoever as to what

23 happened with that phone after January 22, 2016?

24 A.    I do not agree with that statement.  I'm

25 aware that on July 17, 2016, the phone exploded

Page 43

1 while it was being used by Ishynique McCoy.

2 Q.    Okay.  When CWork gets the phone on

3 January 22, 2016, you have no information of what

4 CWork does with that phone?

5 A.    I have no record of what CWork did with the

6 phone, other than my -- my understanding is that the

7 only people inside the phone were FedEx Supply

8 Chain.

9 Q.    Prior to January 22, 2016, correct?

10 A.    Correct, and after up until the incident.

11 There's no indication in the record that there was

12 modification to the phone after January 22, 2016, up

13 to the date of the incident.

14 Q.    "Modification"?  There's no record of any

15 modification; is that what you're saying?

16 A.    Yes.

17 Q.    Okay.

18 A.    After -- after -- after FedEx Supply Chain's

19 work.

20 Q.    Okay.  Do you know when Ms. McCoy got the

21 phone?

22 A.    I believe she stated in her -- her deposition

23 about the time when she received phone, but I -- I

24 don't recall that date.

25 Q.    Okay.  That's fair.

Page 44

1         She testified that she got the phone

2 in March of 2016.

3         Does that sound right?

4 A.    Yes.

5 Q.    Did you review any information or any

6 materials that described the condition of the phone

7 at the time that Ms. McCoy got it in March of 2016?

8 A.    My understanding from Ms. McCoy's deposition

9 is that she -- she understood the phone to be

10 essentially like new, not new, and that it appeared

11 that way.

12 Q.    Do you know whether the phone had been

13 removed from any packaging that it was put in by

14 FedEx Supply Chain to the time that Ms. McCoy

15 received the phone in March of 2016?

16 A.    As I said previously, I don't know what

17 packaging FedEx Supply Chain utilized when they

18 shipped the phone.

19 Q.    Okay.  You don't know where the phone was

20 stored between January 22, 2016, and March of 2016?

21 A.    Again, I -- I have no items in my file and

22 the record that -- that indicate that information.

23 Q.    Do you have any information regarding how

24 many people handled the phone between January 22,

25 2016, and the time that Ms. McCoy came into

Page 45

1 possession of it in March of 2016?

2 A.    I have no information about the number of

3 people that handled the phone in the dates you

4 stated.

5 Q.    Do you know how plaintiff -- or Ms. McCoy got

6 the phone?  Who she got it from?

7 A.    Ms. McCoy's mother gave her the phone after

8 her phone was stolen.

9 Q.    Okay.  So what about Ms. McCoy's mother?  Do

10 you know where she got the phone?

11 A.    I believe she bought it at -- I think she

12 received it from T-Mobile.

13 Q.    Okay.  So at some point, the phone had to

14 travel from CWork to T-Mobile?

15 A.    To eventually make its way to the McCoys, it

16 would have had to leave FedEx Supply Chain's

17 facility and -- and make its way to -- to Ms. McCoy.

18 Q.    So it left -- and that's what I'm asking you,

19 whether you have any information about that process.

20         So we know that it got from FedEx

21 Supply Chain to CWork.  You've already told us you

22 don't have any information regarding the shipping

23 information.

24         Do you know how it got from CWork to

25 T-Mobile?

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 46

1    A.    I am not aware of the means of shipping that
2    CWork utilized to send the phone to T-Mobile.  I'm
3    also unaware of anyone else in that time frame who
4    would have made any repair or modifications to the
5    phone.
6    Q.    Again, sir, I'm not trying to trick you.  I'm
7    just asking you what information you have and don't
8    have.
9                Okay?  Can we agree on that?
10   A.    Well, yeah.  I answer -- you ask, I answer.
11   That's my understanding of how this works.
12   Q.    Okay.  I feel as if I'm asking you pretty
13   straightforward questions but I'm getting very
14   long-winded answers.  And really what I'm just
15   trying to figure out is whether you have information
16   or not.
17               And what I'm trying to figure out
18   here is whether you have any information about the
19   condition or whereabouts of the phone between
20   January 22 and March of 2016, when Ms. McCoy ends up
21   with it.  And I --
22               MR. ROTHERMEL:  Other than what he
23               already testified to, which was that
24               Ms. McCoy received it and believed it to
25               be new.  Okay?  Like, I don't

Page 47

1                understand -- like, I don't know.  What --
2                why you're wasting time on it, but...
3                MR. STANKO:  I -- I don't find it it
4                be a waste of time.  I -- we can disagree
5                on that.
6    BY MR. STANKO:
7    Q.    When did this subject incident occur?
8    A.    July 17, 2016.
9    Q.    Do you have any information about the
10   whereabouts or condition of the phone between March
11   of 2016 and July 17, 2016?
12   A.    My understanding is that it was in the
13   possession of -- of Ms. McCoy and that she was using
14   it as her personal cell phone.
15   Q.    Okay.  And prior to conducting your
16   investigation -- or part of your investigation,
17   did -- did your investigation include any documents,
18   materials, photographs relating to the condition of
19   the phone prior to July 17, 2016?
20   A.    Well, as indicated in the FedEx Supply Chain
21   documentation, there was repair and refurbishment
22   needed.  As we've already discussed, that was
23   performed by FedEx Supply Chain prior to the
24   incident.
25               With regards to the condition of the

Page 48

1    phone prior to the incident while it was in the
2    possession of Ms. McCoy, she had stated that the
3    phone was not altered or repaired while the phone
4    was in her possession; that the phone was not
5    dropped, the phone was not damaged, the phone was
6    not wet; and the phone was not used with a
7    third-party charger.
8    Q.    Other than Ms. McCoy's testimony, the
9    individual who you've been retained to offer an
10   opinion on behalf of, do you have any other
11   information regarding the condition of the phone
12   between January 22, 2016, and July 17, 2016?
13   A.    Mr. Stanko, I do -- the premise of your
14   question, I think is -- is -- is somewhat
15   mischaracterizing my relationship to -- to
16   Ms. McCoy.  I've been retained to perform an
17   investigation by -- by her counsel.  So just -- just
18   to clarify that.
19               But -- but to answer your question,
20   I'm not aware of documentation that exists that
21   would describe the condition of the phone while it
22   was in the possession of Ms. McCoy other than the
23   statements of Ms. McCoy.
24   Q.    So you have no idea what this phone looked
25   like or what its condition was on July 16, 2016?

Page 49

1    A.    Well, I imagine it looked like an iPhone 6
2    Plus, but not burned and damaged on July 16, 2017.
3    Q.    Again, you have no information whatsoever of
4    the condition of this phone on July 16, 2017?
5    A.    I have information as provided by Ms. McCoy.
6    Q.    Does any of that information relate to the
7    condition of the phone on July 16, 2016?
8    A.    Well, the -- as I've previously stated
9    Ms. McCoy has stated that the phone was not altered,
10   was not repaired, not dropped, damaged, wet, or used
11   with a third-party charger.  Those are all
12   statements that speak to the condition of the iPhone
13   before the incident while it was in her care.
14   Q.    Other than those statements, do you have any
15   information about the condition of the phone on
16   July 16, 2016?
17   A.    Other than the amount of information provided
18   by Ms. McCoy, I do not have other information about
19   the condition of the phone as it was in the care of
20   Ms. McCoy.
21   Q.    Can you tell me what happened here on
22   July 17, 2016?
23   A.    Ms. McCoy had the phone on the bed with her
24   around 10:00 a.m.  She had recently woken up.  She
25   was sitting on her bed.  Her iPhone 6 Plus was on

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 50

1 the bed close to her.  She heard a loud boom.
2          She stood from the bed, and with her
3 sister, saw the phone and the surrounding bedding
4 was on fire.  Smothered the phone with clothing,
5 removed the burning sheets with the phone in it and
6 threw it out of the window.
7          Further, the -- the cause of the
8 explosion was improper repair conducted by FedEx
9 Supply Chain by leaving and misplacing certain
10 screws from within the phone, which impinged on the
11 lithium-ion polymer battery causing it to enter
12 thermal runaway.
13 Q.     You said the phone was on a blanket on the
14 bed?  I'm sorry.
15 A.     It was sitting on a bed.  Ms. McCoy testified
16 that the phone was next to her in her -- my
17 understanding is that it's in her immediate location
18 near where she was injured.
19 Q.     Was it in her pocket?
20 A.     Ms. McCoy testified that the phone was next
21 to her, as I've stated.
22 Q.     Was it under a blanket?
23 A.     Ms. McCoy testified that the phone was next
24 to her.  And my understanding is that it was on
25 top -- on top of the bedding, on top of a sheet.

Page 51

1 Q.     Do you know if it had any kind of case on it?
2 A.     Ms. McCoy did testify about the use of the
3 case.  I can't recall from my notes if she had it on
4 or off on -- at the -- at the time of the incident.
5 I -- I believe it was off, but I would have to go
6 back to my notes to check that.
7 Q.     And then you said she threw it out a window.
8 A.     I did say that because that's what she
9 testified to.
10 Q.     Okay.  Do you know if she was on the first
11 story, second story, third story?
12 A.     I -- I think it was the second story, but,
13 again, I'd have to -- I'd have to check her
14 deposition to -- to see that.
15 Q.     When the phone went out the window, do you
16 know if it landed on pavement, grass, dirt?
17 A.     I don't recall from her deposition if she
18 stated exactly what the surface material was where
19 the phone, which was on fire from the exploding
20 lithium-ion battery, landed.
21 Q.     So you don't know one way or the other what
22 it landed on?
23 A.     Well, I -- I -- I believe you may have asked
24 that question or someone may have asked that
25 question to Ms. McCoy.  I -- I just don't have that

Page 52

1 note in front of me at this moment.
2          MR. ROTHERMEL:  He knows the answer.
3 BY MR. STANKO:
4 Q.     Do you know where this incident occurred?
5 A.     2046 Turner Street, Philadelphia, PA.
6 Q.     Did you ever visit that location to see where
7 the phone had been thrown out and what it had landed
8 on?
9 A.     No.
10 Q.     Now, as part of your investigation, did you
11 have any personal interaction with the remains of
12 this phone?
13          MR. ROTHERMEL:  Define "personal
14          interaction."
15 BY MR. STANKO:
16 Q.     Were you in the same room as the remains of
17 this phone?
18          MR. ROTHERMEL:  You mean for the
19          nondestructive and destructive testing; is
20          that what you're referring to?
21 BY MR. STANKO:
22 Q.     Were you ever in the same room as the subject
23 phone?
24 A.     I was at the testing performed at Micron.
25 Q.     Okay.  Did you participate in any other form

Page 53

1 of testing of the remains of the phone?
2 A.     The inspection and examination performed at
3 Micron is the only examination that I attended of
4 this phone.
5 Q.     Okay.  There was -- there was a
6 nondestructive examination that was conducted on
7 August 20, 2020, that was conducted virtually.
8          Did you participate in that?
9 A.     No.
10 Q.     Do you know what was done at that
11 nondestructive examination?
12 A.     My understanding is that it was
13 nondestructive.  That typically involves
14 photography.
15 Q.     Do you know what was done at this
16 nondestructive examination?  I know that may be
17 what's typical, but do you know what was done on at
18 this nondestructive examination on August 20, 2020?
19 A.     It's my understanding that nondestructive
20 examination occurred.  I do not have a procedure for
21 it.  And as I've said, I was not there.
22 Q.     And you mentioned a moment ago that you
23 attended destructive testing at the Micron facility?
24 A.     Correct.
25 Q.     And that was back July 7, 2021?

Page 54

1  A.     Yes, it was.
2  Q.     Okay.  Can you describe for me what was done
3  there?
4  A.     Documentation of the -- of the incident phone
5  before any destructive examination occurred.  So
6  pictures of the exterior of the cell phone,
7  radiography of the cell phone.  After -- after
8  everyone had their opportunity to take their
9  exterior pictures before destructive examination
10 began, the destructive examination commenced, which
11 included opening the cell phone, removing screws as
12 needed to disassemble and access various components
13 within -- within the cell phone.  Each time followed
14 by further documentation and optical microscopy
15 to -- to document different parts of the phone.
16        MR. ROTHERMEL:  All of which is
17        videotaped.
18 BY MR. STANKO:
19 Q.     After all that was done, did you reach any
20 opinions regarding the cause of this explosion?
21 A.     As I've written in my report, the cause of
22 the thermal runaway was penetration of the battery
23 cell casing by misplaced screws left in the phone
24 after defective refurbishment as performed by FedEx
25 Supply Chain.

Page 55

1  Q.     So your report -- actually, you include two
2  definitions of explosion.
3         I'm on page 15 of your report.  And
4  one of those definitions reads "Failure that occurs
5  when a cell container or battery case opens
6  violently and major components are forcibly
7  expelled."
8         Mr. Kobilka, what does that -- what
9  does "major components" relate to?  What is that
10 describing?
11 A.     Components on the inside of the case.  So it
12 could be part of the -- of the jelly roll.  It could
13 be one of the tabs of the -- of the battery cell.
14 Q.     So major components would be only describing
15 components of the actual battery?
16 A.     We're referring to a battery cell explosion,
17 so yes.  The components I'm referring to are going
18 to be part of the battery cell.
19 Q.     So we're referring to a battery that was in
20 an iPhone 6 Plus, right?
21 A.     We are referring to a battery that was in an
22 iPhone 6 Plus.
23 Q.     Okay.  And what I'm asking you here is, this
24 definition talks about the battery case opening
25 violently and major components are forcibly

Page 56

1  expelled.  And what I'd like to know is whether that
2  just means from the battery or within the actual
3  device in which it sits.
4  A.     I'm referring to the battery, the battery
5  cell.
6  Q.     Okay.  So when we're talking about major
7  components being forcibly expelled, you are limiting
8  that to only the battery?
9  A.     The definition of explosion that we're
10 discussing is referring to the battery cell.
11 Q.     Okay.  The iPhone 6 prior to this event,
12 that's a completely sealed device?
13 A.     Could you please ask that question again?
14 Q.     The iPhone 6 Plus that we're talking about,
15 that -- that's a sealed device, correct?
16 A.     The iPhone 6 is sealed.  I -- I agree.
17 Q.     So when there is a -- a violent explosion
18 which causes major components to be forcibly
19 expelled, where do those major components go when
20 they're forcibly expelled?
21 A.     Well, in looking at the incident remains of
22 this phone, one can see the damage that is
23 consistent with a thermal runaway of the lithium-ion
24 battery cell that was within it.  For one, the cell
25 expanded in its width and depth so that the screen

Page 57

1  became opened.  Additionally, the high heat that is
2  generated by the thermal runaway caused damage to
3  the screen and other internal components within --
4  within the cell.
5         Evidence that "an explosion" is the
6  appropriate term can be seen plainly when looking at
7  that remains of the battery.  Looking at figure 13
8  on page 14, you see that the casing of the cell has
9  ruptured and that there is no longer a -- a seal in
10 this battery, that it had ruptured in that specific
11 location.
12 Q.     So the forcible expulsion of the battery
13 actually manipulates the shape of the iPhone?
14 A.     The expansion of the battery being contained
15 in a space for which that size was not designed
16 causes expansion and cracking and -- and various
17 deformation of the -- of the phone which contains
18 it.
19 Q.     And you actually used the phrase "torn open"
20 in your report.
21         Would that be an accurate description
22 of what happens here?
23 A.     The phrase "torn open," I believe I was
24 referring to the cell rupture on -- on page 14 of my
25 report.  Where it's the -- the material of the

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 58

1  battery cell, which is ruptured.
2  Q.     Would it be fair to say that the rupture of
3  the battery cell actually tears open the phone as
4  well?
5  A.     No, the expansion.  The high heat and the
6  expansion of the battery cell are what cause the
7  phone to open and separate, have the internal
8  components separate.
9  Q.     The level of force and heat that's inside the
10  phone causes the phone to separate?
11  A.     Yes.
12  Q.     Now, your conclusion is that a thermal
13  runaway event happened.  And your report contains a
14  quote that extends from 15 -- page 15 to page 16
15  regarding thermal runaways.  And that quote talks
16  about how they can happen.  And I'm now on the top
17  of page 16.
18         And it states that these events can
19  happen "Due to various factors such as exposure to
20  high temperatures, overcharge, external short
21  circuiting, nail penetration, localized crushing and
22  the like."
23         Now, that -- that's quoted from your
24  report, so I assume you agree that a thermal event
25  could -- could be caused by each one of those

Page 59

1  described instances; is that fair?
2  A.     Yes.
3  Q.     Okay.  Now, it -- first one there is exposure
4  to high temperatures.
5         What kind of temperatures would cause
6  a thermal event in a lithium-ion battery?
7  A.     There are standards for testing for
8  temperature -- temperature exposure.  I'm not aware
9  of exactly what that temperature is offhand.  But
10  the -- the temperature that the batteries must be --
11  that are tested to is -- is my understanding that
12  it's higher than what one would achieve during
13  normal use.
14  Q.     Well, what about if the phone was under
15  blankets and someone was sitting on it, would it be
16  possible for a phone to reach a temperature that
17  would cause a thermal runaway event?
18  A.     Well, I -- I can't speak to all thermal
19  runaway events that have occurred in phones.  My
20  understanding is that we're here to talk about this
21  one.
22  Q.     No, I'm not asking you to speak to every
23  thermal event runaway that has ever occurred in a
24  phone.
25         I'm asking you, would it be possible

Page 60

1  for a phone to reach the level of temperature that
2  would cause a thermal runaway event if it were under
3  blankets or an individual was sitting on it?
4  A.     I would have to know more about -- about that
5  temperature.  And it's my understanding that they
6  are tested at higher temperatures than one would
7  expect by simply being within a blanket or being
8  near or under a person.
9  Q.     But sitting here today, you don't know what
10  the temperatures are?
11  A.     The specific temperature eludes me, but it
12  is -- it is contained within the standards to which
13  Apple tests their -- their lithium-ion cells.
14         MR. ROTHERMEL:  Do they sell iPhones
15         down in Florida in the summer?
16  BY MR. STANKO:
17  Q.     And you just referenced standards that Apple
18  tests their iPhones.
19         Did you review any standards in which
20  Apple tests their iPhones in connection with this
21  litigation?
22  A.     Yeah.  Apple utilizes external testing
23  organizations for compliance with IEC 62133.
24  Q.     And is that listed within the materials you
25  reviewed?

Page 61

1  A.     It's referenced in my report.
2  Q.     Are the standards in which Apple tests their
3  iPhones and which you're citing here, are -- is that
4  listed within the materials you reviewed in this
5  case?
6  A.     The standard is listed and referenced to.
7  Q.     I understand the standard is listed, but
8  you're testifying here today that Apple tests their
9  phones with that standard and I'm asking you what
10  you reviewed to learn that.
11  A.     I don't recall if it's a marking on the
12  battery cell that -- that indicates this testing.
13  But, again, it is my understanding that they do test
14  to that standard.
15  Q.     And that understanding, you cannot tell me
16  where that comes from?
17  A.     Like I said, I think -- I think it's -- it
18  may be a marking on the battery itself.
19  Q.     Let's talk about overcharging.  That's the
20  next factor that's listed in the quote that I read
21  from your report.
22         What does overcharging mean?
23  A.     That would be exposing the battery cell to a
24  voltage higher than its rated voltage for charging
25  or -- and -- and that can have negative effects on

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 62

1  the functionality of the battery.
2  Q.      And how -- how does overcharging happen?
3  A.      Overcharging generally occurs when you have a
4  battery that's not in a well-engineered or
5  appropriately engineered system that doesn't have a
6  battery charge controller and is -- it is generally
7  not understood to be an issue with -- with this
8  generation of iPhones.
9  Q.      "This generation" being the iPhone 6 Plus?
10  A.      Right.  They have -- Apple does have
11  electronics to control the charging of the battery
12  management system within -- within the cell --
13  within the phone.
14  Q.      And can you tell me of the materials that you
15  reviewed in connection with this case where you're
16  getting that information?
17  A.      I've seen the battery management system part
18  of -- part of the iPhone.  I've seen it.  I observed
19  it.  And whether this incident isn't -- isn't
20  consistent with the type of failure that you might
21  see in -- in an overcharge.  Like I said, it's
22  consistent with the battery cell being exposed to
23  penetration by a screw that was left in the phone.
24  Q.      You told me earlier that you didn't review
25  any documents regarding the battery management

Page 63

1  system in connection with this litigation.
2          So is it your testimony here today
3  that you're reviewing documents relative to the
4  battery management system in relation to things
5  outside of this case?
6  A.      I said that I have seen it in its -- in the
7  phone.  It's a part of the phone.  It's part of the
8  hardware of the phone.  They have one.  And, again,
9  like I said, the -- the damage observed in the
10  thermal runaway event is inconsistent with what one
11  would expect to have in an overcharge incident.
12  Q.      Did you review any documentation in this case
13  relative to the battery management system that is
14  within an iPhone 6 Plus?
15  A.      I -- as you asked before, no, I haven't.
16  Q.      Okay.  Can an overcharge occur by using a --
17  a charger that is a third-party charger?
18  A.      I -- I can't speak to the nature of every
19  third-party charger that may or may not exist.  I do
20  know that in this incident, it is part of the record
21  that the only charger that was ever used was an
22  Apple charger, which is designed and -- and to work
23  with the phone that Ms. McCoy had.
24  Q.      Sir, my question was, can an overcharge occur
25  by using a third-party charger?

Page 64

1  A.      Again, I don't -- I don't know that there is
2  enough information -- I would want to look at that
3  third-party charger.
4          Does it output the right -- you know,
5  does it have the expected voltage within the
6  specification?  Is it -- is it UL listed?  Has it --
7  has it been tested for use with an iPhone?
8          The -- again, the battery management
9  system is a part of the iPhone, but, again, it is my
10  understanding that no third-party charger was used
11  in this incident.
12  Q.      Can a third-party charger, whether you've
13  looked at it or not, cause an overcharge in an
14  iPhone?
15          MR. ROTHERMEL:  Asked and answered.
16          MR. STANKO:  It hasn't been -- you
17      know what, Frank?  It hasn't been
18      answered.  Okay?
19          MR. ROTHERMEL:  You might not like
20      the answer, but it's answered.
21  BY MR. STANKO:
22  Q.      I'm asking you a very simple question.
23          Can a third-party charger cause an
24  overcharge in an iPhone?
25  A.      If you connected an iPhone to a charger which

Page 65

1  behaved out of spec, it -- it may be plausible that
2  it could be an issue.
3  Q.      Is that a "yes"?
4  A.      You -- sir, you ask the questions and I
5  answer them.
6  Q.      I'm really having trouble deciphering your
7  answers to questions that I believe are simple
8  yes-or-no questions.
9          You can't walk into a gas station
10  today without seeing chargers.  Chargers are
11  everywhere; airports sell them, gas stations sell
12  them.  They are everywhere.  Now, for the purpose of
13  today's deposition, that's what I'm referring to as
14  a third-party charger.  Okay?
15          And my question to you as an
16  electrical engineer is, can a third-party charger, a
17  charger not made by Apple, cause a thermal runaway
18  in an -- because of an overcharge event in an
19  iPhone?
20  A.      And my answer is that I would want to review
21  that charger.
22  Q.      Okay.
23  A.      And you're -- you're --
24  Q.      Let's say you had the opportunity to inspect
25  the charger and you came to the conclusion that it

Jeffrey Kobilka, PE, CFEI
December 16, 2021

1   was not a properly calibrated charger to the battery
2   that was in the iPhone, could it cause an overcharge
3   in that situation?
4            MR. ROTHERMEL:  Don't answer.  That's
5        a -- look, I'm just going to instruct him
6        not to answer the question.  I mean, the
7        way it's -- you know, look, it's kind of
8        ridiculous the way you asked it, but...
9            MR. STANKO:  I'm having trouble
10       hearing you.
11           MR. ROTHERMEL:  He's already answered
12       like three times.  Okay?  And I'm going to
13       sit on his answer that he gave you three
14       different times and so I'm going to
15       instruct him not to answer your question.
16       And if you want to take it up, go ahead.
17           MR. STANKO:  Okay.  Thank you.
18           MR. ROTHERMEL:  You're welcome.
19  BY MR. STANKO:
20  Q.   Mr. Kobilka, did you have an opportunity to
21  inspect the charger that Ms. McCoy was using in this
22  case?
23  A.   I do not believe the phone was on the charger
24  at the time of the incident.  And that's something
25  Ms. McCoy testified to.

1            But have I -- have I seen the charger
2   that she used?  No.  But she did state that it was
3   the charger that came with the phone and that that
4   was the only charger that she used.
5   Q.   So "no" you did not see the charger; so "no"
6   you did not inspect the charger; is that accurate?
7   A.   I have not inspected the charger.  I have not
8   seen the charger.  I have information which is
9   included in the record that it was the charger as
10  provided with her phone.
11  Q.   And that information is from Ms. McCoy; is
12  that accurate?
13  A.   That is part of the record of testimony, yes.
14  Q.   Okay.  Do you have any other information from
15  any other source other than Ms. McCoy regarding the
16  charger that she was using to charge the subject
17  iPhone?
18  A.   Regarding the charger used by Ms. McCoy, I do
19  not have any other information other than that
20  information which was provided by Ms. McCoy about
21  the use of her phone.
22  Q.   How about external short circuiting?  Talk to
23  me about that.
24           What does that entail?
25  A.   An external short circuit, that would be

1   where you take the two tabs of the battery, the two
2   terminals of the battery, the cell, and connect them
3   causing an overcurrent, which can lead to heat and
4   failure within -- within the cell as described by
5   this -- this quote that you -- you've read.
6   Q.   How about nail penetration?
7   A.   Yes.  Penetrating the case of the battery
8   cell will cause the intentional components to touch
9   each other, which they are not supposed to do, and
10  as described by this quote from LG Chem patent, "The
11  consequence of a nail penetration or other method
12  to -- to obtain such an elevation in temperature is
13  that the occurrence of reaction heat is additionally
14  accompanied by elevation of the battery temperature,
15  which in turn further accelerates the reaction
16  between the electrolyte and electrodes, therefore
17  the temperature of the battery rises sharply thereby
18  further accelerating the reaction between the
19  electrolyte and electrodes.  Due to being caught in
20  such self-perpetuating cycle, thermal runaway which
21  causes sharp elevation in the battery temperature
22  occurs and ignition of the battery may take place if
23  the battery temperature rises over a specific range.
24           "In addition, the reaction between
25  the electrolyte and electrodes leads to generation

1   of gases, which in turn results in increased
2   internal pressure of the battery and consequently
3   the battery undergoes explosion at pressure
4   exceeding the predetermined range.  As such, it can
5   be said that the risk of ignition explosion is the
6   most fatal disadvantage of lithium secondary
7   batteries."
8            Now, you asked about a nail, a
9   penetration of the battery cell.  And that is why
10  it's so important that when cell phones are being
11  modified, repaired, refurbished that screws not be
12  left and misplaced within the phone because this can
13  occur.
14  Q.   When -- the phrase "nail penetration," is
15  that referring to an actual nail, like a hammer and
16  nail?  Or is there -- is there another meaning to
17  that?
18  A.   A penetration of the cell casing by a sharp
19  metal object or a metal object of any type.  I
20  would -- I would qualify that as a penetration,
21  which can cause thermal runaway.
22  Q.   Okay.  What about localized crushing?
23  A.   Yeah.  So that -- that's very similar in the
24  sense that you are compressing the -- the layers
25  that are within the battery cell and if you

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 70

1  compromise the integrity of the separation between
2  those two layers, all of the things that I just read
3  can occur.
4      Q.    Could -- could that happen with someone
5  sitting on a phone?
6      A.    The mechanical structure of the phone
7  provides protection from such localized crushing.
8  Unless, potentially, there was a screw misplaced
9  within the phone that could -- that crushing, that
10 penetration could occur.
11     Q.    So -- so localized crushing can only occur if
12 there is a screw in the phone?
13     A.    So what I said is that the structure of the
14 iPhone is what protects this cell, which is -- which
15 is a nonrigid cell is what protects it from -- from
16 that type of normal use.
17     Q.    So -- so with this list here, localized
18 crushing, that doesn't apply to iPhones?
19     A.    Well, it certainly does if -- if there's
20 an -- impinging screw.  It could be localized
21 crushing or -- or similarly a penetration.  But
22 the -- I have not conducted a test as to how hard
23 you would have to press, at what force one would
24 need to depress an iPhone to destroy the casing and
25 crush the battery enough that it caused such a

Page 71

1  problem.
2      Q.    But that could happen?
3      A.    I suppose anything can happen, but I do not
4  find it likely.
5      Q.    I hear you.
6            What I'm -- what I'm trying to figure
7  out is if somebody has a phone, an iPhone 6 Plus in
8  their back pocket and they sit on a hard surface and
9  they are over a certain weight, could that cause a
10 thermal event from localized crushing?
11     A.    Well, use of the phone -- I mean, like I
12 said, the phone is a -- is a rigid case,
13 essentially, around the battery cell that protects
14 it.  So if one were to crush the phone, you -- you
15 would expect to see evidence of that.
16            But is it possible?  And it sounds
17 like your question is, is it possible to crush a
18 phone enough that the battery goes into thermal
19 runaway?  I'm not going to deny that possibility,
20 but it's not one that any of the evidence in this
21 matter points to.
22     Q.    Okay.  So back to the -- the penetration.
23            You testified that there was a
24 penetration of the battery cell here and that --
25 that's your conclusion as to what caused this

Page 72

1  thermal runaway.
2      A.    That is my conclusion.
3      Q.    Okay.  Your report contains 13 photographs.
4            As an aside, do you know how many
5  photographs of this phone were taken in -- relative
6  to the nondestructive examination and the -- and the
7  destructive examination?
8      A.    By all of the parties who were there?
9      Q.    That were produced -- that were produced in
10 the litigation.
11     A.    We've gone over my file and what was provided
12 to me.  I have 116 images provided by Apple.
13     Q.    And -- and you haven't seen any other images
14 other than those 116?
15     A.    I took many pictures.
16     Q.    I'm sorry?
17     A.    I took pictures.
18            MR. ROTHERMEL:  Everybody took
19        pictures.  You were there, right?  I
20        mean --
21            MR. STANKO:  Yeah, we all agreed --
22        we all agreed to produce the pictures.
23 BY MR. STANKO:
24     Q.    So are the pictures that you took,
25 Mr. Kobilka, are they included within the materials

Page 73

1  that you reviewed here?
2      A.    As stated, materials available for review:
3  Photographs from inspection.
4      Q.    Okay.
5      A.    The shared material, which to my
6  understanding was the Micron-provided data, that is
7  my understanding of what the shared data was.
8      Q.    Okay.  So you had the opportunity to take
9  pictures at the July 7, 2021, inspection; Apple
10 produced through SEL 116 images that you listed
11 here.  Your report includes 13 images.
12            Do we agree on that?
13     A.    13 images.
14     Q.    And to be fair here, they include what look
15 to be some x-rays of the phone, the first two,
16 figure 1 and figure 2, are x-rays and then I think
17 the next 11 are photographs.
18            Can you point me to the figure in
19 your report that shows the penetration?
20     A.    The evidence of the penetration can be found
21 circled in yellow on figure 9 and the evidence of
22 penetration can also be observed in a closeup on
23 figure 13.
24     Q.    Okay.  Let's use -- well, can we agree that
25 figure 13 is more close up of what's circled in

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 74

1  figure 9?
2  A.    Figure 13 is a closeup of what is circled in
3  figure 9.
4  Q.    That's what I'm asking.
5        Can we agree on that?
6        MR. ROTHERMEL:  He's telling you it
7        is.
8        MR. STANKO:  Okay.  Good.
9        THE WITNESS:  Yes.
10 BY MR. STANKO:
11 Q.    So let's -- let's go off figure 13 because
12 that's a lot easier to see, at least for my eyes.
13       Can you point to me where the
14 penetration is on figure 13?
15 A.    Well, it's my understanding that it would be
16 within an area in the ruptured part of the cell.  So
17 along -- along the lines of the rupture.
18 Q.    What does that mean, "along the lines of a
19 rupture"?
20 A.    So you can see in figure 13 that the -- the
21 cell is not continuous.  The exterior of the cell is
22 broken.
23 Q.    Yes.
24 A.    The cell has ruptured in this location.
25 Q.    Okay.

Page 75

1  A.    It is my opinion that the cell has ruptured
2  in this location because there was a penetration by
3  a screw that was left in there by FedEx Supply Chain
4  in this vicinity.
5  Q.    Now, when there's a penetration, does that
6  immediately cause the runaway?  Does the temperature
7  immediately rise?  Is there -- or is there a delay?
8  A.    If the screw has not penetrated, it could be
9  left in there, it would be pressing against the
10 battery cell and may not have penetrated immediately
11 and could have been left there essentially waiting
12 for somebody to experience this type of failure
13 and -- and have the phone explode while they're
14 using it.  At the point that the penetration occurs,
15 the thermal runaway occurs rapidly.
16 Q.    And that's what I'm trying to understand.
17       So once the penetration is made of
18 the battery cell wall, it -- it starts the thermal
19 runaway, right?
20 A.    From the point of penetration where you have
21 now essentially a short circuit internal to the
22 battery cell, rapid development of a thermal runaway
23 is expected.
24 Q.    Okay.  And would that cause, you know, burn,
25 fire marks at that point of penetration?

Page 76

1  A.    Well, looking at it, you can see that the
2  entirety of the cell became hot.  Looking at the
3  remains of the phone, you can see that there's a
4  tab, looking at the -- at the x-ray, looking at the
5  remains of the battery management system, which is
6  where the negative tabs connect to the -- negative
7  and positive tabs connect to the battery, that that
8  tab is gone.  The damage and the heat damage doesn't
9  just occur in that spot.  That is what initiates it.
10       But as described in the section that
11 we read and spent quite a bit of time on, it is
12 something that -- thermal runaway, it's a cycle,
13 it's a process that once begun, continues out of
14 control, which is why you generate high heat,
15 expansion, and it can cause injury, as it did in
16 this case.
17 Q.    Okay.  So my question, the burn marks, would
18 they be most concentrated at the point of
19 penetration?
20 A.    The evidence of the penetration and the
21 penetration location is the rupture location.  The
22 heat that's generated, it's expected to generate
23 across much of the phone, but I -- I do agree that
24 the -- or will state that that location since that's
25 where it started, often does experience the most

Page 77

1  severe damage.  And that is consistent with what is
2  seen in the -- in the -- in the tab that is no
3  longer in the vicinity of this penetration and the
4  connection that is just basically gone that's in the
5  remains of the phone.
6        And it's also consistent with the
7  damage that you see externally to the phone, where
8  you have the screen being cracked and burned.  That
9  is all consistent with high heat coming from -- high
10 heat and expansion coming from inside the phone,
11 coming from a battery cell that has entered thermal
12 runaway.
13 Q.    So that high heat creates the markings that
14 we're seeing in this area in figure 13 where you are
15 stating the penetration occurred?
16 A.    The high heat, the expansion of materials,
17 it's a rupture that is consistent with the
18 penetration and subsequent thermal runaway.
19 Q.    Would the high heat and the burn marks that
20 we see at the location of the penetration also be
21 present on the object which penetrated it?
22 A.    Well, considering that there was a loose
23 screw found and that that screw was entirely covered
24 in debris and products from this event, that's
25 consistent with the idea that it was, at the very

Jeffrey Kobilka, PE, CFEI
December 16, 2021

1  least, internal to the phone when this occurred.
2           We've examined several screws in the
3  process of taking this phone apart during
4  disassembly and we looked at those screws.  One of
5  the things you see, if a screw was in its correct
6  location, it's not entirely covered in -- in the
7  debris from -- from this explosion as the screw
8  which was found in the phone was.  So that's
9  consistent with it being present in the phone at the
10  time of the explosion.
11          And the only reasonable conclusion
12  that one can draw when observing the location of the
13  rupture and -- and seeing that there is a screw
14  loose within the cell, is that -- that that screw or
15  one that may have been in it because there were
16  several missing was the cause of this thermal
17  runaway.
18  Q.     So you mentioned that the -- the loose screw
19  that you're referring to had debris on it, right?
20  A.     It was -- yeah, it was not a clean screw.
21  Q.     Okay.  Did you examine it for any damage?
22  A.     When you say "damage," is there any --
23  anything more specific?
24  Q.     Sure.
25  A.     We examined it, we -- sure.

1  Q.     What kind of heat are we talking at the point
2  of rupture?
3  A.     Well, causing -- causing the -- the rupture
4  in that -- when that occurs, that's not the full --
5  I mean, it happens rapidly, but it's not the same as
6  an electrical arc that occurred where you would
7  expect to find molten -- molten metal, resolidified
8  metal.
9           The penetration is causing internal
10  failures within the battery cell.  It's not as much
11  about the -- the screw that -- that penetrated and
12  the characteristics of that screw, as it is about
13  the damage that that screw has done to the battery
14  cell.
15  Q.     What kind of heat are we talking about at the
16  point of penetration?
17  A.     I don't have an exact number for what -- what
18  that temperature would have been.
19  Q.     Was there any heat damage to the screw?
20  A.     The screw was black in color, so it -- it was
21  in the phone at the time of the event is the only
22  reasonable conclusion that can be drawn.  No -- it's
23  not my understanding that any -- any further damage
24  would be expected on -- on such a screw.
25  Q.     So it's your testimony that no further damage

1  would be expected of a screw that penetrated the
2  battery where -- causing this thermal runaway?
3  A.     That is my testimony.
4  Q.     Did you examine the -- the threads of the
5  screw?
6  A.     I -- I -- yes.  Yes.
7  Q.     Did you reach any conclusions regarding
8  whether the threads of the screw were intact?
9  A.     While I -- I didn't observe any arcing damage
10  on the screw, again, I wouldn't expect it.  And
11  the -- the state of the screw was not inconsistent
12  with my understanding of what it would look like had
13  it been the screw that caused this penetration.
14  Q.     Did you reach a conclusion one way or the
15  other of whether any of the threads on the screw
16  were damaged?
17  A.     I didn't observe the threads of the screw to
18  be -- to be damaged.
19  Q.     How many screws are in an iPhone 6 Plus?
20  A.     I haven't counted every screw, but I did
21  count the -- some of the screws that were missing.
22  Q.     I understand that.
23          I'm asking how many screws entirely
24  are in a 6 -- iPhone 6 Plus?
25  A.     I haven't counted them.

1  Q.     What size screw was the screw that you're
2  saying was found in the phone?
3  A.     I recall from the inspection that it was
4  quite similar to a missing screw that -- to one that
5  was taken from the home button.  The exact size of
6  that screw, I don't recall.
7  Q.     And when you say "a missing screw," you mean
8  by the time you saw the -- the iPhone remains here,
9  a screw was not where it was supposed to be?
10  A.     When I say "a missing screw," I mean a screw
11  that was not in the location that proper
12  refurbishment and installation would have put it.
13  Q.     Okay.  So when you see the remains of this
14  phone and you see a missing screw, this is after the
15  phone exploded and was thrown out a second-story
16  window, correct?
17  A.     My inspection occurred after the incident,
18  yes.
19  Q.     Okay.  Is it possible that the explosion
20  forcibly expelled screws from the phone?
21  A.     It is highly unlikely that the explosion
22  would have forcibly expelled the home screen button
23  screw or -- or the other screws for that matter.
24  That is not common -- commonly seen within -- within
25  this type of incident.

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 82

1    Q.    What analysis did you engage in to reach that
2    conclusion?
3    A.    We already talked about how the screw has --
4    is covered in -- in the debris of the explosion
5    which is different than other screws which we did
6    remove where they -- they may have some on the head
7    of the screw, but where the screw was in place,
8    where the threading is, they don't have any because
9    they were actually in place during the time of
10   the -- during the time of the explosion.
11         Further, the screws tend to stay in
12   their location and deform or break, say, the bracket
13   which holds them.  That is something which is
14   commonly seen.
15   Q.    You -- you said "tend to."  What do you mean
16   "tend to"?  The screws tend to stay in place in
17   relation to what?
18   A.    Into the brackets that they -- that they
19   are -- are in, that they are screwed into.  They
20   don't just unthread themselves.  And if there was
21   a -- a missing screw, you would expect -- that that
22   was missing -- that was not missing at the time of
23   the explosion, you would expect to see damage to the
24   housing, the frame of the screw where the screw
25   threads that would have caused it to have been

Page 83

1    dislocated.
2          That's not what we observed here.
3    The housings of the screws were -- were empty and
4    not -- not in the position where you would look at
5    that and say it's been -- it's been damaged and
6    compromised to the point that it couldn't hold a
7    screw.
8    Q.    Would it be possible for a screw to be
9    expelled from an iPhone 6 Plus after being thrown
10   out a second-story window?
11   A.    I think that's a possibility, especially when
12   it wasn't installed correctly and was loose within
13   the phone.
14   Q.    Did you do any analysis or reconstruction of
15   an iPhone 6 Plus being thrown out a window and
16   hitting the ground and what happens to an iPhone 6
17   Plus when that occurs?
18         MR. ROTHERMEL:  In a blanket; is that
19         what you're asking?
20         MR. STANKO:  No, I'm not asking that,
21         Frank, and I'd appreciate you to stay off
22         the record unless you have an objection.
23         MR. ROTHERMEL:  I'm trying to
24         clarify.
25         THE WITNESS:  I have not thrown an

Page 84

1    iPhone 6 Plus out of a two-story window.
2    BY MR. STANKO:
3    Q.    So back to figure 13.
4          Could -- we talked about a nail
5    penetration and what I'm still unclear of is, where
6    in this figure is the nail penetration?
7    A.    As I answered earlier --
8    Q.    And, sir, just to be clear, I -- I don't
9    understand your answer.  Okay?  And I apologize if
10   I'm a little slow in this regard, but what I'm
11   asking for, you described a nail penetration as if
12   it's a penetration, and what I'm looking for is the
13   point of entry.  And I'm really just looking for
14   whether you can point me to that on figure 13.  If
15   the answer is no, that's fine.  I just want to know
16   if we can find it on this photograph.  Okay?
17   A.    As -- as I've stated before, which was not a
18   negative answer, which was not a no, that the -- the
19   point of penetration is the area that you have this
20   closeup on, specifically along -- along the line of
21   the rupture, you can see that there's two --
22   multiple levels here that have been removed, that
23   have peeled back.  This is not a whole entire layer
24   that has ruptured.  Along that line, a weakness was
25   created and that weakness was a screw that was left

Page 85

1    in the phone by FedEx Supply Chain in this location.
2    Q.    That's your opinion, right?
3    A.    Yes.
4    Q.    Okay.
5    A.    Yes.
6    Q.    This is -- this is -- there's a scale here on
7    the bottom right of this photo, and that --
8    10 millimeters, right?
9          Do you see that?
10   A.    That's what it says.
11   Q.    Is that -- is that accurate?
12   A.    I do not believe so.
13   Q.    Okay.  Do you know who took this photograph?
14   A.    This photograph was taken by Micron and was
15   provided, my understanding, to all parties.
16   Q.    Okay.  But the 10 millimeter, that's right
17   there --
18   A.    Doesn't sound right to me.
19   Q.    Okay.
20   A.    No.
21   Q.    Could you -- could you estimate for me the --
22   the diameter, I guess, of this damage?  Can we call
23   it that?  It looks to be this layer --
24   A.    Not from this picture.  I -- with this
25   picture, no, I can't.

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 86

1   Q.    You can't estimate for me that size?  I'm
2   just clarifying.  I --
3   A.    From this picture, I cannot estimate the size
4   of the damage.
5   Q.    Okay.  Do we know the size of the screw?  I
6   know I asked you that earlier, but I'm not sure if I
7   ever got an answer.
8   A.    I recall it being around 1.3 or
9   1.4 millimeters.
10  Q.    And would that be the -- the height of the
11  screw or the width of the screw?
12  A.    The length -- the length, the height.
13  Q.    The length.  Okay.  I'm sorry.  I should say
14  "length."
15        Are there different sized screws
16  within the Apple iPhone 6 Plus?
17  A.    Yes.
18  Q.    How many different sized screws are there in
19  the Apple iPhone 6 Plus?
20  A.    I haven't counted the screws and I don't know
21  the size and shape of each screw.
22  Q.    Do you know where on the subject iPhone that
23  the loose screw, as you're referring to it, where
24  that screw belonged?
25  A.    Well, there were multiple screws missing.  It

Page 87

1   was most consistent with the screw that was missing
2   from the home button assembly.
3   Q.    And how did you arrive at that conclusion?
4   A.    By looking at the microscopy photos and
5   measuring them, measuring the screws during the
6   inspection.
7   Q.    Did you measure and conduct an analysis of
8   each of the housings of the locations where you're
9   stating that the screws were missing from?
10  A.    There were several pictures taken of -- of
11  other screws from other locations that were -- were
12  different.
13  Q.    Okay.  So my question is a little different.
14        Did you conduct any measurements or
15  analysis of the housings of where the screws you're
16  saying were missing from?
17  A.    Analysis of -- of those housings was -- was
18  part of review of -- of the radiography and -- and
19  seeing -- and just the general inspection, the --
20  the destructive inspection to photograph and
21  document the current state of the -- of the phone.
22  Q.    Did you put those housings under a
23  microscope?
24  A.    I don't recall if -- if microscope photos of
25  the housing were taken.  Many microscope photos were

Page 88

1   taken.  Many of those would have included screw
2   housings.  So, yes, it's likely that many of the
3   screw housings were taken pictures of with a
4   microscope.
5   Q.    But -- but your analysis of those screw
6   housings is not anywhere included in your report,
7   correct?
8   A.    Analysis of the screw housings, other than
9   the fact that they were empty when Apple took the
10  x-ray images that are included in my report as
11  figures 1 and 2.
12  Q.    Did you analyze the loose screw under a
13  microscope?
14  A.    Yes.
15  Q.    You say on page 17 of your report -- it's the
16  second full paragraph down.  You state that "The
17  following screws were not installed in the remains
18  of the phone."  And then you list two mid-plate
19  attachment screws, three screen assembly screws, and
20  one side button bracket screw.
21        Do you see that?
22  A.    I do see that.
23  Q.    Now, you say they were not installed in the
24  remains of the phone.
25        Do you know whether they were

Page 89

1   installed when my client refurbished and repaired
2   the phone back in January of 2016?
3   A.    My understanding is that no one has altered
4   or modified, repaired the phone, opened the phone
5   since FedEx Supply Chain, your client did, during
6   their repair and refurbishment work.  So based on
7   the record, including testimony, the phone was --
8   was in the same condition prior -- prior to the
9   incident as it was when it left FedEx Supply Chain.
10  Q.    Okay.  Again, my -- my question to you is a
11  little different than that.  All right?  I
12  understand that there is information in this case
13  that leads you to believe that nobody else repaired
14  or refurbished the phone since it left FedEx Supply
15  Chain.
16        My question to you, Mr. Kobilka, do
17  you know one way or the other whether the screws
18  that you list in your report that were missing when
19  you looked at the phone were installed in January of
20  2016?
21  A.    Based on the information available to the
22  case -- in this case, that the condition of the
23  phone wasn't altered after that up until the
24  incident occurred, it is my understanding that they
25  were not installed properly.

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 90

1  Q.    So based on the information that you've
2  reviewed, you're making an assumption that they
3  weren't there in January of 2016?
4             MR. ROTHERMEL:  Let me just jump in
5        for a second.
6             Did FedEx ever take a photo or any
7        kind of expert imaging of the phone prior
8        to --
9             MR. STANKO:  Frank.
10            MR. ROTHERMEL:  -- I mean after they
11       do the repair and then send it?
12            MR. STANKO:  Hey, Frank, if you would
13       like to ask the witness questions you're
14       perfectly able to do that, but I'd
15       appreciate you waiting until I'm completed
16       with my questions.  Okay?
17            MR. ROTHERMEL:  Okay.  I'm just
18       asking whether or not that was ever
19       provided in discovery.
20            MR. STANKO:  I understand that.  And
21       I don't think --
22            MR. ROTHERMEL:  Did you ever provide
23       in discovery -- did you ever provide in
24       discovery any x-rays, imaging -- any
25       imaging that was done by FedEx Supply

Page 91

1        after they did the repair, in quotes, and
2        shipped the phone?
3             MR. STANKO:  Frank, this is not the
4        proper forum for you to be asking
5        questions of me.  Okay?
6             MR. ROTHERMEL:  Okay.  Well, no, I'm
7        just asking -- that's a very valid
8        question because, look, if you have one,
9        show it to him so we can actually see it.
10            MR. STANKO:  Frank, I'm not attacking
11       the validity of your question.  I'm
12       stating that this is an inappropriate
13       forum for you to be asking what was, what
14       was not produced in discovery.  I'm taking
15       a deposition of the expert that you have
16       produced on behalf of Ms. McCoy.  Okay?
17       If you'd like to discuss what was produced
18       in the discovery, I'm happy to have that
19       conversation with you after this
20       deposition.  This is not the appropriate
21       forum to do that.
22            MR. ROTHERMEL:  This is the perfect
23       one.  You don't have to bring the witness
24       back.  If you've got the photo, give it to
25       us so we can take a look at it and we

Page 92

1        don't have to bring him back.
2             Am I going to ask -- what, I'm going
3        to ask after the deposition and then
4        you're going to provide me a photo?  I
5        mean, how does that make sense?
6             MR. STANKO:  I'll tell you what is
7        not --
8             MR. ROTHERMEL:  Go ahead.
9             MR. STANKO:  -- going to happen is to
10       continue discussing this.
11            MR. ROTHERMEL:  Go ahead.  Go ahead.
12       Go ahead.  Go ahead.
13            MR. STANKO:  I believe there was a
14       question pending before counsel jumped in.
15            Ms. Keys, could you read that back.
16                      - - -
17            (The stenographer read back the
18       record as requested.)
19                      - - -
20            THE WITNESS:  My understanding comes
21       from the information that is available
22       in -- in this -- in this matter.  To
23       assume would be to put information into
24       the record that isn't there.  So what --
25       what I've done is used the facts as they

Page 93

1        are presented to me according to the
2        information that's available in the
3        record.
4  BY MR. STANKO:
5  Q.    Is there any information in the record,
6  Mr. Kobilka, that indicates that the screws were not
7  there in January of 2016?
8  A.    The lack of any information in the record
9  that states that anyone other than FedEx Supply
10 Chain altered this phone indicates that prior --
11 prior to the incident, that it was in the same
12 condition as it was when it left FedEx Supply Chain.
13 Q.    So is it your testimony here today that the
14 loose screw caused the nail penetration?
15 A.    It is my testimony as -- as it's stated in my
16 report that the cause of the thermal runaway was
17 penetration of the battery cell by a misplaced screw
18 left in the phone after defective refurbishment as
19 performed by FedEx Supply Chain.
20 Q.    And I understand that.
21            Is it your testimony that the loose
22 screw that you've described here in your deposition
23 was the screw that penetrated the -- the battery and
24 caused the thermal runaway?
25 A.    Well, I put in my report, I find that to be

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 94

1 likely, but there were other missing screws.
2           Is it possible that one of those
3 screws caused the penetration? Yes. Is -- and that
4 screw -- as we understand, the phone was thrown out
5 of a window. Is it possible that that screw was
6 ejected from -- from the phone? Yes.
7           There are numerous screws that we do
8 not have any accounting of.
9 Q.    Do you know who manufactured the battery?
10 A.    The markings on the battery were consistent
11 with markings I've seen on Apple batteries.
12 That's -- that's the information I have concerning
13 the manufacturer of the battery.
14 Q.    Did you review anything that indicates that
15 FedEx Supply Chain used Apple-manufactured batteries
16 in its refurbishment and repairs?
17 A.    It's -- it's my understanding that they had
18 contracted with one of several companies whose names
19 I don't recall. And I am not aware if those were
20 resellers of Apple batteries or if they were
21 utilizing any -- a -- a different battery.
22           That said, the markings that were
23 observed on the inside of the mid-plate were
24 consistent with Apple battery cells.
25 Q.    Do you know one way or the other whether

Page 95

1 FedEx Supply Chain in the work that it performed in
2 January of 2016 inserted an Apple-manufactured
3 battery into the subject iPhone?
4 A.    It's my understanding based on -- on what I
5 observed during the investigation that it was an
6 Apple-manufactured battery.
7 Q.    And have you reviewed any information that
8 would indicate that FedEx Supply Chain input an
9 Apple-manufactured battery into the subject iPhone
10 on January 18, 2016?
11 A.    Well, I -- I just answered -- answered
12 that -- that I've concluded that it is consist --
13 markings consistent with an Apple-manufactured
14 battery were observed. And I have not seen -- or I,
15 you know, do not recall seeing purchase orders or an
16 explicit work order with regard to this phone with
17 this serial number as far as what battery it was
18 that FedEx Supply Chain installed.
19 Q.    So you don't know one way or the other
20 whether this battery was the battery that FedEx
21 Supply Chain placed in the subject iPhone
22 January 18, 2016?
23 A.    To assume that it wasn't would be to add
24 information to the record that -- that doesn't
25 exist.

Page 96

1 Q.    So you're assuming it was?
2 A.    I'm following the -- the information as
3 presented in the record of no one other than FedEx
4 Supply Chain modifying, altering, repairing this
5 phone.
6           MR. STANKO: That's all I have,
7     Mr. Kobilka. Thank you very much for your
8     time. Some of the other lawyers may have
9     some questions for you, but I should be
10     done, subject to what they have to ask
11     you.
12           -   -   -
13     E X A M I N A T I O N
14           -   -   -
15 BY MS. JOHNSON:
16 Q.    Mr. Kobilka, my name is Erica Johnson and I
17 represent CWork in this case. I only have just one
18 or two brief follow-up questions for you.
19           I just wanted to clarify some
20 testimony that you gave earlier this afternoon.
21           When Mr. Stanko was asking you
22 questions about your understanding of CWork's
23 business, do you recall that testimony?
24 A.    I do.
25 Q.    Okay. And your initial statement was that it

Page 97

1 was your understanding that FedEx and CWork together
2 refurbished and repaired iPhones.
3           Do you recall that testimony?
4 A.    I don't think that's exactly what I meant. I
5 think it was that FedEx Supply Chain performed the
6 repair and that CWork's was in the -- in the
7 logistics of this somewhere. That -- that was the
8 intent.
9 Q.    Okay. And do you -- did you review any
10 evidence, whether it was deposition testimony,
11 documentary evidence of any kind, that would
12 indicate to you that CWork had a hand in the
13 refurbishment and repair of the iPhone 6 in this
14 case?
15 A.    I did not see any evidence that would state
16 that CWork performed the refurbishment/repair.
17           MS. JOHNSON: Okay. That's all I
18     have for you. Thank you.
19           MR. STANKO: Frank?
20           MR. ROTHERMEL: No, I'm fine.
21           MR. STANKO: Thank you, Mr. Kobilka.
22     Thank you, Ms. Johnson.
23     Thank you, Frank.
24     Thank you, Ms. Keys.
25           THE STENOGRAPHER: Ms. Johnson, do

Jeffrey Kobilka, PE, CFEI
December 16, 2021

Page 98

1    you need a copy?

2         MS. JOHNSON:  Yes.  Electronic only

3    and no mini, just full size, please.

4         MR. STANKO:  I've never heard that

5    before.

6         THE STENOGRAPHER:  Mr. Rothermel, do

7    you need a copy?

8         MR. ROTHERMEL:  Yes, I do.  Can I

9    have it in PTX format too?

10        THE STENOGRAPHER:  Yes.

11        MR. ROTHERMEL:  Okay.  And then if I

12   can have a full one and a mini is good,

13   and electronically as well.

14        THE STENOGRAPHER:  Where do you guys

15   want the read and sign sent to?

16        MR. ROTHERMEL:  You can send it to

17   me.

18              -  -  -

19        (Whereupon, the deposition was

20   concluded at 3:38 p.m.)

21              -  -  -

22

23

24

25

Page 99

1              CERTIFICATE

2         I HEREBY CERTIFY that the proceedings, evidence,

3    and objections are contained fully and accurately in the

4    stenographic notes taken by me upon the deposition of

5    JEFFREY M. KOBILKA, PE, CFEI, taken on DECEMBER 16, 2021,

6    and that this is a true and correct transcript of same.

7

8         I FURTHER CERTIFY that I am neither attorney nor

9    counsel for, not related to nor employed by any of the

10   parties to the action in which this deposition was taken;

11   further, that I am not a relative or employee of any

12   attorney or counsel employed in this case, nor am I

13   financially interested in this action.

14

15

16   _____

17        Michelle Keys
          Stenographer
18        and Notary Public

19

20

21        (The foregoing certification of

22   this transcript does not apply to any

23   reproduction of the same by any means

24   unless under the direct control and/or

25   supervision of the certifying reporter.)

Page 100

1              ERRATA SHEET

2    PAGE   LINE   CHANGES OR CORRECTION AND REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Page 101

1

2         I have inspected and read my

3    deposition as captioned above and have

4    listed all changes and corrections above,

5    along with my reasons therefore.

6

7    DATE:_____

8

9    SIGNATURE OF DEPONENT: _____

10

11        I have read the foregoing transcript

12   of my deposition and it is true, correct

13   and complete, to the best of my knowledge,

14   recollection and belief, except for the

15   corrections noted hereon and/or list of

16   corrections, if any, attached on a separate

17   sheet herewith.

18        _____

19             JEFFREY M. KOBILKA, PE, CFEI

20

21

22        Subscribed and sworn to before me

23   this ____ day of _____, 2021.

24   _____

25   Notary Public

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ISHYNIQUE MCCOY | : | CIVIL ACTION – LAW |
| | : | |
| v. | : | |
| | : | |
| T-MOBILE STORE, T-MOBILE USA, INC., | : | |
| APPLE, INC. and ASURION and CWORK | : | |
| SOLUTIONS, LP | : | NO: 2:18-CV-04079-AB |
| | : | |
| v. | : | |
| | : | |
| ATC LOGISTICS & ELECTRONICS, INC. | : | |
| d/b/a GENCO TECHNOLOGY SOLUTIONS | : | |
| d/b/a FEDEX SUPPLY CHAIN | : | |

**INITIAL DISCLOSURES OF THIRD PARTY DEFENDANT, ATC LOGISTICS &
ELECTRONICS, INC. D/B/A GENCO TECHNOLOGY SOLUTIONS D/B/A FEDEX
SUPPLY CHAIN**

Third-Party Defendant, ATC Logistics & Electronics, Inc. d/b/a GENCO Technology

Solutions d/b/a FedEx Supply Chain ("FedEx Supply Chain"), by and through its attorneys,

Marshall Dennehey Warner Coleman & Goggin, makes the following Initial Disclosures

pursuant to Federal Rule of Civil Procedure 26(a):

**PRELIMINARY STATEMENT**

FedEx Supply Chain makes the following disclosures pursuant to Federal Rule of Civil

Procedure 26(a). FedEx Supply Chain makes these disclosures based on current information and

the knowledge, facts, circumstances, and legal theories involved in the underlying action.

Should additional information develop, FedEx Supply Chain will amend and supplement these

disclosures in accordance with Federal Rule of Civil Procedure 26(e).

**A.      The name and, if known, the address and telephone number of each
individual likely to have discoverable information—along with the subjects of that
information—that  the disclosing party may use to support its claims or defenses, unless the
use would be solely for impeachment;**

- Ishyinique McCoy, Plaintiff.

By way of further disclosure, FedEx Supply Chain incorporates by reference all individuals named in the Initial Disclosures and Discovery Responses of Plaintiff and Defendants, in addition to those individuals referenced in those documents produced herein and during discovery.   FedEx Supply Chain reserves the right to supplement this Disclosure as discovery and investigation is continuing.

**B.     A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that disclosing party has in its possession, custody, or control and  may use to support its claims or defenses, unless the use would be solely for impeachment;**

**EXHIBIT A:**       **Repair Services Agreement between CWork Solutions LP and ATC Logistics & Electronics, Inc.;**

**EXHIBIT B:**       **Battery supplier contract with Cellpoint Corporation;**

**EXHIBIT C:**       **Battery supplier contract with Etrade Supply International LTD;**

**EXHIBIT D:**       **Battery supplier contract with LMEG Wireless LLC.**

By way of further disclosure, FedEx Supply Chain reserves the right to use all documents or information named in the Initial Disclosures and Discovery Responses of Plaintiff and Defendants, in addition to those individuals referenced in those documents produced herein and during discovery.   FedEx Supply Chain reserves the right to supplement this Disclosure as discovery and investigation is continuing.

**C.     A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; and**

N/A.

**D.**     **For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

See attached Declarations Page.

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

By:_____
      Robert W. Stanko, Equire
      Andrew C. Goldstein, Esquire
      Attorneys for Third-Party Defendant,
      ATC Logistics & Electronics, Inc.
      d/b/a GENCO Technology Solutions
      d/b/a FedEx Supply Chain

Dated:  June 15, 2020

## REPAIR SERVICES AGREEMENT

This Repair Services Agreement ("Agreement") is entered into by and between CWork Solutions LP, a Delaware limited partnership with principal offices located at 676 E. Swedesford Lane, Wayne, PA 19087 ("CWork") and, ATC Logistics & Electronics, Inc. a Delaware corporation doing business as GENCO Technology Solutions, with principal offices located at 13500 Independence Parkway, Fort Worth, TX 76177 ("Service Provider") effective September 15, 2014 ("Effective Date").

## RECITALS

A.      Service Provider is in the business of providing repair and logistics solutions.

B.      CWork is in the business, by itself or through its affiliates, of providing logistic, asset recovery and repair services for carriers or end users.

C.      Whereas, the Parties desire that, on a non-exclusive basis, Service Provider repairs, tests, refurbishes packages and ships mobile devices (and associated items) as set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## TERMS

1      **Definitions.** In addition to terms defined elsewhere in this Agreement, the capitalized terms set forth below shall have the following meaning:

1.1      **"Consumer"** means the end user (and may be, if applicable, a legal entity) of a Device.

1.2      **"Customer"** means CWork's or CWork's business partner's customer having contracted services from CWork or CWork's business partner who designates CWork as the service provider or administrator of the contracted services.

1.3      **"Device"** means the product(s) for which Service Provider provides Services under this Agreement as identified in the respective SOWs attached to this Agreement.

1.4      **"Expected Shipment Date"** means the date that CWork expects the shipment of Devices to arrive at their facility. CWork will provide this date to the Service Provider.

1.5      **"Fee and Price Schedule"** means the prices and fees set forth in the respective SOW exhibit.

1.6      **"Inventory"** means without limitation the Device, repair parts, accessories, components, consumables, packaging and other inventory held by Service Provider to the extent it is for use with the Services provided by Service Provider to CWork under the terms of this Agreement.

1.7      **"On Time Shipment"** means a Service Provider shipment which is received by CWork between five (5) business days prior and three (3) business days after the agreed upon Expected Shipment Date.

1.8      **"Packaging and Shipping Specifications"** means packaging and shipping specifications set forth in the respective CWork packaging requirement documents.

1.9      **"Services"** means the services performed by Service Provider hereunder which shall include but not be limited to repair, testing, refurbishment, shipping and packaging services as more specifically set forth in the respective SOWs that are attached as Schedules to this Agreement or will be attached to this Agreement from time to time by mutual written agreement between the Parties.

1.10      **"Service Forecast"** means the monthly forecast provided to Service Provider by CWork, in

FedEx Supply 000001

writing, of future Service requirements for a three (3) month rolling period.

**1.11** **"Service Location(s)"** means the location(s) at which Service Provider will provide the Services as set forth in the respective SOW hereto or as agreed from time to time in writing between the Parties.

**1.12** **"Service Specifications"** means the Service specifications set forth in the respective SOW.

**1.13** **"SOW"** means the statement of work for each Customer attached to this Agreement and as amended in writing from time to time upon mutual agreement of the Parties.

**1.14** **"Termination Charges"** means the sum of: (a) the applicable price for the Services which Service Provider has completed prior to the Termination Effective Date for which payment has not been made, (b) reimbursements for material acquisition costs, for all Inventory that supports the Service Forecast at the time of Termination Effective Date which were purchased pursuant to Service Forecasts at Service Provider's cost, and (c) Service Provider's reasonable cancellation costs incurred for any materials, components, equipment subcontracted items or any other items that Service Provider had on order on behalf of CWork on the Termination Effective Date.

**1.15** **"Test Procedures"** means testing specifications, standards, procedures and parameters set forth in the SOW(s) attached hereto.

**1.16** **"Service Provider Created Intellectual Property"** means any discoveries, inventions, technical information, procedures, manufacturing or other processes, software, firmware, technology, Service Provider Data, know-how or other intellectual property rights created, developed or reduced to practice by or for Service Provider in (i) providing any Service pursuant to this Agreement, or (ii) which is otherwise embodied within the Services or any other work provided pursuant to this Agreement.

**1.17** **"Service Provider Existing Intellectual Property"** means any discoveries, inventions, technical information, procedures, manufacturing or other processes, software, firmware, technology, Service Provider Data, know-how or other intellectual property rights owned, developed or obtained by Service Provider outside of this Agreement or known by Service Provider prior to the execution of this Agreement that are used by Service Provider in creating, or are embodied within, any Device, the Services or other work performed under this Agreement.

**1.18** **"Service Parts"** means any Original Equipment Manufacturers (OEM) components, or any other components for which CWork has provided prior written approval, for use in providing Services.

**2** **Services.** CWork hereby authorizes Service Provider and Service Provider agrees to perform the Services as set forth in this Agreement at the Service Location(s), unless otherwise specifically agreed to by CWork.

**2.1** **Testing.** Service Provider will test the Devices in accordance with the CWork Test Procedures.

**2.2** **Packaging and Shipping.** Service Provider will package and ship the Devices in accordance with Packaging and Shipping Specifications set forth in the respective CWork packaging requirement documents. CWork shall be responsible for the sufficiency and adequacy of the Packaging and Shipping Specifications.

**2.3** **Performance of Services.** CWork shall provide the Service Specifications, Test Procedures, Packaging and Shipping Specifications, material component descriptions (including approved substitutions), service requirements, and any other specifications necessary for Service Provider to perform the Services in the respective SOW.

**2.4** **CWork Inspection.** CWork shall have the right, upon reasonable advance notice, during normal business hours and at its expense, to inspect, review, monitor and oversee the Services. CWork will inform Service Provider about the planned inspection at least two (2) days in advance.

FedEx Supply 000002

**2.5** <u>Items to be Supplied by Service Provider</u>. Service Provider will provide needed technology, capacity, labor, transportation logistics, systems and facilities necessary for Service Provider to perform the Services. Service Provider shall only use Service Parts in providing its Services under this Agreement.

**2.6** <u>Materials Procurement</u>. Service Provider will use commercially reasonable efforts to procure components and packaging supplies, as necessary to provide the Services in accordance with the Service Forecast. CWork will pay Service Provider for all materials used for providing Services under this Agreement as outlined in the respective SOW.

**2.7** <u>Inventory</u>. Service Provider accepts the responsibility for maintaining sufficient Inventory to meet the Service Forecast.

**2.8** <u>Location</u>. The Service Provider will perform the Services at its location in the United States, unless otherwise approved in writing by CWork. As of the Amendment Effective Date, CWork has approved Service Provider's use of a repair facility in Mexico, subject to Service Provider's compliance with the terms of this Agreement.

3  <u>Service Provider Warranty</u>. Service Provider warrants the Services for a period of ninety (90) days (unless otherwise specified in the SOW) from the date any Device is received by CWork or by CWork's designated carrier ("Service Provider Warranty Period").

4  <u>Payment Terms</u>. Service Provider shall submit an invoice to CWork on a monthly basis for all related fees and Additional Charges incurred in performance of the Services under this Agreement, in accordance with the respective SOW.

**4.1** <u>Payment.</u> Payment of all invoices shall be net thirty (30) days from date of invoice. Any undisputed invoices not paid within thirty (30) days of receipt shall cause CWork to be in default of this Agreement and Service Provider may suspend some or all of the Services at any time that CWork is past due on the payment of any undisputed amounts 15 days after Service Provider has given notice to CWork of nonpayment.

**4.2** <u>Additional Charges.</u> CWork shall be responsible for all federal, state and local sales, use, excise and other taxes (except taxes based on Service Provider's income), and all reasonable delivery, shipping, and transportation charges ("Additional Charges").

5  <u>Import and Export.</u> If applicable, Service Provider shall make best efforts to ensure any required import or export documentation necessary for Service Provider or its 3rd party partners is available to deliver product. This does not include any manufacturer's OEM certifications or proprietary documentation which would not be generally available.

6  <u>Change Orders, Rescheduling and Cancellation.</u> CWork or Service Provider may, in writing, request a change in Services or the SOW at any time. The non-requesting party will analyze the requested change and provide an assessment of the effect that the requested change will have on cost, scheduling, delivery and implementation. CWork will be responsible for all costs associated with any accepted changes, unless otherwise agreed to in writing by the parties. Any such change shall be documented in a written change order and shall become effective only upon mutual written agreement (amendment) of both Parties to the terms and conditions of such change order, including changes in time required for performance, cost (including cost of materials on hand or on order in accordance with the original Repair Schedule) and applicable delivery schedules.

7  <u>Liability.</u> Each Party shall indemnify and hold the other harmless against all and any losses, claims, damages, awards, penalties or injuries, including reasonable attorney's fees which arise from any negligent acts or breach of this Agreement.

FedEx Supply 000003

8    **Term.** This Agreement has a term of three (3) years from the Effective Date and will be automatically renewed for successive one (1) year periods, unless and until terminated by either Party with ninety (90) days prior written notice to the end of the respective term.

9    **Termination.** This Agreement may be terminated as follows:

**9.1    Termination for Convenience.** Each Party may terminate this Agreement at any time with ninety (90) days prior written notice, provided that such termination shall not be effective before one hundred eighty (180) days from the Effective Date.

**9.2    Termination for Cause.**

a)    Either Party may terminate this Agreement based on the material breach by the other Party of the terms of this Agreement, provided that the Party alleged to be in material breach receives written notice setting forth the nature of the breach at least thirty (30) days prior to the intended termination date. In the event the breach cannot be cured within thirty (30) days, the breaching party shall have additional time within which to cure; provided the breaching party starts to cure within the thirty (30) day period. During such time the Party in material breach may cure the alleged breach and if such breach is cured within such thirty (30) day period, no termination will occur and this Agreement will continue in accordance with its terms. If such breach shall not have been cured, termination shall occur upon the termination date set forth in such notice.

b)    Additionally, (i) CWork may terminate this Agreement based on Service Provider's material failure to meet the Service Level Agreement (SLA) defined in the respective SOW of this Agreement or (ii) either party may terminate this Agreement if the assumptions upon which the pricing in the respective SOWs change materially and CWork refuses to agree to corresponding price changes; provided that the terminating party gives written notice of (i) or (ii) above at least thirty (30) days prior to the intended termination date. If Service Provider rectifies the issue raised by CWork in (i) or (ii) above within such thirty (30) day period, no termination will occur and this Agreement will continue in accordance with its terms. If such issue is not rectified, termination shall occur upon the termination date set forth in such notice.

c)    CWork may terminate this Agreement immediately with written notice to Service Provider due to Service Provider's:

(i) intentional act of fraud, embezzlement, theft or any other material violation of law that occurs during the Term of this Agreement; or

(ii) intentional damage to assets of CWork; or

(iii) intentional disclosure of CWork's Confidential Information.

**9.3    Termination for Bankruptcy/Insolvency.** Upon the happening of any of the following events with respect to a Party, this Agreement may be terminated immediately:

a.    The appointment of a receiver or custodian to take possession of any or all of the assets of a Party, or should a Party make an assignment for the benefit of creditors, or should there be an attachment, execution, or other judicial seizure of all or a substantial portion of a Party's assets, and such attachment, execution or seizure is not discharged within thirty (30) days.

b.    A Party becomes a debtor, either voluntarily or involuntarily, under Title 11 of the United States Code or any other similar law and, in the case of an involuntary proceeding, such proceeding is not dismissed within thirty (30) days of the date of filing.

4

FedEx Supply 000004

      c.     The dissolution or termination of the existence of a Party whether voluntarily, by operation of law or otherwise.

**9.4**    **Termination Consequences.** If this Agreement is terminated for any reason, CWork shall not be excused from performing its obligations under this Agreement with respect to payment for all monies due Service Provider hereunder including fees, costs and expenses incurred by Service Provider up to and including the Termination Effective Date and Service Provider shall not be excused from performing its obligations under this Agreement until CWork finds a replacement provider to whom the services can be transitioned, provided that any such transition period shall, in no event, exceed period of six (6) months, unless mutually agreed by the parties.

**9.5**    **Physical Inventory.** Unless otherwise agreed by the Parties in writing, a complete physical inventory will be conducted by Service Provider or a party designated by Service Provider if termination is not for cause. In the event that Service Provider terminates this Agreement for cause CWork shall pay the cost of the complete physical inventory, and will assume ownership and legal title to the physical Inventory.

**10**    **Termination Charges**. Upon termination, expiration or cancellation of this Agreement for any reason, Service Provider shall submit to CWork Service Provider's written claim for termination/cancellation charges within 60 days from the effective date of such termination or cancellation for any Service related costs as e.g. materials, components, equipment or any other costs incurred by Service Provider on CWork's behalf. Service Provider's claim shall be based upon costs incurred by Service Provider up to and including the date of termination, expiration or cancellation ("Termination Effective Date") including applicable margin. Service Provider will provide to CWork all information necessary to confirm the costs and expenses sustained by Service Provider due to termination, expiration or cancellation. To the extent that Service Provider cannot claim its costs as specified in this Section, upon cancellation, expiration or termination for any reason, CWork's obligation shall be to pay the Termination Charges claimed by Service Provider.

**11**    **Duty to Mitigate Costs**. Both Parties will, in good faith, undertake reasonable measures to mitigate the costs of termination, expiration or cancellation. Service Provider will make commercially reasonable efforts to cancel all applicable component and material purchase orders and reduce the Inventory through return for credit programs or allocate such components and materials for alternate CWork programs if applicable, or other Customer orders; provided, the same can be used within sixty (60) days of the termination date. CWork shall assist Service Provider with the cancellation of component and material orders and to reduce the Inventory through return for credit programs or through allocating such components and materials for alternate CWork programs if applicable.

**12**    **Confidentiality.**

Confidential Information shall mean any and all data and information relating to the business of the disclosing party (the "Disclosing Party") which is disclosed to the other party (the "Receiving Party") pursuant to this Agreement, including, but not limited to information about hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, "know-how", compilations, market research, marketing techniques and plans, business plans and strategies, customer names and all other information related to customers, including without limitation any "nonpublic personal information" as defined under the Gramm-Leach-Bliley Act, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the Disclosing Party for regulatory, customer relations, and/or competitive reasons. Confidential Information shall also include such confidential and proprietary information or material belonging to a Disclosing Party of or to which the other party may obtain knowledge or access through or as a result of the performance of its obligations under this Agreement. Confidential Information also includes any information described above which the Disclosing Party has obtained in confidence from another party who treats it as proprietary or

FedEx Supply 000005

designates it as Confidential Information, whether owned or developed by the Disclosing Party.

Confidential Information shall not include information which (a) is or becomes part of the public domain other than as a result of a disclosure to the Receiving Party in breach of this Agreement; (b) is rightfully known by the Receiving Party prior to disclosure by the Disclosing Party; (c) is furnished to others by the Disclosing Party without restriction on disclosure, (d) is independently developed by the Receiving Party at any time, without any breach of this Agreement; (e) is rightfully obtained by the Receiving Party from a source other than the Disclosing Party who the Receiving Party reasonably believes is not bound by a contractual, legal or fiduciary obligation of confidentiality to the Disclosing Party; (f) the Disclosing Party expressly agrees in writing does not constitute Confidential Information; or (g) is required to be disclosed by the Receiving Party by judicial or government action.

### Disclosure and Use of Confidential Information

1. The Receiving Party agrees to use the Disclosing Party's Confidential Information only for the purposes of fulfilling its obligations to the other party and only for the purposes for which it was disclosed. Receiving Party further agrees not to disseminate, disclose, publish, transfer or otherwise make available Confidential Information to other third parties, without prior written approval from the Disclosing Party or as otherwise required by law, unless such disclosure is necessary for Receiving Party to meet is contractual obligations and that party is similarly bound by the same privacy standards in the handling of the Confidential Information.

2. Receiving Party may disclose Confidential Information to its officers, directors, general partners, employees, agents, financial advisors or attorneys who are directly involved in Receiving Party meeting its contractual obligations and who have a specific need to know such information, and have obligated themselves to hold such Confidential Information in trust and confidence or otherwise comply with the terms of its Agreement.

3. Disclosing Party warrants that the disclosure of the Confidential Information to the Receiving Party is in accordance with applicable state and federal law and the Disclosing Party's own stated privacy policies.

4. Receiving Party warrants that all Confidential Information relating to the Disclosing Party shall be held in confidence to the same extent and in at least the same manner Receiving Party protects its own confidential and proprietary information.

5. Receiving Party will not make any more copies of Confidential Information than is necessary for its use under the terms of the Agreement and each such copy shall be marked with the same proprietary notices as appear on the originals.

6. Prior to any mandatory or compelled request for the disclosure of Confidential Information to any authorized governing body, the Receiving Party shall first attempt to notify the Disclosing Party to allow the Disclosing Party to try and seek a protective order protecting or limiting the disclosure of the Confidential Information, unless the notification is prohibited by the nature of the request or subpoena.

7. All Confidential Information, including this Agreement and all information relating to Assurant, Inc., a publicly traded company, and its subsidiaries and affiliates, cannot be relied upon and/or communicated to anyone else for the purpose to buy, sell, trade or otherwise take any position in any of the securities of Assurant, Inc, or any derivatives thereof, or to take any action to affect the trading prices of the securities of Assurant, Inc. It is acknowledged that use of such Confidential Information for purposes of buying, selling, trading or taking any position in such securities, or any derivatives thereof, prior to any public disclosure by Assurant, Inc. or its affiliates of such information would violate federal and state securities laws restricting the use or disclosure of inside information. In accordance with such obligation to keep such information confidential, it is agreed that there will not be any press releases to similar disclosures concerning Assurant, Inc. without the prior written consent of

FedEx Supply 000006

Assurant, Inc.

## Privacy and Security Compliance

1.  Receiving Party agrees, where legally required, to comply with all applicable privacy and security laws, including but not limited to, 1) Gramm-Leach-Bliley Act ("GLB"), 2) any and all applicable state privacy and security laws, and 3) any relevant regulations promulgated in conjunction with applicable privacy and security laws.

2.  Receiving Party agrees to take all reasonable  security precautions to protect against the unauthorized use, publication, destruction or disclosure of the Confidential Information, including but not limited to the use of security control technologies (such as encryption, firewalls, passwords, authentication, data access and transmission controls and control procedures, virus protection and anti-spy software, etc.), physical  security measures and limited access to buildings or acknowledgements with person having access to Confidential Information. The objective of the security precautions shall be to ensure the security and confidentiality of Confidential Information, protect against any anticipated threats or hazards to the security or integrity of Confidential Information and protect against the unauthorized access to or use of Confidential Information that could result in substantial harm or inconvenience.

3.  Receiving Party agrees to fully cooperate with Disclosing Party to ensure its privacy and security compliance including to reasonably cooperate with Disclosing Party in its efforts to assess security procedures, including but not limited to assisting with assessments, questionnaires and/or audits. Upon written request, Receiving Party shall provide to Disclosing Party information, such as audits of summaries of test results, demonstrating the effectiveness of its privacy and/or security programs.

4.  Receiving Party shall, as soon as practicable, notify Disclosing Party of any actual or suspected breach of Confidential Information, shall reasonably cooperate with Disclosing Party to mitigate the unauthorized disclosure of Confidential Information and any resulting damage and assist in Disclosing Party's notification of affected persons. To the extent that the unauthorized use, disclosure, damage to destruction of Confidential Information is a direct result of the actions or inactions of Receiving Party and/or its agents or representatives, Receiving Party will be responsible for all costs incurred in resolving the incident.

5.  All Confidential Information shall remain the sole and exclusive property of the Disclosing Party and shall be returned or destroyed, at the sole discretion of the Disclosing Party, upon any request, expiration of the legal retention period, and/or termination of the parties' relationship. Receiving Party shall return or destroy, at its cost and expense, the Confidential Information and all copies or other reproductions of Confidential Information, regardless of format.  All such Confidential Information will be shredded and all such electronic or digital records and files will be erased or otherwise rendered unreadable, in a way that prevents the records or files from being practicably read or reconstructed. Receiving Party shall promptly confirm to Disclosing Party the destruction of the Confidential Information.

## Injunctive Relief

It is agreed that the unauthorized disclosure or other violation of applicable privacy and security laws may cause immediate or irreparable injury to the Disclosing Party and that Disclosing Party may not be adequately compensated for such injury in monetary damages.  Therefore, the parties acknowledge and agree that, in such event, the Disclosing Party shall be entitled to seek any temporary or permanent injunctive relief  or restraining order, in addition to all other remedies available at law or in equity, including costs and reasonable attorney's fees, without posting of a bond, necessary to prevent such unauthorized disclosure to use, or threat of disclosure or use and consents to the jurisdiction of any federal or state court of competent jurisdiction sitting in  Miami, Florida for purpose of any suit hereunder and to service of process therein by certified or registered mail, return, receipt requested.

FedEx Supply 000007

Notwithstanding anything stated above, neither party shall be required to delete, destroy or deliver information contained on computer back-up tapes maintained in the ordinary course of business; provided however, that all customer names and all other information related to customers, including without limitation any "nonpublic personal information" as defined under the Gramm-Leach-Bliley Act, that may have been retained by Service provider shall be deleted and destroyed by Service Provider.

**13    Intellectual Property Rights; Assignment.**

**13.1    Service Provider Existing Intellectual Property.**  Service Provider shall retain all right, title and ownership to any Service Provider Existing Intellectual Property that is used during performance of the Services or as part of any other work provided pursuant to this Agreement or any other related agreement executed by the Parties.

Upon full payment of all monies due and owing under this Agreement and all other monies due and owing to Service Provider pursuant to any other related agreement executed by the Parties, Service Provider will grant to CWork a worldwide, non-exclusive, fully paid-up, royalty free right and license to the Service Provider Existing Intellectual Property only insofar as is required for CWork to use, sell or distribute the Devices provided as part of the Services performed by Service Provider pursuant to this Agreement; provided however, that no license to repair processes and/or repair process improvements shall be granted hereunder. This right is only valid during the term of this contract.

**13.2    Service Provider Created Intellectual Property.**  Service Provider shall retain all right, title and ownership to any Service Provider Created Intellectual Property that is used during performance of the Services. Upon full payment of all monies due and owing under this Agreement and all other monies due and owing to Service Provider pursuant to any other related agreement executed by the Parties, Service Provider will grant to CWork a worldwide, non-exclusive, fully paid-up, royalty free right and license to use the Service Provider Created Intellectual Property only insofar as is required for CWork to use the Devices.

**14    Relationship of Parties.** Service Provider shall perform its obligations hereunder as an independent contractor.   Nothing contained herein shall be construed to imply a partnership or joint venture relationship between the Parties. The Parties shall not be entitled to create any obligations on behalf of the other Party, except as expressly contemplated by this Agreement. The Parties will not enter into any contracts with third parties in the name of the other Party without the prior written consent of the other Party.

**15    Insurance.**

Service Provider shall maintain in force with companies having an AM Best rating of A VIII or higher, unless approved in writing in advance by CWork:

**(i)**    Commercial General Liability Insurance with a combined single limit of not less than $1,000,000 per occurrence and $2,000,000 aggregate;

**(ii)**   Workers' Compensation Insurance to the extent required by applicable laws and employer's liability coverage of at least $1,000,000 per occurrence;

**(iii)**  Comprehensive Automobile Liability Insurance, in the event a motor vehicle is to be used in Service Provider's performance of services, covering liability arising out of any auto (owned, hired and non-owned) with a combined single limit of not less than $1,000,000;

**(iv)**   Umbrella Liability Insurance of not less than $5,000,000 per occurrence; (the coverage's specified in (i) through (iii) all on an occurrence basis);

8

FedEx Supply 000008

(v)   Professional Liability Insurance (extending such coverage to the services contemplated by this Agreement) with a $5,000,000 limit of liability (on a claims made basis); and

(vi)   Crime/Employee Dishonesty Insurance, including a Third Party Fidelity endorsement and an endorsement naming Assurant, Inc. it's affiliates and subsidiaries as loss payee, with a $1,000,000 limit of coverage (on a discovery basis).

All policies shall be on a primary basis and without any right of contribution from any insurance carried by CWork.  The insurance coverage specified in (i) and (iii) above shall name Assurant, Inc., its affiliates and subsidiaries and its employees and agents as additional insureds.  Such insurance shall include appropriate clauses and/or endorsements pursuant to which the insurance companies shall waive its right of subrogation against CWork and provide cross-liability coverage. Service Provider shall provide proof of such insurance in the form of a certificate of insurance to CWork prior to the commencement of this agreement and at each subsequent policy renewal date.  The certificate shall provide for not less than thirty (30) days written notice to CWork prior to policy cancellation, or non renewal.

Failure of CWork to request such certificates of insurance or other evidence of full compliance with the insurance requirements or failure of CWork to identify a deficiency from evidence that is provided shall not be construed as a waiver of obligation to maintain such insurance.

Notwithstanding anything to the contrary herein, CWork's ability to collect under these insurance policies outlined in this Section 7 above shall not be limited by the other provisions set forth in this Agreement.

16   **Publicity.** Without the consent of the other Party, neither Party shall refer to this Agreement in any publicity or advertising or disclose to any third party any of the terms of this Agreement. Notwithstanding the foregoing, neither Party will be prevented from, at any time, furnishing any information to any governmental or regulatory authority, including the United States Securities and Exchange Commission or any other foreign stock exchange regulatory authority, that it is by law, regulation, rule or other legal process obligated to disclose, so long as the other Party is given advance written notice of such disclosure.  A Party may disclose the existence of this Agreement and its terms to its attorneys and accountants, suppliers, customers and others only to the extent necessary to perform its obligations and enforce its rights hereunder.

17   **Force Majeure.** Neither Party will be liable for any delay in performing, or for failing to perform, its obligations under this Agreement resulting from any cause beyond its reasonable control including, acts of God; blackouts; power failures; inclement weather; fire; explosions; floods; hurricanes;  typhoons; tornadoes; earthquakes; epidemics; strikes; work stoppages; labor, component or material shortages; slow-downs; industrial disputes; sabotage; accidents; destruction of production facilities; riots or civil disturbances; terrorism, acts of government or governmental agencies, including changes in law or regulations that materially and adversely impact the Party,; provided that the Party affected by such event promptly notifies (in no event more than five (5) business days of discovery of the event) the other Party of the event.  If the delays caused by the force majeure conditions are not cured within thirty (30) days of the force majeure event, then either Party may immediately terminate this Agreement.

18   **Miscellaneous.**

18.1   **Notices.** All notices, demands and other communications made hereunder shall be in writing and shall be given either by UPS, USPS or Federal Express (with charges prepaid), or electronic mail (e-mail) addressed to the respective Parties at the following addresses:

FedEx Supply 000009

Notice to Service Provider: ATCLE
100 Papercraft Park
Pittsburgh, PA 15238
Attention: Chief Financial Officer

With a copy to:          ATCLE
5201 Alliance Gateway Freeway
Fort Worth, TX 76177


Notice to CWork:          Assurant Solutions
11222 Quail Roost Drive
Miami, FL 33157-6596
Attention: General Counsel

With a copy to:          CWork Solutions, LP
625 Willow Springs Lane
York, PA 17406
Attn: Pat O'Callaghan

**18.2     Amendment.** This Agreement may not be amended, modified, or changed in any respect except by an agreement in writing signed by the Parties.

**18.3     Partial Invalidity.** Whenever possible, each provision of this Agreement shall be interpreted in such a way as to be effective and valid under applicable law.  If a provision is prohibited by or invalid under applicable law, it shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**18.4     Entire Agreement.** This Agreement, the Schedules and any addenda attached hereto or referenced herein, constitute the complete and exclusive statement of the agreement of the Parties with respect to the subject matter of this Agreement, and replace and supersede all prior agreements and negotiations by and between the Parties. Each Party acknowledges and agrees that no agreements, representations, warranties or collateral promises or inducements have been made by any Party to this Agreement except as expressly set forth herein or in the Schedules and any addenda attached hereto or referenced herein, and that it has not relied upon any other agreement or document, or any verbal statement or act in executing this Agreement.  In the event of any inconsistency between the provisions of this Agreement and any Schedule and any addenda attached hereto or referenced herein, the provisions of this Agreement shall prevail unless expressly stipulated otherwise, in writing executed by the Parties.

**18.5     Binding Effect.** This Agreement shall be binding on the Parties and their successors and assigns; provided, however, that (a) neither Party shall assign, delegate or transfer, in whole or in part, this Agreement or any of its rights or obligations arising hereunder (except with regard to payment of monies) without the prior written consent of the other Party, and (b) except that either Party may, without having to obtain the prior written consent of the other Party, may transfer, assign or sub-license the benefit of the whole or any part of its obligations and rights under this Agreement to any Affiliate of, or any successor of all or part of such Party.  Any purported assignment without such consent shall be null and void.  CWork acknowledges and agrees that Service Provider may use temporary employees or contract labor in its performance of the Services; provided that Service Provider remains liable to CWork for compliance with the terms of this Agreement and that Service Provider remains liable to such temporary employees or contract labor for payment of any amounts due.

**18.6     Waiver.** Waiver by either Party of any breach of any provision of this Agreement shall not be considered as or constitute a continuing waiver or a waiver of any other breach of the same or any

10

FedEx Supply 000010

other provision of this Agreement.

**18.7**    **Construction.** Since both Parties have engaged in the drafting of this Agreement, no presumption of construction against any Party shall apply.

**18.8**    **Dispute Resolution.** Unless otherwise stated in this Agreement, if any dispute shall arise between CWork and Service Provider with regard to the interpretation of this Agreement or either party's rights hereunder, then the dispute shall be referred to an arbitration panel consisting of three (3) independent arbitrators, none of whom shall be affiliated with either party. CWork shall choose one (1) arbitrator and Service Provider shall choose one (1) arbitrator and the two (2) chosen arbitrators shall select a third arbitrator. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after the receipt of written notice from the other party requesting arbitration and naming its arbitrator, the requesting party may name an arbitrator for the other party. If after thirty (30) days the two (2) arbitrators are not able to agree on a choice for the third arbitrator, then the American Arbitration Association shall make the appointment of a person who is neutral to the parties in controversy. Each party shall submit its case to the three (3) arbitrators within thirty (30) days of the appointment of the third arbitrator unless a majority of the arbitrators or the parties mutually agree to extend such time period. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("Rules") in effect at the time the arbitration is instituted and as provided herein. In the event of any inconsistency between such Rules and this Agreement, this Agreement shall control. The decision of a majority of the arbitrators shall be binding on the parties. The arbitrators are prohibited from awarding punitive, exemplary, multiple or consequential damages of whatever nature. Each party shall bear the expense of its own arbitrator, or one-half of the expense of the two (2) arbitrators if both are appointed by the requesting Party as provided above, and shall jointly and equally bear with the other the expense of the third arbitrator and of the arbitration. Each party understands and agrees that, as a result of this Section, neither party shall have the right to seek redress in a court of equity or law except as provided herein. Each party hereby waives it right to a jury trial. Any arbitration proceeding shall take place in Miami, Florida.

**18.9**    **Governing Law.** This Agreement and the interpretation of its terms shall be governed by the laws of Florida.

**18.10**    **Other Documents.** The Parties shall take all such actions and execute all such documents that may be necessary to carry out the purposes of this Agreement, whether or not specifically provided for in this Agreement.

**18.11**    **Counterparts.** This Agreement may be executed by facsimile and delivered in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall be deemed to be one agreement.

**18.12**    **Subcontracting.** If Service Provider subcontracts its duties to any third party, the use of such third party subcontractors does not relieve Service Provider of its duties in this Agreement. Service Provider shall cause such third party subcontractors to perform Service Provider's duties according to the terms of this Agreement. Service Provider will not subcontract any work without prior written approval from CWork.

19    Compliance with Laws. Service Provider represents, warrants and covenants that it will comply with all applicable federal, state and local laws, statutes, acts, ordinances, rules, codes and regulations, guidance, circulars, executive orders and other official releases of or by any government, or any regulatory or other authority, department or agency thereof, in any applicable jurisdiction anywhere in the world (collectively "Laws") in connection with the Services, including, but not limited to, the Export Control Act, the Foreign Corrupt Practices Act, those laws applicable to refurbishing, reselling, recycling and any other disposition and/or treatment, use or disposal of used consumer electronics (in whole or in part), environmental, privacy and disposal Laws. At CWork's request, Service Provider shall provide any applicable license or certificate of compliance that verifies Service Provider's compliance with Laws.

11

FedEx Supply 000011

20    **Export Restrictions.**  Service Provider agrees to fully comply with all applicable export control Laws,  and will not export, re-export, release, or transfer, directly or indirectly, any commodities, software, or technology, for any proscribed end-use, to any entity engaged in the manufacture of nuclear, biological, or chemical weapons, or missile technology;  or to any proscribed country (including without limitation Cuba, Iran, North Korea, Sudan, or Syria), entity, or person (wherever located), including but not limited to those entities and persons listed on the U.S. Government's Denied Persons List, Unverified List, Entity List, Debarred Parties List or Specially Designated Nationals List, without first obtaining at its own expense written authorization from the U.S. Government authorizing such export, re-export, release, or transfer.

21    **Tax and Customs.**  Service Provider will be responsible for payment of all applicable value added, sales or use taxes or like taxes owed to any governmental authority as a result of entering into this Agreement.  CWork is not liable for any of the taxes that Service Provider is legally obligated to pay as a result of Service Provider's provision of the Services. All such taxes (including without limitation, income taxes, withholding taxes, value added, franchise, gross receipt, sales, use, property or similar taxes, duties, levies, fees, excises or tariffs incurred in connection with or related to the distribution of the Equipment) will be Service Provider's financial responsibility.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives.

CWork Solutions LP
By its General Partner
Signal GP, LLC

By: _Pat O'Callaghan_
      Signature

Name: _PAT O'CALLAGHAN_
         (Print)

Title: _SVP Service & Delivery_

Date: _12-8-14_

_____

_____

_____

ATC Logistics & Electronics, Inc.

By: _____
      Signature

Name: _R.L. Roadarmel_
         (Print)

Title: _Vice-President_

Date: _12-2-14_

By: _Joseph Salamunovich_
      Signature

Name: _JOSEPH SALAMUNOVICH_
          (Print)

Title: _EVP_

Date: _12/2/14_

12

<u>Schedule 1</u>
<u>Statement of Work</u>

**I. Scope:**
The scope of this document is to define the work to be performed by Service Provider on behalf of CWork in support of CWork's programs for the Devices shown below. Service Provider will perform services related to repairs and refurbishments of Devices, in support of CWork's business.

**II. Devices:**

The Service Provider will render repair and refurbishment services on wireless Devices such as cellular telephone handsets and data devices.

**III. Service Location:**
Services will be provided at:

**IV. Deliverables:**
1. Obligations of Service Provider.  Service Provider shall:
   a. replace all defective parts with new, reclaimed or refurbished Service Parts.
   b. ensure that all Service obligations described in this SOW are performed according to this SOW.
   c. return Devices that cannot be repaired and are deemed Beyond Economic Repair ("BER"), unless Service Provider receives prior written consent from CWork to retain the Devices for parts reclamation.
2. Obligations of CWork.  CWork shall:
   a. provide Service Provider with the Service Forecast on a monthly basis.
   b. provide Service Provider with Test Procedures, Service Specifications and the Packaging and Shipping Specifications documentation.
   c. provide Service Provider with KPI/SLA results on a monthly basis.
   d. notify Service Provider of quality failures and initiate return merchandise authorization ("RMAs") for the Device.

**V. Services**

a. The repair Service process includes diagnosis, repair, refurbishment and disposition of the Device.
b. As part of this process:
   i. All returned Devices will be diagnosed (triaged) in order to determine repairability.
   ii. If found to be repairable:
      1. Service Provider will repair and test the Devices to meet manufacturer's defined specifications when available, or mutually agreed specifications, for that Device.
      2. Service Provider will perform Services in accordance with CWork provided Test Procedures.
      3. Service Provider will only use Service Parts for repairs and refurbishment.
      4. All processes and tools used by Service Provider during the performance of Services process must be manufacturer defined.  In instances where manufacturer defined tools are unavailable, then CWork and Service Provider will agree to the specific tools and/or processes for the repair and refurbishment of a particular Device type/model.
      5. Service Parts "harvested" from Beyond Economic Repair (BER) returns may be used by Service Provider as part of the repairs process.
      6. Service Provider shall label all Devices as per mutually agreed to requirements.
      7. Service Provider will return all Devices repaired and unrepaired to CWork, unless prior written approval is obtained by Service Provider from CWork.

FedEx Supply 000013

       8.   Service Provider shall inspect and service all Devices, to the best of its ability, that have sustained liquid damage.

       9.   Where the Device is deemed BER, the Service Provider may harvest the parts and the Device shall not be repaired.

  iii.   If during the initial Device triage, Service Provider deems the returned Device to be BER:

      1.      Service Provider may harvest the Device for any parts that may be reusable for future repairs.

      2.      Upon receiving approval from CWork, Service Provider will dispose of any parts that cannot be "harvested" in accordance with existing disposal and recycling regulations.

c.   Service Level Commitments

  i.   KPI Targets: All repaired Devices will be shipped to CWork in accordance to the agreed upon production schedule.

  ii.   All BER Devices shall be considered property of CWork and CWork is entitled to all economic benefit arising or attributable to the BER Devices.

Service Provider agrees to pursue all possible cost reduction initiatives in order to provide a lower price to CWork.

## VI. Reporting:

a.   CWork will require an electronic flat file from the Service Provider for all Devices returned to CWork. The items required for the flat file are listed below, provided that such list may be modified from time to time by CWork. The Service Provider shall provide CWork with the flat file encompassing the following reports for each distinct shipment:

     RMA#
     Model
     Original IMEI/MEID
     Damaged by Service Provider
     BER (Y/N)

b.   KPIs and associated reporting will be used to monitor the program performance. Additionally the KPIs will be used during Quarterly Business Reviews (QBRs) to optimize performance. Service Provider will provide a monthly report reflecting the following key performance metrics ("KPI"):

FedEx Supply 000014

**KPI – Repair:**

- Repaired volumes: number of Devices repaired
- Repair Yield: # of Devices repaired/# of Devices  processed
- Out of box quality
- Shipment accuracy
- On time delivery

**VII.    Description of Services and Requirements.**

**Administrative:**
1. All repair facilities must meet health, fire, safety and employment and municipal codes.
2. Service Provider shall provide notification of any inbound shipment overage or other shipment error to CWork within forty-eight (48) hours of receipt.  Failure to notify CWork of shipping errors within specified time will result in product responsibility shifting to Service Provider for any lost or damaged items.
3. Service Provider shall notify CWork of any inbound CWork shipments received by Service Provider that exhibit damage or improper safety packaging.
4. From time to time, CWork may provide to Supplier certain documents relating to specifications of a particular model, process, or requirement; if such documents do not materially impact agreed pricing, Supplier agrees to comply with such documents and, furthermore, acknowledges and agrees that failure to comply with such documents will be considered a material breach of this Agreement. These documents may include, but are not limited to:

    a.   Demand forecast
    b.   Cosmetic standards
    c.   Functional and RF test requirements
    d.   Software matrix
    e.   Quality standards
    f.   Packaging requirements

5. All returned Devices for repair are property of CWork. These Devices will be tracked by IMEI/Serial number throughout the process.  Any loss of Devices will require Service Provider reimburse CWork for loss of that Device. The reimbursement will be replacement value (fair market wholesale price plus shipping) to the original (lost) Device.
6. Service Provider will supply CWork with a breakdown of all units repaired on, each shipment made to CWork, including item IMEI details, RF test results and item status (repaired or BER) .
7. Service Provider will inform CWork of any predictive or preventive repairs performed where applicable.
8. Liquid Damaged Devices will be diagnosed based on mutually agreed to standards.
9. Devices that fail the Liquid Damage diagnosis shall not be repaired, but shall be deemed as BER.

**Quality:**
1. Service Provider shall include only Service Parts in the boxed Devices supplied to CWork.
2. All "as new" Devices must be totally void of any and all Consumer content.
3. Service Provider shall provide a ninety (90) day warranty from date Devices have been received by CWork on all repairs performed on Consumer returned Devices ("Warranty Period").
4. A repair bounce ("Repair Bounce") is defined as any Device that does not meet mutually agreed to specifications and is returned by a Consumer within the Warranty Period. A Repair Bounce will be repaired at no charge to CWork. This excludes any liquid damaged or physically abused Devices.
5. Any endemic issues found in and during the repairs' process must be resolved in a timely manner:
    a.   Endemic quality issues must be addressed by Service Provider such that Service Provider will notify CWork within 24 hours of the discovery of any endemic issue, as per the criteria

15

        defining endemic issues defined by the relevant manufacturer of the Device, as and when such endemic issue notification is available to Service Provider.

    b.    Following the notification, Service Provider shall implement steps as necessary including the definition of a timeline for the resolution of the issue.

    c.    This timeline must be implemented in agreement with CWork.

    d.    Service Provider must include the root cause of the issue, corrective action plan and control mechanism to ensure non-recurrence of the issue.

6. Any Consumer returned Devices with a third Repair Bounce will not be repaired and will be returned to CWork. Any such occurrence must be brought to CWork's attention. Such Devices are the property of CWork and will be disposed of per CWork's policies.

7. All refurbished Devices must contain the approved software versions listed on the approved software document provided by CWork.

8. All refurbished Devices must conform to the mutually agreed to refurbishment criteria and must meet Device manufacturer defined performance specifications when available.

9. Service Provider must employ sufficient trained personnel to perform specified Services.

10. CWork at its discretion will audit Service Provider facilities, processes, Inventory and all relevant material. In addition, CWork and the Service Provider will agree to a regular cadence of audits performed by CWork personnel, up to and including the placement of a CWork employee inside of Service Provider's area that is dedicated to CWork.

11. Service Provider will provide reports/updates as per CWork's instructions on a set of KPI.

12. CWork can at its discretion ask for samples of parts used for repairs, or that were replaced during the repair process.

13. Out of box Quality % shall be equal to or greater than 99% Measurement Table.

**Logistics:**

1. Service Provider will complete an annual physical Inventory count and will share the results with CWork for all Devices returned by CWork, that are either awaiting repairs (WIP – Work in Process), awaiting parts, or have been deemed BER.   Service Provider will undertake ongoing monthly cycle counts of Device inventory by selected locations and share results with CWork as requested.

**KPI Performance Consequences:**

1. During the first three (3) months from the launch of a new Device model, KPI performance will be measured without consequence to allow Service Provider to optimize its processes.

2. At the end of each calendar month, an assessment will be made of the performance of Service Provider against the Service Provider's committed service levels and SLA targets as described in Exhibit A of this SOW ("Service Commitments").

    a.    Each SLA will be measured on a monthly basis at the end of the month.  If Service Provider receives a "failed" rating in any category CWork will meet with the Service Provider to discuss a plan for resolution.

    b.    If over any three (3) calendar month period during this Agreement, Service Provider fails to achieve three or more Service Commitments, CWork may terminate this Agreement upon providing Service Provider with one month prior written notice.

    c.    For the avoidance of doubt, where a Service Commitment repeatedly fails, each monthly failure will be discrete and treated separately. For example, if one Service Commitment is found to fail in the months of January, February and March, this will constitute three separate service failures and not one single failure.

16

FedEx Supply 000016

Exhibit A
Service Provider SLAs

Definition of measurement:

Target = Meet or Exceed the agreed Service Commitment

Definitions and measurements of SLAs (based on a monthly period)

| SLA | Name | Definition | Calculation |
|---|---|---|---|
| 1 | Repairable yield | Percentage of successfully Repaired Devices recovered | # devices repaired/ # devices processed |
| 2 | On time shipment to committed date | Percentage of On Time Shipments | The number of on time shipments by Service Provider divided by the total number of shipments by the Service Provider |
| 3 | Out of Box Quality | CWork quality department will perform a random sampling per shipment<br><br>Sample size will be determined by .65 AQL level 2 | Based on the AQL calculation table |
| 4 | Bounce Rate | Percentage of Repaired Devices returned to CWork within 90 days from date shipped to CWork | Number of Devices returned from Consumer divided by the number of Devices shipped to Consumer |

Measurement Table

| Service Commitment/ SLA | Target |
|---|---|
| 1. Repairable Yield | |
| Insurance Devices | x≥60% |
| Non-Insurance Devices | x≥75% |
| | |
| 2. On time shipment to committed date* | x≥98% |
| 3. Out of Box Quality | x≥99% |
| 4. Bounce Rate: (excludes Consumer induced failures, liquid/physical damage) | x≤2% |

*On time shipment is no earlier than 5 business days and no later than 3 business days from the original agreed upon delivery date.

17

FedEx Supply 000017

Exhibit B

Devices and Pricing

Devices supported by Services as outlined in this SOW:

| Model | July Pricing | 10/1/14 Pricing | 01/1/15 Pricing |
|---|---|---|---|
| iPhone 5 | | | |
| iPhone 5s | | | |
| iPhone 5c | | | |
| BER | | | |

18



## Purchase Order Terms and Conditions

1.  **Agreement:**  Any purchase order placed by ATC Logistics & Electronics, Inc. ("Buyer") with you ("Seller") for the purchase of goods and/or services is expressly subject to, and Buyer's acceptance is expressly conditioned upon, Seller's assent to each and every term and condition contained below and on the face of such purchase order (these terms and conditions together with the purchase order are referred to herein as this "Order").  This Order shall constitute a binding contract upon the earlier of Seller's acceptance or commencement of performance.  Buyer objects to all additions, exceptions, or changes to this Order, whether contained in any printed form of Seller or elsewhere, unless such additions, exceptions or changes are agreed to by Buyer in writing.  This Order constitutes the entire agreement between the parties with respect to the goods and/or services reflected in this Order, except to the extent that Buyer and Seller execute a written agreement with respect to such goods and/or services.  In the event that the terms of this Order are in conflict with the terms of such written agreement, the terms of the written agreement will control.  Any written acknowledgement, statement or prior understanding between the parties related to such goods and/or services is superseded by this Order.   There may be no substitutes or variations from specifications or instructions or partial shipments, without the prior written approval of Buyer.

2.  **Price and Packaging:**  Unless otherwise specified, the prices stated in this Order are in U.S. dollars DDP destination (including all charges for packing, hauling, storage, insurance and transportation).  Sales and use taxes not subject to exemption shall be separately stated on Seller's invoice.  The goods shall be shipped by Seller in accordance with Buyer's instructions or, in the absence of such instructions, in accordance with good commercial practice to insure that no damage will result from weather, transportation or handling and that the goods shall be free from pests and contaminates of any sort.

3.  **Competitive Price:**  Seller warrants that the prices provided for herein are as low as any net price now given by Seller to any other customer for like goods and/or service in similar quantities and agrees that if, during the term of this Order, lower net prices are quoted by Seller to any third party for a similar quantity of similar goods or services, such lower net price shall be from that time substituted for the prices contained herein.  If, during the term of this Order, Buyer is able to purchase goods or services of the quality and in a quantity not more than herein specified and upon like terms and conditions at a price lower than stated herein, Seller, upon receipt of satisfactory written evidence of same, shall, at its option, either meet such lower price or permit Buyer to purchase the undelivered portion hereunder from such vendor at such lower price.  The quantity so purchased by Buyer from such other vendor shall be deducted from the quantity covered by this Order.  All changes to unit pricing should be  *prospective (for goods not yet dispatched)*  vs. retroactive, to avoid the need for value reconciliation with customs on imported goods.

4.  **Payment:**  Unless otherwise provided on the face of the purchase order that constitutes a part of this Order, payment by Buyer of undisputed invoices will be made to Seller in U.S. dollars within 45 days after Buyer's receipt of such invoice at its address set forth on such purchase order.

5.  **Overshipments and Undershipments:**  Overshipments and undershipments of goods not approved by Buyer in writing may be returned by Buyer, at Buyer's sole discretion.  All such returns shall be at Seller's risk and expense or held by Buyer at Seller's risk and expense, and Buyer shall not be obligated to pay for such overshipments or undershipments of goods.  A shipment will not be considered an overshipment or undershipment if it is within 2% of the total quantity ordered hereunder.

6.  **Warranty:**  Seller makes all warranties contained in the Uniform Commercial Code.  Further, Seller warrants that the goods delivered or services performed:

(a) shall (i) be merchantable, (ii) conform to this Order, to specifications, drawings and other descriptions referenced in this Order, and to any accepted samples, (iii) be free from defects in design and materials unless such design or materials were supplied by Buyer, (iv) be free from defects in workmanship, and (v) be fit and safe for the intended purposes; (b) shall comply with all federal, state and local laws and regulations applicable thereto;

(c) will not infringe on any United States or foreign patent, trademark, copyright or other intellectual property right of any third party; and

(d) will be free and clear of all liens, encumbrances, security interests and other claims.

**7.  Inspections; Testing; Rejection:**  All goods and services purchased under this Order are subject to Buyer's inspection, testing and acceptance at Buyer's destinations.  Buyer reserves the right to reject, refuse acceptance of, or revoke acceptance of any nonconforming goods or services.  Buyer shall be allowed a reasonable period of time (but not less than thirty (30) days) to inspect the goods or services and to notify Seller of any non-conformance with this Order.  Payment for any goods or services under this Order shall not be deemed acceptance of such goods or services.  Rejected goods may be returned to Seller or held by Buyer for replacement of such rejected or returned goods, in either event, at Seller's risk and expense.  No rejected or returned goods shall be replaced without Buyer's written approval.  Upon Buyer's request, if Seller fails to promptly replace or correct any returned or rejected goods or services to Buyer's satisfaction, Buyer may purchase such goods or services from another source and Seller shall be liable to Buyer for any additional costs thereby incurred by Buyer.

**8.  Recall:**  In the event that a recall of the goods or other corrective action with respect to goods or services is necessitated by a defect, a failure to conform to the specifications, applicable laws, or any other reason within Seller's control and not due to Buyer's negligent act or omission, Seller shall bear all costs and expenses of such recall or corrective action including, without limitation, costs of notifying customers, customer refunds, costs of returning goods, and other third party expenses.

**9.  Compliance with Laws:**  Seller certifies, represents and warrants that it shall:

(a) comply with all international, federal, state and local laws and regulations applicable to its operations including, but not limited to, (i) those dealing with employee health and safety, employment opportunity and affirmative action, (ii) those relating to the use, storage, handing and disposal of hazardous substances and the protection of the environment, (iii)  those prohibiting any form of child labor or other exploitation of children, and (iv) the Foreign Corrupt Practices Act;

(b) comply with all terms of 48 C.F.R §52.244-6 (Subcontract for Commercial Items and Commercial Components) (including the requirement of including this provision in subcontracts awarded under this contract), and 15 U.S.C. §637 (d)(2) and (3) (Utilization of Small Business Concerns), and such provision is herby incorporated into this Order as fully set forth herein;

(c) in accordance with the provisions of 48 C.F.R §52.209-6, certify that neither it nor its principals was or is debarred or suspended, or is the subject of proposed debarment by the federal government;

(d) not employ forced, slave, or convict labor or other exploitive forced labor practices; and

(e) comply with the export/import laws and restrictions of the United States and all applicable foreign jurisdictions.

**10.  Indemnification:**  Seller shall defend, indemnify and hold Buyer and its affiliates and their respective successors, assigns, officers, directors and employees harmless with respect to all claims, liabilities, damages, losses and expenses (including reasonable attorney's fees) related to, caused by, or arising from (a) the goods' or services' actual or alleged patent, copyright or trademark infringement or violation of other third party proprietary rights,(b) the purchase or sales or use of the goods or services covered by this Order, (c) Seller's breach of any provision of this Order including breach of warranty or failure to deliver the goods or services on a timely basis, or (d) Seller's actual or alleged negligent or willful acts or omissions; except to the extent such claims, liabilities, damages, losses

or expenses are actually attributable to the negligent or willful acts or omissions of Buyer.  If Buyer is enjoined from the use of goods, Seller shall, at Buyer's option, either procure for Buyer the right to continue using the goods, replace the goods with substantially equivalent goods, modify the goods so as to be usable by Buyer, or repurchase the goods at the price set forth in this Order.  This provision shall survive termination of this Order.

**11.  Risk of Loss:**  Risk of loss or damage to the goods shall be, if for a domestic (U.S.) order, on Seller until the goods have been delivered to and accepted by Buyer.  Risk of loss or damage to the goods shall be, if for a foreign (non-U.S.) order, on Buyer from the place of origin.

**12.  Property Furnished to Seller/Confidentiality:**  Seller shall not use, reproduce, appropriate for or disclose to anyone other than Buyer, any goods, equipment, tooling, dies, drawings, processes, know-how, concepts, ideas, data, designs, or other proprietary information furnished by Buyer or for which Seller has been reimbursed by Buyer ("Material"), nor shall Seller use the same to manufacture goods or provide services other than as required hereunder without Buyer's prior written approval.  Title to all Material shall remain with Buyer at all times and where practicable, Material in tangible form shall be clearly marked or tagged to indicate Buyer's ownership.  Seller shall bear the risk of loss or damage to the Material until it is returned to Buyer.  All Material in tangible form shall be returned to Buyer upon termination or completion of this Order unless directed by Buyer.  Seller shall maintain Material in at least the same condition as it was in at the time that it came into Seller's possession, ordinary wear and tear excepted.  Material will be kept free and clear of all liens, encumbrances, security interests and other claims (except any created through Buyer) and will be deemed to be subject to a bailment.  This provision shall survive termination of this Order.

**13.  Notice of Labor Dispute:**  Whenever an actual or potential labor dispute delays or threatens to delay the timely performance of this Order, Seller shall immediately give notice thereof, including all relevant information with respect thereto, to Buyer.

**14.  Termination:**  In addition to any other remedy provided for hereunder or at law or in equity, Buyer may terminate this Order, in whole or in part, without liability to Buyer,

(a)  if Seller breaches or threatens to breach any term or condition of this Order and Seller does not cure such breach or provide adequate assurance of its performance within ten days of Buyer's request,

(b)  upon written notice to Seller if (i) deliveries are not made at the time or in the quantities specified in this Order or (ii) Buyer receives notice from Seller of its inability to perform hereunder due to a force majeure event (see Section 24), or

(c)  at any time for its convenience on 30 days' written notice to Seller.

Upon receipt of such notice Seller shall, to the extent specified in such notice, stop work under this Order (by itself and permitted subcontractors).  Seller's sole compensation for such termination shall be payment by Buyer for all goods and services delivered to Buyer pursuant to this Order prior to the effective date of the termination and accepted by Buyer pursuant to this Order.

**15.  Limitation of Liability:**  In no event shall either party be liable to the other party for any special, incidental, consequential or punitive damages arising out of this Order, except to the extent such damages are sought by a third party and are the subject of indemnification pursuant to Section 10.

**16.  Set-Off:**  Without limiting Buyer's rights under the law or in equity, Buyer may exercise a right of set-off against Seller for any and all amounts due to Seller by Buyer including, but not limited to, amounts under this Order or a subsequent Order.

**17.  Assignment, Subcontracting:**  Seller shall not delegate any duties, assign this Order (including, without limitation, the right to receive payment) or subcontract any portion of this Order without Buyer's prior written consent (which may be withheld in Buyer's sole discretion).  This Order shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**18.  Controlling Law:**  The validity and interpretation of this Order shall be governed by the law of the state shown in Buyer's address on the face of this Order, excluding its conflicts of law provisions.  The application of the United Nations Convention on Contracts for the International Sales of Goods (1980) is excluded.

**19.  Incorporation of Equal Opportunity Clauses** :    It is the policy of Buyer to administer all actions and procedures without regard to race, color, religion, sex, national origin, disability, or other characteristics protected by law.  Because Buyer or its affiliated entities perform work for the federal government, Buyer is required by law to incorporate the following equal employment opportunity provisions into this Order.  The provisions outlined below do not mandate absolute compliance with the referenced executive orders, statutes and regulations, but instead apply only to Seller to the extent applicable under the applicable law.  If the value of this Order is $10,000 ($100,000 in the case of clause (b)) or more, then:

(a)  *Equal Opportunity Clause under Executive Order 11246.*   The equal opportunity clause set forth in 41 CFR §60-1.4(a) is incorporated by reference unless exempt under the provisions 41 CFR §60-1.5;

(b)  *Equal Opportunity for Disabled Veterans, Recently Separated Veterans, Armed Forces Service Medal Veterans, and Other Protected Veterans.*  The equal opportunity clause set forth in 41 CFR §60-250.5(a) is incorporated by reference unless exempt under the provisions 41 CFR §60-250.4;

(c)  *Equal Opportunity for Workers With Disabilities.*  The equal opportunity clause set forth in 41 CFR §60-741.5(a) is incorporated by reference unless exempt under the provisions of 41 CFR §60-741.4; and

(d)  *Employee Notice Clause under Executive Order 13496.*  The employee notice clause set forth in 29 CFR §471, appendix A to Subpart A is incorporated by reference unless exempt under the provisions of 29 CFR §471.3-4.

**20.  General:**

(a)  No modification to, or change in, or departure from, or waiver of, the provisions of this Order shall be valid or binding unless approved in writing by a proper representative of Buyer.

(b)  No waiver of breach of any provision of this Order shall constitute a waiver of any subsequent breach of such provision or any breach of any other provision hereof.

(c)  If any provisions of this Order, or portion of any provision, is declared or found to be unenforceable, the balance of this Order and such provision or portion thereof shall be interpreted and enforced to the greatest extent possible.

(d)  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  Neither party hereto, nor its respective counsel, shall be deemed the drafter of this Order, and all provisions of this Order shall be construed in accordance with their fair meaning, and not strictly for or against either party. (e) The rights, remedies, powers and privileges provided in this Order are cumulative and not exclusive of any rights, remedies, powers and privileges provided by applicable law.

(e)  If any legal proceeding is necessary to enforce or interpret the terms of this Order, or to recover damages or seek equitable relief for breach thereof, the prevailing party shall be entitled to reasonable attorney's fees, as well as costs and disbursements, in addition to any other relief to which such party may be entitled.

**21.  Import Control:**  Seller shall provide necessary import documents in the manner required by United States Customs and Border Protection ("Customs") and by Buyer for classification, valuation, recording and compliance. In addition to all of the Customs requirements that must be met,

(a)  invoices must be in English; quantities stated must be accurate; the value of goods stated in the invoice must be complete and accurate; the amount invoiced must be final with no adjustments after shipment and must equal the true "demand for payment" amount (excluding assist values, for Customs purposes only);

(b) all goods must be marked with the country of origin (e.g., "Made in France"), immediate packaging must be marked with the same country of origin, and the invoice must state the country of origin for each line item and must match the marking on the goods; and

(c) the packing list must be placed in an envelope attached to each container.

**22. Export Control:**  Seller shall control the disclosures of and access to technical data, information and other items received under this Order in accordance with United States export control laws and regulations including, but not limited to, the International Traffic in Arms Regulations (ITAR) and the Export Administration Regulation (EAR).

**23. C-TPAT Requirements:**  Seller acknowledges that Buyer is participating in the Customs Trade Partnership Against Terrorism program (C-TPAT") with Customs.  For Seller's goods to be imported in the United States, Seller shall accept, implement, and comply with all applications, recommendations or requirements of C-TPAT (for information go to http://www.cbp.gov/xp/cgov/import/commercial_enforcement/ctpat/).  At Buyer's or the Customs Service's request, Seller shall certify in writing its acceptance, implementation, and compliance with C-TPAT and any corresponding recommendations and guidelines.  Seller grants Buyer a right of on-site inspection at the factory or other facilities used to produce or otherwise prepare goods as necessary in order to comply with the provisions of C-TPAT.

**24. Product and Chemical Compliance:**

(a) Buyer reserves the right to request 100% disclosure of material and chemical composition as necessary to meet customer and regulatory reporting requirements. (b) Seller is required to provide product material content reports through the International Material Data System (IMDS) or other means identified by Buyer for all goods sold to Buyer.

(b) Seller is required to provide Buyer with Material Safety Data Sheets (MSDS) for all supplied hazardous substances or products containing hazardous substances, as defined under 29 CFR §1910.1200 and other applicable regulations.

(c) Seller is required to meet any International Standards for Phytosanitary Measures (ISPM) No. 15 requirements as to any packaging used in any phase of shipment of the products.

**25. Force Majeure:**  Neither party shall be liable for failure to perform any of its obligations hereunder to the extent that such failure is due to causes beyond such party's reasonable control (and not due to labor problems or such party's negligence or financial difficulties) including, without limitation, acts of God, fire, flood, storm, national emergency or war, provided that the effected party gives the other party prompt notice of the commencement of the occurrence that caused the failure and shall use commercially reasonable efforts to correct the failure if possible.

**26. Insurance:**  Seller shall obtain and keep in force a policy of commercial general liability insurance protecting Buyer and Seller against claims for bodily injury, personal injury and property damage.  Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence and not less than $1,000,000 in the aggregate.  Seller shall also obtain and keep in force workers compensation insurance in the amount required by applicable statutory law.  Upon request, Seller shall cause to be delivered to Buyer certificates evidencing the existence and amount of such insurance and naming Buyer as an additional insured under the liability insurance.  All insurance shall be primary to and not contributory with any similar insurance carried by Buyer, whose insurance shall be considered excess insurance only.  All insurance shall be with reputable, financial sound companies.  Providing the required insurance shall in no way relieve Seller of its obligation to indemnify Buyer pursuant to Section 10.

**27. Relationship of the Parties:**  Seller is an independent contractor and this Order shall not be construed to constitute Seller the partner, agent or legal representative of Buyer for any purpose whatsoever.  Seller is not granted any right or authority to assume or create any obligation or liability, express or implied, on behalf of or in the name

of Buyer or to bind Buyer in any manner whatsoever.

**28.  Buyer's Name and Trademark:**   Seller, without Buyer's prior written consent (which may be withheld in Buyer's sole discretion), will not in any manner (a) publish or disclose the fact that Seller has furnished or contracted to furnish goods and/or services to Buyer or (b) use Buyer's name or trademarks in any publication, advertisement or other public forum, except where such use publication or disclosure is required by applicable law.

**29.  Work Made for Hire:**   All data, materials, documentation, computer programs, inventions (whether or not patentable), pictures, audio, video, artistic works, and all works of authorship (including all worldwide rights therein under patent, copyright, trade secret confidential information, or other proprietary rights) created or developed by Seller in connection with providing goods or services to Buyer shall be considered work made for hire by Seller and shall be owned by Buyer.  Seller will take any action reasonably necessary to transfer to Buyer, and perfect Buyer's ownership of, the foregoing.  Notwithstanding the foregoing, to the extent that Seller uses any Seller or third party routines, code or development tools that are not a substitute or replacement of the actual goods or services provided to Buyer (collectively, the "Tools"), then Seller or Seller's third party licensors shall retain ownership of such Tools. In addition, Seller or such third party licensors shall retain ownership of any preexisting materials that are contained in any such goods or services and that are specifically identified in writing by Seller prior to delivery to Buyer ("Preexisting Materials").  With respect to the Tools and the Preexisting Materials contained in any goods or services provided to Buyer, Seller grants to Buyer an irrevocable, nonexclusive, worldwide, fully paid, royalty free license to (i) use and distribute (internally or externally) copies of, and prepare derivative works based upon, the Tools and Preexisting Materials and derivative works thereof, and (ii) authorize others to do any of the foregoing.

ATC Logistics & Electronics, Inc.

Cellpoint Corporation
_____

By:_____          By: _____
Name: _____          Name: _Ehsan Gharatappeh_____
Title: _____          Title: __CEO_____
Date: _____          Date: ___April 15, 2015_____



## Purchase Order Terms and Conditions

**1.   Agreement:**  Any purchase order placed by ATC Logistics & Electronics, Inc. ("Buyer") with you ("Seller") for the purchase of goods and/or services is expressly subject to, and Buyer's acceptance is expressly conditioned upon, Seller's assent to each and every term and condition contained below and on the face of such purchase order (these terms and conditions together with the purchase order are referred to herein as this "Order").  This Order shall constitute a binding contract upon the earlier of Seller's acceptance or commencement of performance. Buyer objects to all additions, exceptions, or changes to this Order, whether contained in any printed form of Seller or elsewhere, unless such additions, exceptions or changes are agreed to by Buyer in writing. This Order constitutes the entire agreement between the parties with respect to the goods and/or services reflected in this Order, except to the extent that Buyer and Seller execute a written agreement with respect to such goods and/or services.  In the event that the terms of this Order are in conflict with the terms of such written agreement, the terms of the written agreement will control.  Any written acknowledgement, statement or prior understanding between the parties related to such goods and/or services is superseded by this Order.  There may be no substitutes or variations from specifications or instructions or partial shipments, without the prior written approval of Buyer.

**2.   Price and Packaging:**  Unless otherwise specified, the prices stated in this Order are in U.S. dollars DDP destination (including all charges for packing, hauling, storage, insurance and transportation).  Sales and use taxes not subject to exemption shall be separately stated on Seller's invoice. The goods shall be shipped by Seller in accordance with Buyer's instructions or, in the absence of such instructions, in accordance with good commercial practice to insure that no damage will result from weather, transportation or handling and that the goods shall be free from pests and contaminates of any sort.

**3.   Competitive Price:**  Seller warrants that the prices provided for herein are as low as any net price now given by Seller to any other customer for like goods and/or service in similar quantities and agrees that if, during the term of this Order, lower net prices are quoted by Seller to any third party for a similar quantity of similar goods or services, such lower net price shall be from that time substituted for the prices contained herein.

**4.   Payment:**  Unless otherwise provided on the face of the purchase order that constitutes a part of this Order, payment by Buyer of undisputed invoices will be made to Seller in U.S. dollars within 45 days after Buyer's receipt of such invoice at its address set forth on such purchase order.

**5.   Overshipments and Undershipments:**  Overshipments of goods not approved by Buyer in writing may be returned by Buyer, at Buyer's sole discretion.  All such returns shall be at Seller's risk and expense or held by Buyer at Seller's risk and expense, and Buyer shall not be obligated to pay for such overshipments of goods.  A shipment will not be considered an overshipment if it is within 2% of the total quantity ordered hereunder.

**6.   Warranty:**  Seller makes all warranties contained in the Uniform Commercial Code.  Further, Seller warrants that the goods delivered or services performed:

(a)   shall (i) be merchantable, (ii) conform to this Order, to specifications, drawings and other descriptions referenced in this Order, and to any accepted samples, (iii) be free from defects in design and materials unless such design or materials were supplied by Buyer, (iv) be free from defects in workmanship, and (v) be fit and safe for the intended purposes; (b) shall comply with all federal, state and local laws and regulations applicable thereto;

(c)   will not infringe on any United States or foreign patent, trademark, copyright or other intellectual property right of any third party; and

FedEx Supply 000025

(d)  will be free and clear of all liens, encumbrances, security interests and other claims.

**7.   Inspections; Testing; Rejection:**  All goods and services purchased under this Order are subject to Buyer's inspection, testing and acceptance at Buyer's destinations. Buyer reserves the right to reject, refuse acceptance of, or revoke acceptance of any nonconforming goods or services. Buyer shall be allowed a reasonable period of time (but not less than thirty (30) days) to inspect the goods or services and to notify Seller of any non-conformance with this Order. Payment for any goods or services under this Order shall not be deemed acceptance of such goods or services. Rejected goods may be returned to Seller or held by Buyer for replacement of such rejected or returned goods, in either event, at Seller's risk and expense. No rejected or returned goods shall be replaced without Buyer's written approval. Upon Buyer's request, if Seller fails to promptly replace or correct any returned or rejected goods or services to Buyer's satisfaction, Buyer may purchase such goods or services from another source. Seller has technicians resident in Dallas, Texas, USA, and Seller will be given the opportunity to review and verify any defects or QC failures prior to issuing an RMA for returned product. Seller product warranty is for 90 days after product shipment. Seller will not issue credits for product broken during Buyer assembly or de-assembly, nor for product where no defect is found, nor for surplus product (buyer remorse). Payment for good parts will not be withheld due to a percentage of failed parts. Partial payment deductions should not be made by buyer until Seller credit memos are issued. Seller promptly issues credit memos for verified defective product.

**8.   Recall:**  In the event that a recall of the goods or other corrective action with respect to goods or services is necessitated by a defect, a failure to conform to the specifications, applicable laws, or any other reason within Seller's control and not due to Buyer's negligent act or omission, Seller shall bear all costs and expenses of such recall or corrective action including, without limitation, costs of notifying customers, customer refunds, costs of returning goods, and other third party expenses.

**9.   Compliance with Laws:**  Seller certifies, represents and warrants that it shall:

(a)  comply with all international, federal, state and local laws and regulations applicable to its operations including, but not limited to, (i) those dealing with employee health and safety, employment opportunity and affirmative action, (ii) those relating to the use, storage, handing and disposal of hazardous substances and the protection of the environment, (iii) those prohibiting any form of child labor or other exploitation of children, and (iv) the Foreign Corrupt Practices Act;

(b)  comply with all terms of 48 C.F.R §52.244-6 (Subcontract for Commercial Items and Commercial Components) (including the requirement of including this provision in subcontracts awarded under this contract), and 15 U.S.C. §637 (d)(2) and (3) (Utilization of Small Business Concerns), and such provision is herby incorporated into this Order as fully set forth herein;

(c)  in accordance with the provisions of 48 C.F.R §52.209-6, certify that neither it nor its principals was or is debarred or suspended, or is the subject of proposed debarment by the federal government;

(d)  not employ forced, slave, or convict labor or other exploitive forced labor practices; and

(e)  comply with the export/import laws and restrictions of the United States and all applicable foreign jurisdictions.

**10.  Indemnification:**  Seller shall defend, indemnify and hold Buyer and its affiliates and their respective successors, assigns, officers, directors and employees harmless with respect to all claims, liabilities, damages, losses and expenses (including reasonable attorney's fees) related to, caused by, or arising from (a) the goods' or services' actual or alleged patent, copyright or trademark infringement or violation of other third party proprietary rights,(b) the purchase or sales or use of the goods or services covered by this Order, (c) Seller's breach of any provision of this Order including breach of warranty or failure to deliver the goods or services on a timely basis, or (d) Seller's actual or alleged negligent or willful acts or omissions; except to the extent such claims, liabilities, damages, losses or expenses are actually attributable to the negligent or willful acts or omissions of Buyer. If Buyer is enjoined from the use of goods, Seller shall, at Buyer's option, either procure for Buyer the right to continue using the goods, replace the goods with substantially equivalent goods, modify the goods so as to be usable by Buyer, or repurchase the goods at the price set forth in this Order. This provision shall survive termination of this Order.

FedEx Supply 000026

**11. Risk of Loss:**  Risk of loss or damage to the goods shall be, if for a domestic (U.S.) order, on Seller until the goods have been delivered to and accepted by Buyer.  Risk of loss or damage to the goods shall be, if for a foreign (non-U.S.) order, on Buyer from the place of origin.

**12. Property Furnished to Seller/Confidentiality:**  Seller shall not use, reproduce, appropriate for or disclose to anyone other than Buyer, any goods, equipment, tooling, dies, drawings, processes, know-how, concepts, ideas, data, designs, or other proprietary information furnished by Buyer or for which Seller has been reimbursed by Buyer ("Material"), nor shall Seller use the same to manufacture goods or provide services other than as required hereunder without Buyer's prior written approval. Title to all Material shall remain with Buyer at all times and where practicable, Material in tangible form shall be clearly marked or tagged to indicate Buyer's ownership. Seller shall bear the risk of loss or damage to the Material until it is returned to Buyer. All Material in tangible form shall be returned to Buyer upon termination or completion of this Order unless directed by Buyer. Seller shall maintain Material in at least the same condition as it was in at the time that it came into Seller's possession, ordinary wear and tear excepted. Material will be kept free and clear of all liens, encumbrances, security interests and other claims (except any created through Buyer) and will be deemed to be subject to a bailment. This provision shall survive termination of this Order.

**13. Notice of Labor Dispute:**  Whenever an actual or potential labor dispute delays or threatens to delay the timely performance of this Order, Seller shall immediately give notice thereof, including all relevant information with respect thereto, to Buyer.

**14. Termination:**  In addition to any other remedy provided for hereunder or at law or in equity, Buyer may terminate this Order, in whole or in part, without liability to Buyer,

(a)  if Seller breaches or threatens to breach any term or condition of this Order and Seller does not cure such breach or provide adequate assurance of its performance within ten days of Buyer's request,

(b)  upon written notice to Seller if (i) deliveries are not made at the time or in the quantities specified in this Order or (ii) Buyer receives notice from Seller of its inability to perform hereunder due to a force majeure event (see Section 24), or

(c)  at any time for its convenience on 60 days' written notice to Seller.

Upon receipt of such notice Seller shall, to the extent specified in such notice, stop work under this Order (by itself and permitted subcontractors). Seller's sole compensation for such termination shall be payment by Buyer for all goods and services delivered to Buyer pursuant to this Order prior to the effective date of the termination and accepted by Buyer pursuant to this Order.

**15. Limitation of Liability:**  In no event shall either party be liable to the other party for any special, incidental, consequential or punitive damages arising out of this Order, except to the extent such damages are sought by a third party and are the subject of indemnification pursuant to Section 10.

**16. Set-Off:**  Without limiting Buyer's rights under the law or in equity, Buyer may exercise a right of set-off against Seller for any and all amounts due to Seller by Buyer including, but not limited to, amounts under this Order or a subsequent Order.

**17. Assignment, Subcontracting:**  Seller shall not delegate any duties, assign this Order (including, without limitation, the right to receive payment) or subcontract any portion of this Order without Buyer's prior written consent (which may be withheld in Buyer's sole discretion). This Order shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**18. Controlling Law:**  The validity and interpretation of this Order shall be governed by the law of the state shown in Buyer's address on the face of this Order, excluding its conflicts of law provisions. The application of the United Nations Convention on Contracts for the International Sales of Goods (1980) is excluded.

FedEx Supply 000027

**19.** **Incorporation of Equal Opportunity Clauses**:   It is the policy of Buyer to administer all actions and procedures without regard to race, color, religion, sex, national origin, disability, or other characteristics protected by law. Because Buyer or its affiliated entities perform work for the federal government, Buyer is required by law to incorporate the following equal employment opportunity provisions into this Order.  The provisions outlined below do not mandate absolute compliance with the referenced executive orders, statutes and regulations, but instead apply only to Seller to the extent applicable under the applicable law.  If the value of this Order is $10,000 ($100,000 in the case of clause (b)) or more, then:

(a) *Equal Opportunity Clause under Executive Order 11246.*  The equal opportunity clause set forth in 41 CFR §60-1.4(a) is incorporated by reference unless exempt under the provisions 41 CFR §60-1.5;

(b) *Equal Opportunity for Disabled Veterans, Recently Separated Veterans, Armed Forces Service Medal Veterans, and Other Protected Veterans.*  The equal opportunity clause set forth in 41 CFR §60-250.5(a) is incorporated by reference unless exempt under the provisions 41 CFR §60-250.4;

(c) *Equal Opportunity for Workers With Disabilities.*  The equal opportunity clause set forth in 41 CFR §60-741.5(a) is incorporated by reference unless exempt under the provisions of 41 CFR §60-741.4; and

(d) *Employee Notice Clause under Executive Order 13496.*  The employee notice clause set forth in 29 CFR §471, appendix A to Subpart A is incorporated by reference unless exempt under the provisions of 29 CFR §471.3-4.

**20.** **General:**

(a) No modification to, or change in, or departure from, or waiver of, the provisions of this Order shall be valid or binding unless approved in writing by a proper representative of Buyer.

(b) No waiver of breach of any provision of this Order shall constitute a waiver of any subsequent breach of such provision or any breach of any other provision hereof.

(c) If any provisions of this Order, or portion of any provision, is declared or found to be unenforceable, the balance of this Order and such provision or portion thereof shall be interpreted and enforced to the greatest extent possible.

(d) The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  Neither party hereto, nor its respective counsel, shall be deemed the drafter of this Order, and all provisions of this Order shall be construed in accordance with their fair meaning, and not strictly for or against either party. (e) The rights, remedies, powers and privileges provided in this Order are cumulative and not exclusive of any rights, remedies, powers and privileges provided by applicable law.

(e) If any legal proceeding is necessary to enforce or interpret the terms of this Order, or to recover damages or seek equitable relief for breach thereof, the prevailing party shall be entitled to reasonable attorney's fees, as well as costs and disbursements, in addition to any other relief to which such party may be entitled.

**21.** **Import Control:**   Seller shall provide necessary import documents in the manner required by United States Customs and Border Protection ("Customs") and by Buyer for classification, valuation, recording and compliance.  In addition to all of the Customs requirements that must be met,

(a) invoices must be in English; quantities stated must be accurate; the value of goods stated in the invoice must be complete and accurate; the amount invoiced must be final with no adjustments after shipment and must equal the true "demand for payment" amount (excluding assist values, for Customs purposes only);

(b) all goods must be marked with the country of origin (e.g., "Made in France"), immediate packaging must be marked with the same country of origin, and the invoice must state the country of origin for each line item and must match the marking on the goods; and

(c) the packing list must be placed in an envelope attached to each container.

22. **Export Control:** Seller shall control the disclosures of and access to technical data, information and other items received under this Order in accordance with United States export control laws and regulations including, but not limited to, the International Traffic in Arms Regulations (ITAR) and the Export Administration Regulation (EAR).

23. **C-TPAT Requirements:** Seller acknowledges that Buyer is participating in the Customs Trade Partnership Against Terrorism program (C-TPAT") with Customs. For Seller's goods to be imported in the United States, Seller shall accept, implement, and comply with all applications, recommendations or requirements of C-TPAT (for information go to http://www.cbp.gov/xp/cgov/import/commercial_enforcement/ctpat/). At Buyer's or the Customs Service's request, Seller shall certify in writing its acceptance, implementation, and compliance with C-TPAT and any corresponding recommendations and guidelines. Seller grants Buyer a right of on-site inspection at the factory or other facilities used to produce or otherwise prepare goods as necessary in order to comply with the provisions of C-TPAT.

24. **Product and Chemical Compliance:**

(a) Buyer reserves the right to request 100% disclosure of material and chemical composition as necessary to meet customer and regulatory reporting requirements. (b) Seller is required to provide product material content reports through the International Material Data System (IMDS) or other means identified by Buyer for all goods sold to Buyer.

(b) Seller is required to provide Buyer with Material Safety Data Sheets (MSDS) for all supplied hazardous substances or products containing hazardous substances, as defined under 29 CFR §1910.1200 and other applicable regulations.

(c) Seller is required to meet any International Standards for Phytosanitary Measures (ISPM) No. 15 requirements as to any packaging used in any phase of shipment of the products.

25. **Force Majeure:** Neither party shall be liable for failure to perform any of its obligations hereunder to the extent that such failure is due to causes beyond such party's reasonable control (and not due to labor problems or such party's negligence or financial difficulties) including, without limitation, acts of God, fire, flood, storm, national emergency or war, provided that the effected party gives the other party prompt notice of the commencement of the occurrence that caused the failure and shall use commercially reasonable efforts to correct the failure if possible.

26. **Insurance:** Seller shall obtain and keep in force a policy of commercial general liability insurance protecting Buyer and Seller against claims for bodily injury, personal injury and property damage. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence and not less than $1,000,000 in the aggregate. Seller shall also obtain and keep in force workers compensation insurance in the amount required by applicable statutory law. Upon request, Seller shall cause to be delivered to Buyer certificates evidencing the existence and amount of such insurance and naming Buyer as an additional insured under the liability insurance. All insurance shall be primary to and not contributory with any similar insurance carried by Buyer, whose insurance shall be considered excess insurance only. All insurance shall be with reputable, financial sound companies. Providing the required insurance shall in no way relieve Seller of its obligation to indemnify Buyer pursuant to Section 10.

27. **Relationship of the Parties:** Seller is an independent contractor and this Order shall not be construed to constitute Seller the partner, agent or legal representative of Buyer for any purpose whatsoever. Seller is not granted any right or authority to assume or create any obligation or liability, express or implied, on behalf of or in the name of Buyer or to bind Buyer in any manner whatsoever.

28. **Buyer's Name and Trademark:** Seller, without Buyer's prior written consent (which may be withheld in Buyer's sole discretion), will not in any manner (a) publish or disclose the fact that Seller has furnished or contracted to furnish goods and/or services to Buyer or (b) use Buyer's name or trademarks in any publication, advertisement or other public forum, except where such use publication or disclosure is required by applicable law.

29. **Work Made for Hire:** All data, materials, documentation, computer programs, inventions (whether or not

FedEx Supply 000029

patentable), pictures, audio, video, artistic works, and all works of authorship (including all worldwide rights therein under patent, copyright, trade secret confidential information, or other proprietary rights) created or developed by Seller in connection with providing goods or services to Buyer shall be considered work made for hire by Seller and shall be owned by Buyer. Seller will take any action reasonably necessary to transfer to Buyer, and perfect Buyer's ownership of, the foregoing. Notwithstanding the foregoing, to the extent that Seller uses any Seller or third party routines, code or development tools that are not a substitute or replacement of the actual goods or services provided to Buyer (collectively, the "Tools"), then Seller or Seller's third party licensors shall retain ownership of such Tools. In addition, Seller or such third party licensors shall retain ownership of any preexisting materials that are contained in any such goods or services and that are specifically identified in writing by Seller prior to delivery to Buyer ("Preexisting Materials"). With respect to the Tools and the Preexisting Materials contained in any goods or services provided to Buyer, Seller grants to Buyer an irrevocable, nonexclusive, worldwide, fully paid, royalty free license to (i) use and distribute (internally or externally) copies of, and prepare derivative works based upon, the Tools and Preexisting Materials and derivative works thereof, and (ii) authorize others to do any of the foregoing.

ATC Logistics & Electronics, Inc.                    Etrade Supply International LTD

By:_____              By:_____
Name: _____              Name: _Gary A. Straus_____
Title: _____            Title: _S.V.P._____
Date: _____             Date: ___May 13, 2014_____



# Purchase Order Terms and Conditions

1.  **Agreement:** Any purchase order placed by ATC Logistics & Electronics, Inc. ("Buyer") with you ("Seller") for the purchase of goods and/or services is expressly subject to, and Buyer's acceptance is expressly conditioned upon, Seller's assent to each and every term and condition contained below and on the face of such purchase order (these terms and conditions together with the purchase order are referred to herein as this "Order"). This Order shall constitute a binding contract upon the earlier of Seller's acceptance or commencement of performance. Buyer objects to all additions, exceptions, or changes to this Order, whether contained in any printed form of Seller or elsewhere, unless such additions, exceptions or changes are agreed to by Buyer in writing. This Order constitutes the entire agreement between the parties with respect to the goods and/or services reflected in this Order, except to the extent that Buyer and Seller execute a written agreement with respect to such goods and/or services. In the event that the terms of this Order are in conflict with the terms of such written agreement, the terms of the written agreement will control. Any written acknowledgement, statement or prior understanding between the parties related to such goods and/or services is superseded by this Order. There may be no substitutes or variations from specifications or instructions or partial shipments, without the prior written approval of Buyer.

2.  **Price and Packaging:** Unless otherwise specified, the prices stated in this Order are in U.S. dollars DDP destination (including all charges for packing, hauling, storage, insurance and transportation). Sales and use taxes not subject to exemption shall be separately stated on Seller's invoice. The goods shall be shipped by Seller in accordance with Buyer's instructions or, in the absence of such instructions, in accordance with good commercial practice to insure that no damage will result from weather, transportation or handling and that the goods shall be free from pests and contaminates of any sort.

3.  **Competitive Price:** Seller warrants that the prices provided for herein are as low as any net price now given by Seller to any other customer for like goods and/or service in similar quantities and agrees that if, during the term of this Order, lower net prices are quoted by Seller to any third party for a similar quantity of similar goods or services, such lower net price shall be from that time substituted for the prices contained herein. If, during the term of this Order, Buyer is able to purchase goods or services of the quality and in a quantity not more than herein specified and upon like terms and conditions at a price lower than stated herein, Seller, upon receipt of satisfactory written evidence of same, shall, at its option, either meet such lower price or permit Buyer to purchase the undelivered portion hereunder from such vendor at such lower price. The quantity so purchased by Buyer from such other vendor shall be deducted from the quantity covered by this Order. All changes to unit pricing should be *prospective (for goods not yet dispatched)* vs. retroactive, to avoid the need for value reconciliation with customs on imported goods.

4.  **Payment:** Unless otherwise provided on the face of the purchase order that constitutes a part of this Order, payment by Buyer of undisputed invoices will be made to Seller in U.S. dollars within 45 days after Buyer's receipt of such invoice at its address set forth on such purchase order.

5.  **Overshipments and Undershipments:** Overshipments and undershipments of goods not approved by Buyer in writing may be returned by Buyer, at Buyer's sole discretion. All such returns shall be at Seller's risk and expense or held by Buyer at Seller's risk and expense, and Buyer shall not be obligated to pay for such overshipments or undershipments of goods. A shipment will not be considered an overshipment or undershipment if it is within 2% of the total quantity ordered hereunder.

6.  **Warranty:** Seller makes all warranties contained in the Uniform Commercial Code. Further, Seller warrants that the goods delivered or services performed:

GENCO-SC-LF-1009   Rev 01                FedEx Supply 000031

(a) shall (i) be merchantable, (ii) conform to this Order, to specifications, drawings and other descriptions referenced in this Order, and to any accepted samples, (iii) be free from defects in design and materials unless such design or materials were supplied by Buyer, (iv) be free from defects in workmanship, and (v) be fit and safe for the intended purposes; (b) shall comply with all federal, state and local laws and regulations applicable thereto;

(c) will not infringe on any United States or foreign patent, trademark, copyright or other intellectual property right of any third party; and

(d) will be free and clear of all liens, encumbrances, security interests and other claims.

**7.   Inspections; Testing; Rejection:**  All goods and services purchased under this Order are subject to Buyer's inspection, testing and acceptance at Buyer's destinations.  Buyer reserves the right to reject, refuse acceptance of, or revoke acceptance of any nonconforming goods or services.  Buyer shall be allowed a reasonable period of time (but not less than thirty (30) days) to inspect the goods or services and to notify Seller of any non-conformance with this Order.  Payment for any goods or services under this Order shall not be deemed acceptance of such goods or services.  Rejected goods may be returned to Seller or held by Buyer for replacement of such rejected or returned goods, in either event, at Seller's risk and expense.  No rejected or returned goods shall be replaced without Buyer's written approval.  Upon Buyer's request, if Seller fails to promptly replace or correct any returned or rejected goods or services to Buyer's satisfaction, Buyer may purchase such goods or services from another source and Seller shall be liable to Buyer for any additional costs thereby incurred by Buyer.

**8.   Recall:**  In the event that a recall of the goods or other corrective action with respect to goods or services is necessitated by a defect, a failure to conform to the specifications, applicable laws, or any other reason within Seller's control and not due to Buyer's negligent act or omission, Seller shall bear all costs and expenses of such recall or corrective action including, without limitation, costs of notifying customers, customer refunds, costs of returning goods, and other third party expenses.

**9.   Compliance with Laws:**  Seller certifies, represents and warrants that it shall:

(a) comply with all international, federal, state and local laws and regulations applicable to its operations including, but not limited to, (i) those dealing with employee health and safety, employment opportunity and affirmative action, (ii) those relating to the use, storage, handing and disposal of hazardous substances and the protection of the environment, (iii)  those prohibiting any form of child labor or other exploitation of children, and (iv) the Foreign Corrupt Practices Act;

(b) comply with all terms of 48 C.F.R §52.244-6 (Subcontract for Commercial Items and Commercial Components) (including the requirement of including this provision in subcontracts awarded under this contract), and 15 U.S.C. §637 (d)(2) and (3) (Utilization of Small Business Concerns), and such provision is herby incorporated into this Order as fully set forth herein;

(c) in accordance with the provisions of 48 C.F.R §52.209-6, certify that neither it nor its principals was or is debarred or suspended, or is the subject of proposed debarment by the federal government;

(d) not employ forced, slave, or convict labor or other exploitive forced labor practices; and

(e) comply with the export/import laws and restrictions of the United States and all applicable foreign jurisdictions.

**10. Indemnification:**  Seller shall defend, indemnify and hold Buyer and its affiliates and their respective successors, assigns, officers, directors and employees harmless with respect to all claims, liabilities, damages, losses and expenses (including reasonable attorney's fees) related to, caused by, or arising from (a) the goods' or services' actual or alleged patent, copyright or trademark infringement or violation of other third party proprietary rights,(b) the purchase or sales or use of the goods or services covered by this Order, (c) Seller's breach of any provision of this Order including breach of warranty or failure to deliver the goods or services on a timely basis, or (d) Seller's actual or alleged negligent or willful acts or omissions; except to the extent such claims, liabilities, damages, losses

or expenses are actually attributable to the negligent or willful acts or omissions of Buyer.  If Buyer is enjoined from the use of goods, Seller shall, at Buyer's option, either procure for Buyer the right to continue using the goods, replace the goods with substantially equivalent goods, modify the goods so as to be usable by Buyer, or repurchase the goods at the price set forth in this Order.  This provision shall survive termination of this Order.

**11.  Risk of Loss:**  Risk of loss or damage to the goods shall be, if for a domestic (U.S.) order, on Seller until the goods have been delivered to and accepted by Buyer.  Risk of loss or damage to the goods shall be, if for a foreign (non-U.S.) order, on Buyer from the place of origin.

**12.  Property Furnished to Seller/Confidentiality:**  Seller shall not use, reproduce, appropriate for or disclose to anyone other than Buyer, any goods, equipment, tooling, dies, drawings, processes, know-how, concepts, ideas, data, designs, or other proprietary information furnished by Buyer or for which Seller has been reimbursed by Buyer ("Material"), nor shall Seller use the same to manufacture goods or provide services other than as required hereunder without Buyer's prior written approval.  Title to all Material shall remain with Buyer at all times and where practicable, Material in tangible form shall be clearly marked or tagged to indicate Buyer's ownership.  Seller shall bear the risk of loss or damage to the Material until it is returned to Buyer.  All Material in tangible form shall be returned to Buyer upon termination or completion of this Order unless directed by Buyer.  Seller shall maintain Material in at least the same condition as it was in at the time that it came into Seller's possession, ordinary wear and tear excepted.  Material will be kept free and clear of all liens, encumbrances, security interests and other claims (except any created through Buyer) and will be deemed to be subject to a bailment.  This provision shall survive termination of this Order.

**13.  Notice of Labor Dispute:**  Whenever an actual or potential labor dispute delays or threatens to delay the timely performance of this Order, Seller shall immediately give notice thereof, including all relevant information with respect thereto, to Buyer.

**14.  Termination:**  In addition to any other remedy provided for hereunder or at law or in equity, Buyer may terminate this Order, in whole or in part, without liability to Buyer,

(a)  if Seller breaches or threatens to breach any term or condition of this Order and Seller does not cure such breach or provide adequate assurance of its performance within ten days of Buyer's request,

(b)  upon written notice to Seller if (i) deliveries are not made at the time or in the quantities specified in this Order or (ii) Buyer receives notice from Seller of its inability to perform hereunder due to a force majeure event (see Section 24), or

(c)  at any time for its convenience on 30 days' written notice to Seller.

Upon receipt of such notice Seller shall, to the extent specified in such notice, stop work under this Order (by itself and permitted subcontractors).  Seller's sole compensation for such termination shall be payment by Buyer for all goods and services delivered to Buyer pursuant to this Order prior to the effective date of the termination and accepted by Buyer pursuant to this Order.

**15.  Limitation of Liability:**  In no event shall either party be liable to the other party for any special, incidental, consequential or punitive damages arising out of this Order, except to the extent such damages are sought by a third party and are the subject of indemnification pursuant to Section 10.

**16.  Set-Off:**  Without limiting Buyer's rights under the law or in equity, Buyer may exercise a right of set-off against Seller for any and all amounts due to Seller by Buyer including, but not limited to, amounts under this Order or a subsequent Order.

**17.  Assignment, Subcontracting:**  Seller shall not delegate any duties, assign this Order (including, without limitation, the right to receive payment) or subcontract any portion of this Order without Buyer's prior written consent (which may be withheld in Buyer's sole discretion).  This Order shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**18.** **Controlling Law:** The validity and interpretation of this Order shall be governed by the law of the state shown in Buyer's address on the face of this Order, excluding its conflicts of law provisions. The application of the United Nations Convention on Contracts for the International Sales of Goods (1980) is excluded.

**19.** **Incorporation of Equal Opportunity Clauses:**   It is the policy of Buyer to administer all actions and procedures without regard to race, color, religion, sex, national origin, disability, or other characteristics protected by law. Because Buyer or its affiliated entities perform work for the federal government, Buyer is required by law to incorporate the following equal employment opportunity provisions into this Order. The provisions outlined below do not mandate absolute compliance with the referenced executive orders, statutes and regulations, but instead apply only to Seller to the extent applicable under the applicable law. If the value of this Order is $10,000 ($100,000 in the case of clause (b)) or more, then:

(a) *Equal Opportunity Clause under Executive Order 11246.* The equal opportunity clause set forth in 41 CFR §60-1.4(a) is incorporated by reference unless exempt under the provisions 41 CFR §60-1.5;

(b) *Equal Opportunity for Disabled Veterans, Recently Separated Veterans, Armed Forces Service Medal Veterans, and Other Protected Veterans.* The equal opportunity clause set forth in 41 CFR §60-250.5(a) is incorporated by reference unless exempt under the provisions 41 CFR §60-250.4;

(c) *Equal Opportunity for Workers With Disabilities.* The equal opportunity clause set forth in 41 CFR §60-741.5(a) is incorporated by reference unless exempt under the provisions of 41 CFR §60-741.4; and

(d) *Employee Notice Clause under Executive Order 13496.* The employee notice clause set forth in 29 CFR §471, appendix A to Subpart A is incorporated by reference unless exempt under the provisions of 29 CFR §471.3-4.

**20.** **General:**

(a) No modification to, or change in, or departure from, or waiver of, the provisions of this Order shall be valid or binding unless approved in writing by a proper representative of Buyer.

(b) No waiver of breach of any provision of this Order shall constitute a waiver of any subsequent breach of such provision or any breach of any other provision hereof.

(c) If any provisions of this Order, or portion of any provision, is declared or found to be unenforceable, the balance of this Order and such provision or portion thereof shall be interpreted and enforced to the greatest extent possible.

(d) The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. Neither party hereto, nor its respective counsel, shall be deemed the drafter of this Order, and all provisions of this Order shall be construed in accordance with their fair meaning, and not strictly for or against either party. (e) The rights, remedies, powers and privileges provided in this Order are cumulative and not exclusive of any rights, remedies, powers and privileges provided by applicable law.

(e) If any legal proceeding is necessary to enforce or interpret the terms of this Order, or to recover damages or seek equitable relief for breach thereof, the prevailing party shall be entitled to reasonable attorney's fees, as well as costs and disbursements, in addition to any other relief to which such party may be entitled.

**21.** **Import Control:** Seller shall provide necessary import documents in the manner required by United States Customs and Border Protection ("Customs") and by Buyer for classification, valuation, recording and compliance. In addition to all of the Customs requirements that must be met,

(a) invoices must be in English; quantities stated must be accurate; the value of goods stated in the invoice must be complete and accurate; the amount invoiced must be final with no adjustments after shipment and must equal the true "demand for payment" amount (excluding assist values, for Customs purposes only);

(b) all goods must be marked with the country of origin (e.g., "Made in France"), immediate packaging must be marked with the same country of origin, and the invoice must state the country of origin for each line item and must match the marking on the goods; and

(c) the packing list must be placed in an envelope attached to each container.

**22. Export Control:** Seller shall control the disclosures of and access to technical data, information and other items received under this Order in accordance with United States export control laws and regulations including, but not limited to, the International Traffic in Arms Regulations (ITAR) and the Export Administration Regulation (EAR).

**23. C-TPAT Requirements:** Seller acknowledges that Buyer is participating in the Customs Trade Partnership Against Terrorism program (C-TPAT") with Customs. For Seller's goods to be imported in the United States, Seller shall accept, implement, and comply with all applications, recommendations or requirements of C-TPAT (for information go to http://www.cbp.gov/xp/cgov/import/commercial_enforcement/ctpat/). At Buyer's or the Customs Service's request, Seller shall certify in writing its acceptance, implementation, and compliance with C-TPAT and any corresponding recommendations and guidelines. Seller grants Buyer a right of on-site inspection at the factory or other facilities used to produce or otherwise prepare goods as necessary in order to comply with the provisions of C-TPAT.

**24. Product and Chemical Compliance:**

(a) Buyer reserves the right to request 100% disclosure of material and chemical composition as necessary to meet customer and regulatory reporting requirements. (b) Seller is required to provide product material content reports through the International Material Data System (IMDS) or other means identified by Buyer for all goods sold to Buyer.

(b) Seller is required to provide Buyer with Material Safety Data Sheets (MSDS) for all supplied hazardous substances or products containing hazardous substances, as defined under 29 CFR §1910.1200 and other applicable regulations.

(c) Seller is required to meet any International Standards for Phytosanitary Measures (ISPM) No. 15 requirements as to any packaging used in any phase of shipment of the products.

**25. Force Majeure:** Neither party shall be liable for failure to perform any of its obligations hereunder to the extent that such failure is due to causes beyond such party's reasonable control (and not due to labor problems or such party's negligence or financial difficulties) including, without limitation, acts of God, fire, flood, storm, national emergency or war, provided that the effected party gives the other party prompt notice of the commencement of the occurrence that caused the failure and shall use commercially reasonable efforts to correct the failure if possible.

**26. Insurance:** Seller shall obtain and keep in force a policy of commercial general liability insurance protecting Buyer and Seller against claims for bodily injury, personal injury and property damage. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence and not less than $1,000,000 in the aggregate. Seller shall also obtain and keep in force workers compensation insurance in the amount required by applicable statutory law. Upon request, Seller shall cause to be delivered to Buyer certificates evidencing the existence and amount of such insurance and naming Buyer as an additional insured under the liability insurance. All insurance shall be primary to and not contributory with any similar insurance carried by Buyer, whose insurance shall be considered excess insurance only. All insurance shall be with reputable, financial sound companies. Providing the required insurance shall in no way relieve Seller of its obligation to indemnify Buyer pursuant to Section 10.

**27. Relationship of the Parties:** Seller is an independent contractor and this Order shall not be construed to constitute Seller the partner, agent or legal representative of Buyer for any purpose whatsoever. Seller is not granted any right or authority to assume or create any obligation or liability, express or implied, on behalf of or in the name

of Buyer or to bind Buyer in any manner whatsoever.

**28. <u>Buyer's Name and Trademark</u>:**  Seller, without Buyer's prior written consent (which may be withheld in Buyer's sole discretion), will not in any manner (a) publish or disclose the fact that Seller has furnished or contracted to furnish goods and/or services to Buyer or (b) use Buyer's name or trademarks in any publication, advertisement or other public forum, except where such use publication or disclosure is required by applicable law.

**29. <u>Work Made for Hire</u>:**  All data, materials, documentation, computer programs, inventions (whether or not patentable), pictures, audio, video, artistic works, and all works of authorship (including all worldwide rights therein under patent, copyright, trade secret confidential information, or other proprietary rights) created or developed by Seller in connection with providing goods or services to Buyer shall be considered work made for hire by Seller and shall be owned by Buyer.  Seller will take any action reasonably necessary to transfer to Buyer, and perfect Buyer's ownership of, the foregoing.  Notwithstanding the foregoing, to the extent that Seller uses any Seller or third party routines, code or development tools that are not a substitute or replacement of the actual goods or services provided to Buyer (collectively, the "Tools"), then Seller or Seller's third party licensors shall retain ownership of such Tools. In addition, Seller or such third party licensors shall retain ownership of any preexisting materials that are contained in any such goods or services and that are specifically identified in writing by Seller prior to delivery to Buyer ("Preexisting Materials").  With respect to the Tools and the Preexisting Materials contained in any goods or services provided to Buyer, Seller grants to Buyer an irrevocable, nonexclusive, worldwide, fully paid, royalty free license to (i) use and distribute (internally or externally) copies of, and prepare derivative works based upon, the Tools and Preexisting Materials and derivative works thereof, and (ii) authorize others to do any of the foregoing.

ATC Logistics & Electronics, Inc.                    LMEG Wireless LLC

By: _____       By: _____
Name: _____       Name: _____Levi Wilhelm_____
Title: _____       Title: _____COO_____
Date: _____       Date: _____8/13/15_____